**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | CASE NO. 12-MD-02311 HON. MARIANNE O. BATTANI |
| In Re: BEARINGS CASES | |
| THIS RELATES TO:  DIRECT PURCHASER ACTIONS | 2:12-cv-00501-MOB-MKM |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Plaintiffs DALC Gear & Bearing Supply Corp., McGuire Bearing Company, and Sherman Bearings Inc., individually and on behalf of the Class of direct purchasers described below, bring this action against Defendants for damages and injunctive relief under the antitrust laws of the United States and upon information and belief, hereby allege as follows:

**SUMMARY OF THE CASE**

1.     Defendants are manufacturers and suppliers of automotive and industrial machinery bearings ("Bearings") sold in the United States.  Plaintiffs allege that Defendants conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Bearings sold in the United States from January 1, 2004 through the present.  Plaintiffs further allege that they could not have discovered, and did not discover, Defendants' conspiracy at a time earlier than July 2011, and that Defendants fraudulently concealed their conspiracy.

2.     Plaintiffs bring this lawsuit as a class action on behalf of direct purchasers who, during the Class Period, purchased Bearings in the United States from one or more of the Defendants.  This action is brought under Section 1 of the Sherman Act to enjoin Defendants' anticompetitive conduct and recover damages suffered by the Class.

3.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the proposed Class (as defined below) paid higher prices for Bearings than they would have paid in a competitive market, and therefore have suffered injury to their business and property.

## JURISDICTION AND VENUE

4.     Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violation of the Sherman Act, 15 U.S.C. § 1.

5.     The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. § 15 and 26, and 28 U.S.C. § 1331 and 1337. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in this District.

6.     This Court has personal jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership or control of its United States subsidiaries: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Bearings throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants conduct business throughout the United

States, including in this District, and they have purposefully availed themselves of the laws of the United States.

7.      Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

8.      By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court.   Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

<u>**DEFINITIONS**</u>

9.      The term "Class Period," as used in this complaint, refers to the time period from January 1, 2004 through the present.

10.     The term "Bearings," as used in this complaint, refers to both automotive and industrial machinery bearings.  Examples include, but are not limited to, the following products: ball bearings, tapered roller bearings, roller bearings, and mounted bearings.

11.     The term "Defendant" or "Defendants," as used in this complaint, refers to, in addition to those named specifically above, all of the named Defendants' predecessors, including Bearings manufacturers merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold Bearings directly to purchasers in the United States during the Class Period.

12.     References made herein to any corporation include any predecessors, successors, parents, subsidiaries, affiliates and divisions of that corporation.

## TRADE AND COMMERCE

13.     During the Class Period, each Defendant sold Bearings in the United States in a continuous and uninterrupted flow of interstate commerce.

14.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## PARTIES

*Plaintiffs*

15.     Plaintiff DALC Gear & Bearing Supply Corp. is a New York corporation with its principal place of business located in Brewster, New York.  Plaintiff purchased Bearings directly from one or more of the Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

16.     Plaintiff McGuire Bearing Company is an Oregon corporation with its principal place of business in Portland, Oregon.  Plaintiff purchased Bearings directly from one or more of the Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

17.     Plaintiff Sherman Bearings Inc. is a Texas corporation with its principal place of business in Houston, Texas.  Plaintiff purchased Bearings directly from one or more of the Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

*Defendants*

18.     Defendant JTEKT Corporation ("JTEKT") is a Japanese corporation with its principal place of business in Osaka, Japan.  Defendant JTEKT – directly or through its

subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold Bearings that were purchased in the United States, including in this District, during the Class Period.

19.     Defendant Koyo Corporation of U.S.A. ("Koyo") is a South Carolina corporation with its principal place of business in Westlake, Ohio.  It is a subsidiary of, and wholly-owned or controlled by, its parent, JTEKT.  Defendant Koyo sold Bearings that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of JTEKT.

20.     Defendant Nachi-Fujikoshi Corp. ("Nachi-Fujikoshi") is a Japanese corporation with its principal place of business in Toyama, Japan.  Defendant Nachi-Fujikoshi – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold Bearings that were purchased in the United States, including in this District, during the Class Period.

21.     Defendant Nachi America Inc. ("Nachi America") is an Indiana corporation with its principal place of business in Greenwood, Indiana.  It is a subsidiary of, and wholly-owned or controlled by, its parent, Nachi-Fujikoshi.  Defendant Nachi America sold Bearings that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Nachi-Fujikoshi.

22.     Defendant NSK Ltd. ("NSK") is a Japanese corporation with its principal place of business in Tokyo, Japan.  Defendant NSK – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold Bearings that were purchased in the United States, including in this District, during the Class Period.

- 5 -

23.     Defendant NSK Americas, Inc. ("NSK Americas") is a Delaware corporation with its principal place of business in Ann Arbor, Michigan.  It is a subsidiary of, and wholly-owned or controlled by, its parent, NSK.  Defendant NSK Americas sold Bearings that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of NSK.

24.     Defendant Schaeffler AG is a German corporation with its principal place of business in Herzogenaurach, Germany.  Defendant Schaeffler AG – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold Bearings that were purchased in the United States, including in this District, during the Class Period.

25.     Defendant Schaeffler Group USA Inc. ("Schaeffler Group USA") is a Delaware corporation with its principal place of business in Fort Mill, South Carolina.  It is a subsidiary of, and wholly-owned or controlled by, its parent, Schaeffler AG.  Defendant Schaeffler Group USA sold Bearings that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Schaeffler AG.

26.     Defendant AB SKF ("SKF") is a Swedish corporation with its principal place of business in Göteborg, Sweden.  According to its website, "[t]wenty-eight of SKF's 140 global manufacturing sites are located in the U.S. including facilities for the production of…roller bearings."  U.S. sites include but are not limited to Plymouth, Michigan and Highland Heights, Ohio.  Defendant SKF – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold Bearings that were purchased in the United States, including in this District, during the Class Period.

27.     Defendant NTN Corporation ("NTN") is a Japanese corporation with its principal place of business in Osaka, Japan.  Defendant NTN – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed or sold Bearings that were purchased in the United States, including in this District, during the Class Period.

28.     Defendant NTN USA Corporation ("NTN USA") is a Delaware corporation with its principal place of business in Mount Prospect, Illinois.  It is a subsidiary of, and wholly-owned or controlled by, its parent, NTN Corporation.  Defendant NTN USA sold Bearings that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of NTN.

29.     To the extent that subsidiaries, divisions and other affiliates within Defendants' corporate families sold Bearings, these related entities played a material role in the conspiracy alleged in this complaint because Defendants wished to ensure that the prices paid for such Bearings would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein.  Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing or collecting monies from Plaintiffs and the members of the Class was, authorized, ordered, known to and approved by their respective corporate parent named as a Defendant in this complaint.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

30.     The acts alleged in this complaint to have been done by Koyo Corporation of U.S.A., Nachi America Inc., NSK Americas, Inc., Schaeffler Group USA Inc., and NTN USA Corporation were authorized, ordered, and condoned by their parent companies and the acts alleged to have been done by JTEKT, Nachi-Fujikoshi, NSK, Schaeffler AG, SKF, and NTN

were authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of the Defendants' business affairs.

31.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this complaint.

32.     Each Defendant acted as the agent or joint venturer of or for other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this action both on behalf of itself and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3).  The Class is defined as follows:

> All individuals and entities that purchased Bearings in the United States directly from one or more Defendants or their co-conspirators (or their controlled subsidiaries, affiliates, or joint ventures) from January 1, 2004 through the present.

34.     Plaintiffs do not know the exact number of Class members, such information being in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

35.     There are questions of law or fact common to the class, including but not limited to the following:

a.      Whether Defendants engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize prices of Bearings sold in the United States;

b.      The identity of the participants of the alleged conspiracy;

c.      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.      Whether the alleged conspiracy violated the Section 1 of the Sherman Act;

e.      Whether the contract, combination, or conspiracy caused Bearings prices to be higher than they would have been in the absence of Defendants' conduct;

f.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the other Class members;

g.      Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and other Class members;

h.      Whether Plaintiffs and other Class members are entitled to injunctive relief and, if so, the nature and extent of such relief; and

i.      The appropriate class-wide measure of damages.

36.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

37.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly purchased Bearings from a Defendant, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiffs is common to the Class.

38.    Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of Bearings and have no conflict with any other members of the Class.  Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

39.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

40.    A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

41.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

42.    The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## INDUSTRY BACKGROUND

**Bearings Background and Market Size**

43.    Bearings are friction-reducing devices that allow one moving part to glide past another moving part.  Rolling bearings include both ball bearings and roller bearings.

44.    Ball bearings, also known as anti-friction bearings, are the most common type of bearing and are small metallic or ceramic spheres used to reduce friction between axles and shafts in numerous applications.  Ball bearings are commonly found in fans, roller blades, wheel bearings, and under hood applications on cars.  (*See* Figure 1.)



Figure 1

45.     Roller bearings, unlike ball bearings, use various shapes other than spheres. Therefore, the load is spread over a larger area enabling the bearing to handle greater loads than ball bearings.   Roller bearings include spherical roller bearings, needle roller bearings, cylindrical roller bearings, thrust roller bearings, and tapered roller bearings.

46.     Tapered roller bearings are the second most popular bearing type, with only deep groove ball bearings more common.   Tapered roller bearings are generally found in heavy industrial, truck and wheel applications with combined radial and axial loads.   Some examples are manual transmissions, gearboxes, power generation and other process equipment.   These bearings use conical rollers that run on conical races.   Due to manufacturing complexities, tapered roller bearings are generally more expensive than ball bearings.  (*See* Figure 2.)



Figure 2

47.     Sales of Bearings in the U.S. totaled approximately $7.1 billion in 2008 and approximately $8.5 billion in 2012.  The automotive industry has been the primary user of tapered roller bearings and ball bearings.

48.     Defendants and their co-conspirators manufactured Bearings: (a) in the United States for installation in vehicles and industrial machinery manufactured and sold in the United States and (b) abroad for export to the United States and installation in vehicles and industrial machinery sold in the United States.

**The Bearings Industry**

49.     The structure of the Bearings market makes it particularly conducive to price fixing and market allocation.  The Bearings market exhibits many of the qualities that facilitate collusion, including: (1) substantial barriers to entry (2) high, and increasing, market concentration; (3) inelastic demand; (4) homogeneous or commoditized products; (5) excess capacity, and (6) opportunities to conspire.  Together, these characteristics vastly increased the feasibility of anticompetitive conduct in the Bearings market.

50.     There are substantial barriers to entry in the market for Bearings.  A new entrant into this market faces significant startup costs which include investments in plants, machinery, distribution infrastructure, a skilled labor and sales force, and research and development.  The strong pre-existing relationships between market players create an additional deterrent to potential new entrants.  Moreover, the minimum efficient scale for Bearings production is large and increasing, thereby discouraging new entrants into the market.

51.     The Bearings industry has become highly concentrated.  For the past decade the number of firms has been steadily decreasing and market share is continually shifting towards the Bearings industry's largest participants.

52.     In 2011, Defendants JTEKT, Koyo, Nachi-Fujikoshi, Nachi America, NSK, NSK Americas, Schaeffler AG, SKF, NTN, and NTN USA together had a global market share exceeding 60%.

53.     A majority of ball bearings products are standardized, meaning that the design and function of most bearings products can be produced by any of the Defendants.  One of the most important determinants in the purchase of Bearings is price.

54.     In fact, Defendants routinely purchase bearings from each other to meet customer demand.

55.     Throughout the Class Period, Defendants' annual sales in the United States totaled several billion dollars, comprising much of the total U.S. sales during the same period.

56.     The demand for Bearings is highly inelastic because there are no close substitutes. In a market where demand is inelastic, collusion is facilitated as consumers cannot substitute products.  Thus, producers can raise prices to supra-competitive levels and increase profits.   In a market where demand is inelastic, purchasers are forced to pay these supra-competitive prices.

- 13 -

57.     Because Bearings are essential components in the manufacturing and transportation markets, Class Members were forced to purchase these products at supra-competitive prices throughout the Class Period.

58.     As more fully set out in paragraphs 97 through 105, Defendants had many opportunities to collude, including high level agreements between Defendants to supply each other with lines of Bearings, at industry or trade meetings, distributor-organized events, and false industry-wide campaigns.

59.     During the Class Period, contraction in demand and consolidation in the Bearings industry led to an overabundance of production capacity.  Excess capacity for production indicates that a market is susceptible to collusive anticompetitive behavior.

## DEFENDANTS' ANTITRUST CONSPIRACY

### Government Investigations

60.     Globally-coordinated antitrust investigations are taking place in the United States, Japan, Europe, Australia, Canada, and Singapore regarding industrial and automotive Bearings. There has not only been an investigation in Japan, but also a successful amnesty applicant, criminal prosecution, and guilty verdicts against two of the Defendants there.  Canada's investigation has so far led to the filing of a criminal action against JTEKT, which has pleaded guilty.

### Japan Investigation and Convictions

61.     The Japan Fair Trade Commission ("JFTC") launched an investigation in July 2011 after Defendant JTEKT sought leniency by alerting the regulatory agency of the Bearings conspiracy.  Japan's leniency program grants full immunity from prosecution to the applicant if it admits its participation in the cartel and provides the JFTC with the relevant information

detailing the anticompetitive violation.  Because of its admission and cooperation, JTEKT was not prosecuted criminally by the JFTC.

62.     On July 26 and 27, 2011, the JFTC conducted on-site inspections of Defendants NSK, NTN, JTEKT and Nachi-Fujikoshi amid suspicions that the companies violated Japan's anti-monopoly law in relation to their sales of Bearings.

63.     NTN confirmed in its 2012 Financial Report that in July 2011, the Company underwent an on-site inspection by the JFTC, on suspicion that the Company had decided to raise sale prices of bearings in cooperation with other manufacturers, and further reported that in April of 2012 a search was conducted by special investigators from Tokyo District Public Prosecutor's Office and the JFTC.

64.     In its 2012 Annual Report, NSK confirmed that its "headquarters and relevant sales branches of NSK were investigated on July 26 and 27, 2011, by the JFTC in relation to the Japan Antimonopoly Act regarding the sales of bearings of NSK."

65.     On April 20, 2012, the Special Investigation Department of the Tokyo District Public Prosecutors Office and the JFTC raided NSK facilities regarding a potential violation of the Antimonopoly Act of Japan ("AMA").

66.     On May 18, 2012, the Japan Times reported that certain NTN officials have made statements admitting their participation in the Bearings price-fixing conspiracy during voluntary questioning by Japanese prosecutors.  This article also noted that officials of NSK, JTEKT and Nachi-Fujikoshi had already admitted to their roles in the conspiracy.

67.     As a result of these raids and its investigation, on June 14, 2012, the JFTC filed a criminal accusation with the Public Prosecutor General against Defendants NSK, NTN and Nachi-Fujikoshi and seven individuals engaged in the sale of Bearings for violating Japan's

- 15 -

AMA.  The JFTC alleged that "these companies, as for the products at issue, in cooperation with one another, contrary to the public interest, substantially restrained competition in the field of trade on sales for the product at issue by mutually restricting their business activities." According to the article that appeared in the Japan Times on June 15, 2012 reporting these charges, the three companies have raised bearings prices five times since 2004 and the JFTC believes that these price increases were the result of cartel activity.

68.     On December 28, 2012, the Tokyo District Court found Defendant Nachi-Fujikoshi and two former officials guilty of participating in a price-fixing cartel to increase the prices of industrial machinery bearings in violation of Japan's antimonopoly laws.  Keiichi Ogino, a former member of the board of directors, was sentenced to fourteen months in prison and suspended for three years, and Michio Murai, a former deputy chief of the bearings division, was sentenced to twelve months and also suspended for three years.  The Tokyo District Court also issued a 180 million yen (U.S. $2 million) criminal fine against Nachi-Fujikoshi.

69.     The Court found that Defendants NSK, NTN, JTEKT and Nachi-Fujikoshi:

[M]et during the end of May 2010 and August 2010 in the Tokyo Bay area at the "E Hall" and other places and through their subsidiary companies and agents negotiated higher prices for ball bearings (excluding miniature ball bearings) used in industrial machinery (excluding cars and car parts) (hereinafter, the "Industrial Bearings").  Acting in cooperation and with the purpose of raising prices, the Four Defendant Companies held meetings and conferences.  On or after July 1, 2010, the Four Defendant Companies raised prices of regular ball bearings by 8 percentage points and large ball bearings by 10 percentage points, citing an increase in steel prices.  The result of this price increase is increased prices for industrial machinery and other industrial prices.  Employees from these Defendants, acting in concert, contacted sales areas and important customers to get their approvals for the price increases.  The result was restriction on market activity, a restraint on free competition and an adverse affect (*sic*) to the public welfare.

- 16 -

70.     Two months later, on February 25, 2013, the Tokyo District Court found Defendant NSK and three former executives guilty of participating in a price-fixing cartel for automotive and industrial machinery bearings.  Keisuke Takagawa and Katsumi Kuwabara, former senior vice presidents, were sentenced to fourteen months in prison, while Yoshi Nishiyama, a former head of the industrial machinery business division, was sentenced to twelve months.  The Tokyo District Court also issued a 380 million yen (approximately U.S. $4 million) criminal fine against NSK.

71.     On February 25, 2013, Nikkei Japan Business Newspaper reported that the presiding judge stated, "[t]he crime is malicious – large in scope and carried out systematically. Having the largest market share, NSK carried out the central role in this cartel."

72.     On the same day, Defendant NSK President and CEO Norio Otsuka issued a press release stating: "[w]e express our sincere regret for the concern this matter has caused our shareholders, customers, and other stakeholders.  NSK regards the situation with the utmost gravity and will take comprehensive measures to ensure strict compliance with all applicable laws and regulations during our corporate activities."

73.     On March 29, 2013, the JFTC issued cease and desist orders and surcharge payment orders to Defendants NTN, NSK, and Nachi-Fujikoshi for their involvement in a price-fixing conspiracy in connection with the sale of industrial machinery bearings and automotive bearings in violation of Article 3 of the AMA.  The JFTC fined NTN approximately 7.2 billion yen, NSK 5.6 billion yen, and Nachi-Fujikoshi 509 million yen (totaling approximately $142 million USD).  Defendant JTEKT admitted to its participation in a price-fixing conspiracy, but was not fined.  JTEKT provided information to the JFTC that led to the investigation after it applied to the leniency program in June 2011.

74.     On the same day, Defendant JTEKT President Shoji Ikawa stated that "we express our deepest regrets for the fact that the JFTC named JTEKT CORPORATION as one of the companies involved in conduct which violated the AMA.  We would like to take this opportunity to again offer our sincere apologies to all of our customers, shareholders and stakeholders for the concerns that this has caused."

75.     On April 1, 2013, Defendant NTN followed suit and issued a press release stating that "NTN sincerely regrets the great deal of concern caused to shareholders, customers and all relevant personnel by this matter notwithstanding the fact that NTN has been committed to complying with the laws and regulations."

76.     As of August 21, 2013, the trial against NTN and its two former officers has yet to start.

**United States**

77.     The United States Department of Justice ("DOJ") is also conducting an investigation into the Bearings industry.

78.     In its 2012 Final Report, NTN stated: "[I]n November 2011 our United States consolidated subsidiary received a subpoena from the United States Department of Justice requesting the submission of information related to transactions in bearings."

79.     In its 2011 Annual Report, Schaeffler similarly reported that it was a subject of the DOJ's Bearings antitrust investigation.

80.     In its 2012 Annual Report, NSK stated that on November 9, 2011, its subsidiary in the U.S. received from the DOJ a subpoena, which requested that it provide information regarding sales of Bearings.

81. In its 2012 Annual Report, SKF stated that it was being investigated by the DOJ and other government agencies "regarding a possible violation of antitrust rules."

82. On July 8, 2013, the United States of America, through the Antitrust Division of the United States Department of Justice ("the Antitrust Division" or "the Division"), submitted its Motion to Intervene and for a Temporary and Limited Stay of Certain Discovery in all matters in *In re Automotive Parts Antitrust Litigation*, including this matter. In its motion, the Antitrust Division requests a temporary and limited stay of certain discovery for a period of one year, arguing that the integrity of its ongoing criminal investigation into the automotive parts industry and any resulting criminal prosecutions resulting from that investigation may be seriously compromised if the Court does not enter a temporary and limited stay of certain discovery in these consolidated civil cases, including certain document discovery and depositions involving the merits. In support of this Motion, the Division filed the Declaration of Mark Grundvig under seal, as it contains detailed information regarding the Division's investigation and the grand jury investigation into the auto parts industry.

**European Commission**

83. This global antitrust investigation originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC"). Throughout 2010 and 2011, the EC executed surprise raids as the European offices of certain Defendants as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts, including Bearings.

84. Subsequently, on November 8, 2011, the EC announced that it had made unannounced inspections at the premises of companies that manufacture Bearings over concerns

that these companies may have violated antitrust rules.  Defendants SKF and Schaeffler have admitted that their facilities were raided by European Union regulators.

85.     A number of Defendants have acknowledged that they are subjects of the Bearings investigations.  JTEKT has admitted that the EC is investigating its Dutch unit as part of the EC's Bearings antitrust investigation.

86.     In its 2012 Annual Report, NSK stated that its sales subsidiary in Germany was inspected on November 8, 2011, by the EC in relation to EU competition law regarding the sales of Bearings.

87.     Likewise, in its 2011 Annual Report, AB SKF explained that, along with other companies in the Bearing industry, it is "part of an investigation by the European Commission regarding a possible violation of EU antitrust rules."  SKF has also acknowledged that EU officials have visited its Gothenburg, Sweden and Schweinfurt, Germany facilities.  SKF's 2012 Annual Report further stated that "[i]t is likely that the European Commission will impose a fine on SKF."

88.     Schaeffler AG's 2011 Annual Report also acknowledges the worldwide Bearings antitrust investigation, noting, "[t]he European Commission as well as the US Department of Justice have commenced antitrust investigations of various manufacturers of rolling bearings, including Schaeffler.  The European and the U.S. competition authorities are investigating whether manufacturers of rolling bearings participated in unlawful agreements and/or concerted practices concerning rolling or plain bearings."

89.     NTN reported in its 2012 Financial Report that: "[i]n November 2011, our European consolidated subsidiaries also received an on-site inspection by the European

Commission into transactions in bearings, on suspicion of noncompliance with the EU Competition Law."

90.     NTN's operations in France and Germany were also probed by the EC as part of its antitrust investigation into the automotive Bearings industry.

**Australia**

91.     On July 15, 2013, the Australian Competition and Consumer Commission ("ACCC") announced that it has instituted civil proceedings in the Federal Court against Koyo Australia Pty Ltd (Koyo), a subsidiary of JTEKT Corporation, for alleged cartel conduct relating to the supply of ball and roller bearings for use in motor vehicles and industrial applications. The ACCC alleges that in 2008 and 2009, Koyo and at least two of its competitors made and gave effect to two separate cartel arrangements for an increase to the price of Bearings to their aftermarket customers.

**Canada**

92.     On July 12, 2013, the Competition Bureau of Canada ("CBC") announced that JTEKT pleaded guilty to two counts of bid-rigging and was fined $5 million by the Superior Court of Quebec for its participation in an international bid-rigging cartel, making it the first party to plead guilty in relation to the investigation into automotive bearings.  JTEKT's plea relates to automotive wheel hub unit bearings supplied to Toyota Motor Corporation ("Toyota") and its North American affiliates between 2007 and 2013.

93.     On or about the same day, JTEKT and CBC filed a statement of admissions (the "Statement of Admissions") with the Superior Court Quebec which included an admission by JTEKT of the facts constituting an offence under Canada's Competition Act.  According to the Statement of Admissions, JTEKT secretly conspired with NSK to submit bids or tenders in

- 21 -

response to requests for quotations ("RFQs") to supply Toyota that were predetermined by agreement. These agreements were reached, at least in part, through direct communications between JTEKT sales management level personnel and their counterparts at NSK where the employees discussed, among other things, Toyota's RFQs and how to coordinate their respective responses to Toyota. These discussions resulted in an agreement whereby JTEKT would win certain RFQs while NSK would win others; both JTEKT and NSK submitted bids to Toyota in accordance with the agreement.

94. The CBC became aware of the Bearings cartel by way of its Immunity Program. Under this Immunity Program, the first party to disclose to the Bureau an offense not yet detected or to provide evidence leading to a referral of evidence to the Public Prosecution Service of Canada ("PPSC") may receive immunity from the PPSC, provided that it fully cooperates with the Bureau's investigation and any ensuing prosecution. Subsequent cooperating parties may receive lenient treatment under the CBC's Leniency Program. JTEKT participated in the CBC's Leniency Program and provided substantial assistance to the Bureau and the PPSC.

**Singapore**

95. On February 6, 2013, NSK Ltd.'s Singapore-based sales subsidiary received an on-the-spot inspection from the Competition Commission of Singapore.

96. Also on February 6, 2013, NTN issued a press release stating that its Singapore-based subsidiary underwent an on-site inspection by the Competition Commission of Singapore "to gather information about possible anti-competitive behaviors among certain bearing manufacturers."

**Korea**

97.     NTN reported in its 2012 Financial Report that: "[i]n July 2012, a consolidated subsidiary of the Company in South Korea underwent an on-site inspection from the Korea Fair Trade Commission on suspicion of a violation of the Monopoly Regulation and Fair Trade Act in connection with bearings business."

98.     Likewise, NSK's 2012 Annual Report stated: "in July 2012, the Korea Fair Trade Commission conducted an on-site investigation against NSK's Korean subsidiary regarding a potential violation of the Monopoly Regulations and Fair Trade Act of Korea in transactions involving bearings products."

99.     SKF's 2012 Annual Report also stated it was being investigated by the Korea Fair Trade Commission and other government agencies "regarding a possible violation of antitrust rules."

**Opportunities to Conspire**

100.     During the Class Period, Defendants and their co-conspirators had opportunities to meet and perform acts in furtherance of their conspiracy while attending industry events. Defendants and their co-conspirators had opportunities to meet privately at annual or semi-annual trade association meetings, including, but not limited to, the Association of Steel and Iron Engineers, the Bearings Specialties Association, the Small Motors Manufacturers Association, and the Electric Motor Repair Group.

101.     Defendants NSK, NTN, Schaeffler, Nachi-Fujikoshi, Koyo and SKF are six of the seven members of the World Bearing Association ("WBA"). The WBA, comprising the seven largest Bearings manufacturers in the world, was created in 2006. Its founding member

associations include the American Bearing Manufacturers Association, the Japanese Bearing Industrial Association and the Federation of European Bearing Manufacturers.

102. The WBA afforded these six defendants additional opportunities to engage in improper discussions and perform acts in furtherance of their price-fixing conspiracy. The WBA has been referred to as the "World Cartel of Bearing manufacturers" and in September 2011 was reportedly on the verge of "extinction." As of September 2011, the WBA was not registered, not incorporated, had no Articles of Association, had no record of any meetings and had not filed documents with any government department globally. The WBA no longer has a president, contact information, place of identification or postal address.

103. The WBA initiated a campaign, "Stop Fake Bearings," (found online at http://www.stopfakebearings.com) ostensibly to identify and prevent counterfeiting in the bearings industry. The WBA provided another avenue through which these Bearings manufacturers could conspire, as well as cover for their collusive activities.

104. Golf outings organized by distributors presented additional opportunities for employees of the defendant companies to conspire. It was not uncommon for the golf outings to draw more employees from bearings manufacturers than from distributors. Thus, manufacturers' employees had an opportunity to meet and were often paired together as part of the golf outing.

105. During such meetings or golf outings, Defendants and their co-conspirators had the opportunity to engage in private meetings, conversations and communications to discuss pricing and customer allocation for Bearings sold in the United States.

106. Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss pricing for Bearings sold in the United States.

107.    Defendants and their co-conspirators routinely produced and sold Bearings to each other.  For example, at times, a particular manufacturer would shut down a product line (*i.e.* cease production of a particular size or type of bearing) while maintaining the item on its price list.  If a customer ordered a product that was no longer being produced, the nonproducing manufacturer would purchase it from a competitor.   To facilitate such purchase and sales transactions, senior level employees, a General Manager or President of the Defendant manufacturer, would meet or communicate to discuss and finalize these arrangements. These transactions provided numerous additional opportunities for Defendants to collude on customer allocation and pricing structures in the U.S. Bearings market.

108.    The above referenced meetings, conversations, and communications provided ample opportunity for Defendants to coordinate pricing, sales, and market allocation with respect to Bearings sold in the United States.

**Pricing Data Supports Plaintiffs' Claims**

109.    There is substantial evidence that prices in the U.S. increased during the same period that the Japanese and other bearings manufacturers have admitted or were found to have conspired to raise bearings prices outside the U.S.  Government data confirm that ball and roller bearings prices in the U.S. increased substantially during the time period of the admitted conspiracy in Japan, particularly when compared to prior to the conspiracy.  And additional data sources confirm that prices of both Japanese exports of ball and roller bearings and U.S. imports from Japan of ball and roller bearings also increased substantially during the time period of the admitted conspiracy in Japan, particularly when compared to prior to the conspiracy.

110.    Price increases in Japan during the Class Period have been higher on average than before the Class Period.  Japanese roller bearing export prices increased at a higher rate during

the Class Period than before the Class Period.   Likewise, Japanese ball bearing export prices increased at a higher rate during the Class Period, than before the Class Period.

111.   U.S. government data on imports from Japan to the United States also demonstrate that the price of Japanese ball and tapered roller bearings (in U.S. dollars) increased more to U.S. customers during the Class Period than before the Class Period.

112.   The Producer Price Index (PPI) for ball and roller bearings also demonstrates prices increasing in the United State substantially more during the Class Period than before it. The aggregate data of ball and roller bearings demonstrates annual PPI increases from 1996 to 2003 of 1.18% while during the 2004 to 2012 time period, there were annual price increases of 3.97%.  The PPI pricing data for tapered roller bearings during the Class Period shows increases of 5.63% annually, compared with 0.95% annually for the eight years prior.

113.   The increase in bearings prices in the United States is also not explained by increased costs for bearings production during the Class Period, a fact which is also confirmed by U.S. government data.

**History of Collusion**

114.   According to sources, the JFTC said it "believes the culture of collusion is ingrained in the bearing industry."   In 1973, the JFTC similarly found that NSK, Koyo Seiko Co. (currently JTEKT), Nachi-Fujikoshi and NTN Toyo Bearing Co. (currently NTN) formed a cartel and held secret meetings at which they fixed bearings prices.  Through a significant portion of the 1980s, collusion on price and market division took place among NSK, Koyo Seiko Co., Nachi-Fujikoshi, and NTN Toyo Bearing Co.   In 2002, the French Conseil de la Concurrence (Competition Council) fined four bearings manufacturers €19 million for their participation in a price-fixing cartel that was active from 1993 through 1997.  The cartel included

- 26 -

three participants in the present Bearings price-fixing cartel, Defendants SKF, Schaeffler and NSK, and caused a cumulative increase in gross industry prices of bearings of 16.4%.

115.    In the mid 1980's, the Japanese Defendants regularly colluded to fix sale prices for bearings.  During this time the executives of the Japanese Defendants engaged in telephone conferences to discuss pricing for customers and markets.

116.    The Japanese Defendants had agreements not to compete for their customers. Their sales employees were not allowed to take customers from the other Japanese Defendants. If there was an issue about prices and customers, the supervisors of the Japanese Defendants would meet to determine who from their group would sell to a given customer and what price would be charged for the sale.

**THE U.S. BEARINGS MARKET**

117.    Defendants NTN, NSK, Nachi-Fujikoshi, and JTEKT on average export approximately 55% of their Bearings to the United States and Europe.  The United States imports 40% of its Bearings from Asia.  With the exception of NSK and SKF, Defendants derive the majority of their revenue from sales within the United States.

118.    Prices in the U.S. increased during the same period that the Japanese and other Bearings manufacturers have admitted to conspiring to raise Bearings prices outside the U.S.

119.    Throughout the Class Period, the U.S. subsidiaries of the Japanese Defendants were controlled by their foreign parents.   The control is either asserted directly through orders from Japanese executives or indirectly through the use of shadow management teams and Japanese expatriates who report directly to executives in Japan.  The control used by Japanese parent corporations over their subsidiaries ensured that pricing decisions that were issued in Japan were enforced in the U.S. Bearings market.

120.    For example, Nachi rotated in Japanese executives to fill top positions in the United States every 2-3 years. The Japanese parent, an admitted member of the price-fixing conspiracy, would implement U.S. price increases through these agents. Nachi America sometimes was forced to negotiate its pricing structure with the foreign parent.

121.    Similarly, NSK America and NTN each had complete shadow management structures to oversee sale of Bearings in the United States.    Defendants' and their co-conspirators' domestic pricing was also controlled by foreign parents where the foreign entity acted as supplier to the domestic subsidiary.  For example, JTEKT Corporation charged Koyo USA for Japanese-made Bearings, establishing a floor for domestic pricing.

## <u>FRAUDULENT CONCEALMENT</u>

122.    Defendants and their co-conspirators affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Class from at least January 1, 2004 through at least July 2011, when the antitrust investigations of Bearings manufacturers became public. During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to their claims, despite due diligence.  Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least July 2011.

123.    Defendants and their co-conspirators' successful contract, combination, or conspiracy was by its nature inherently self-concealing.

124.    Defendants and their co-conspirators represented publicly, both to customers and otherwise, that their pricing activities were unilateral.  In making those false representations, Defendants misled Plaintiffs and members of the Class as to the true, collusive, and coordinated nature of their price-fixing activities.

125.    Defendants and their co-conspirators' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

126.    In particular, Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss price-fixing and customer and market allocation that affected customers in the United States and elsewhere.

127.    During these secret meetings, conversations, and communications, Defendants and their co-conspirators agreed upon prices affecting customers in the United States and elsewhere.

128.    As a result of their secret coordinated actions, and unbeknownst to Plaintiffs and the Class, Defendants and their co-conspirators sold Bearings to purchasers in the United States at collusive and supra-competitive prices.

129.    Despite due diligence, Plaintiffs had no knowledge of Defendants and their co-conspirators' unlawful contract, combination, or conspiracy.

130.    Plaintiffs received pricing information from one or more of Defendants or their co-conspirators.  Plaintiffs had no way to know that these prices were higher than they should have been due to the conspiracy alleged herein.

131.    Plaintiffs did not and could not have discovered Defendants and their co-conspirators' unlawful contract, combination, or conspiracy at any earlier date, despite due diligence.  Defendants and their co-conspirators undertook affirmative acts of concealment of their contract, combination, or conspiracy, including their attendance at secret meetings, making misrepresentations to Plaintiffs and the Class of the reasons for the prices charged, and engaging in secret conversations concerning the price-fixing of Bearings.

132.     Specifically, price increases were often attributed to increases in cost of inputs, such as steel, when in fact they were the direct result of the conspiracy's secret collusion.

## ANTITRUST INJURY

133.     Defendants' conspiracy caused injury to Plaintiffs and members of the Class by suppressing price competition among Bearings manufacturers, thereby depriving all direct purchasers of Bearings of the benefits of a competitive market, and resulted in the setting of prices of Bearings at artificially high levels.

134.     As a direct result of Defendants' conspiracy, Plaintiffs and members of the Class have been injured in their business or property in that they paid more for Bearings than otherwise would have been the case in a competitive market.

135.     Defendants knew and intended that their pricing actions regarding their sales of Bearings would have a direct impact on prices for Bearings for all direct purchasers of Bearings throughout the United States.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 – Horizontal Price-Fixing Against All Defendants)

136.     Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

137.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Bearings sold in the United States, and/or to allocate markets and customers for Bearings sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

138.    The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices, and/or allocated markets and customers, for Bearings sold in or into the United States.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

139.    Defendants succeeded in fixing, raising, maintaining, and stabilizing the prices, as well as allocating markets and/or customers for Bearings sold in the United States during the Class Period.

140.    For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.    Restraining trade or commerce by fixing, controlling or maintaining, at artificial and supra-competitive levels, the prices at which Bearings were sold in the United States;

b.    Depriving direct purchasers of free and open competition;

c.    Selling Bearings to direct purchasers in the United States at supra-competitive prices; and

d.    Employing measures to conceal the true nature of their unlawful conduct from Plaintiffs and other members of the Class in furtherance of the conspiracy.

141.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for Bearings than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.      That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      That Plaintiffs and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  August 21, 2013

Respectfully submitted,

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Road: Ste. 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

*Interim Liaison Counsel for*
*Direct Purchaser Plaintiffs*

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
**KOHN SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
**SPECTOR ROSEMAN KODROFF**
**& WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
Michael L. Silverman
**FREED KANNER LONDON**
**& MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com
msilverman@fklmlaw.com

*Interim Lead Counsel for Direct Purchaser Plaintiffs*

- 33 -

M. John Dominguez
COHEN MILSTEIN SELLERS
& TOLL PLLC
2925 PGA Boulevard, Suite 204
Palm Beach Gardens, FL 33410
(561) 833-6575

Brent W. Johnson
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Ave. NW, Suite 500 West
Washington, D.C. 20005
(202) 408-4600

Ruthanne Gordon
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Irwin B. Levin
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481

Bruce E. Gerstein
GARWIN GERSTEIN & FISHER, LLP
1501 Broadway, Suite 1416
New York, NY 10036
(212) 398-0055

Lee Albert
GLANCY BINKOW & GOLDBERG LLP
77 Water Street, 7th Floor
New York, NY 10015
(646) 722-4180

W. Joseph Bruckner
LOCKRIDGE GRINDAL
NAUEN P.L.L.P.
100 Washington Avenue South
Minneapolis, MN 55401
(612) 339-6900

Solomon B. Cera
Thomas C. Bright
Pamela A. Markert
GOLD BENNETT CERA & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
(415) 777-2230

Jeffrey S. Goldenberg
GOLDENBERG SCHNEIDER, LPA
35 East Seventh Street, Suite 600
Cincinnati, OH 45202
(513) 345-8291

Linda P. Nussbaum
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
(612) 338-4605

Robert N. Kaplan
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980
Daniel Hume
KIRBY MCINERNEY LLP
825 Third Avenue
New York, NY 10022
(212) 371-6600

Steven D. Irwin
LEECH TISHMAN FUSCALDO
& LAMPL, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219
(412) 261-1600

| | |
|---|---|
| Lewis Goldfarb<br>MCELROY, DEUTSCH, MULVANEY<br>& CARPENTER, LLP<br>1300 Mount Kemble Avenue<br>P.O. Box 2075<br>Morristown, NJ 07962-2075<br>(973) 425-8689<br><br>Marvin A. Miller<br>MILLER LAW LLC<br>115 S. LaSalle Street, Suite 2910<br>Chicago, IL 60603<br>(312) 332-3400<br><br>Jayne A. Goldstein<br>POMERANTZ GROSSMAN HUFFORD<br>DAHLSTROM & GROSS LLP<br>1792 Bell Tower Lane, Suite 203<br>Weston, FL 33326<br>(954) 315-3454<br><br>Melissa Maxman<br>Ronald F. Wick<br>COZEN O'CONNOR<br>The Army and Navy Building<br>1627 I Street, NW<br>Suite 1100<br>Washington, D.C. 20006<br>(202) 912-4800 | Steve Greenfogel<br>LITE DEPALMA GREENBERG, LLC<br>1521 Locust Street<br>Philadelphia, PA 19102<br>(215) 564-5182<br><br>Garret Blanchfield<br>REINHARDT, WENDORF<br>& BLANCHFIELD<br>E-1250 First National Bank Bldg.<br>332 Minnesota St.<br>St. Paul, MN 55101<br>(651) 287-2100<br><br>R. Alexander Saveri<br>SAVERI & SAVERI, INC.<br>706 Sansome Street<br>San Francisco, CA 94111<br>(415) 217-6810<br><br>Jason J. Thompson<br>SOMMERS SCHWARTZ PC<br>2000 Town Center, Suite 900<br>Southfield, MI 48075<br>(248) 355-0300<br><br>Daniel J. Mogin<br>THE MOGIN LAW FIRM, P.C.<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br>(619) 687-6611 |

*Additional Counsel*