# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | CASE NO. 12-MD-02311 HON. MARIANNE O. BATTANI |
| In Re: BEARINGS CASES | |
| THIS RELATES TO: DIRECT PURCHASER ACTIONS | 12-cv-00501-MOB-MKM |

## DIRECT PURCHASER PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' COLLECTIVE MOTION TO DISMISS

David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Road, Suite 111
Bloomfield Hills, MI 48304
(248) 971-2500

*Interim Liaison Counsel for the Direct Purchaser Plaintiffs*

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
**KOHN SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffery L. Spector
**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300

Steven A. Kanner
William H. London
Michael E. Moskovitz
Michael L. Silverman
**FREED KANNER LONDON & MILLEN LLC**
220 1Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500

*Interim Lead Counsel for the Direct Purchaser Plaintiffs*

# TABLE OF CONTENTS

COUNTER-STATEMENT OF THE ISSUES PRESENTED.........................................................iii

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ................................. v

INDEX OF AUTHORITIES................................................................. vi

INTRODUCTORY STATEMENT ...................................................... 1

SUMMARY OF THE COMPLAINT'S ALLEGATIONS ................................. 2

ARGUMENT ................................................................................ 6

I.   THE COMPLAINT SUFFICIENTLY ALLEGES A FEDERAL ANTITRUST
     CLAIM AND EXCEEDS THE PLEADING STANDARDS SET FORTH BY THE
     FEDERAL RULES, *TWOMBLY*, AND *IQBAL* .......................................... 6

   A.   Legal Standards.............................................................. 6

   B.   DP Plaintiffs Have Sufficiently Alleged the Existence of an Antitrust Conspiracy... 6

     1.   The Complaint Exceeds Rule 8's Requirements ...................................... 6

     2.   The Conspiracy Allegations Are Plausible As Demonstrated By Market
          Structure, Government Investigations, And Guilty Pleas.................................. 8

     3.   Defendants' Attempt to Limit The Conspiracy To Only The Express
          Terms Of The Guilty Pleas Should Be Rejected ......................................... 10

     4.   The Complaint Sufficiently Details Each Defendant's Involvement in the
          Conspiracy ......................................................................... 13

     5.   Defendants' Attempt To Discount The Relevance Of Particular Allegations,
          As Opposed To Evaluating The Complaint As A Whole, Should Be Rejected .............. 16

II.  THE COMPLAINT SUFFICIENTLY PLEADS PLAINTIFFS' STANDING............. 20

III. PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF
     LIMITATIONS....................................................................... 24

   A.   Plaintiffs' Claims Were Tolled By The Discovery Rule ......................................... 25

   B.   Plaintiffs' Claims Were Tolled By Defendants' Fraudulent Concealment .............. 26

IV.  THE COMPLAINT PROPERLY PLEADS PLAINTIFFS' ENTITLEMENT
     TO INJUNCTIVE RELIEF ........................................................... 31

CONCLUSION...........................................................................................................34

## <u>COUNTER-STATEMENT OF THE ISSUES PRESENTED</u>

1. Whether the Consolidated Amended Class Action Complaint (the "Complaint") filed by Direct Purchaser Plaintiffs DALC Gear & Bearing Supply Corp., McGuire Bearing Company, and Sherman Bearings Inc. ("Plaintiffs") alleges more than "labels and conclusions" and a "formulaic recitation of the elements of a cause of action," thereby satisfying Fed. R. Civ. P. 8 and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("*Twombly*"), where the Complaint alleges:

- the existence and scope of numerous, globally-coordinated government investigations into Defendants' Bearings conspiracy;

- a Defendant's entry into the Competition Bureau of Canada's Immunity Program, and the corresponding guilty plea, which implicated at least one other Defendant and admitted to their mutual involvement in a Bearings conspiracy;

- findings of fact by a Japanese Court regarding four of the six Defendant group's participation in a Bearings conspiracy;

- a market structure conducive to collusion; and

- opportunities to collude.

**Direct Purchaser Plaintiffs Answer:**  **Yes**

**Defendants Answer:**  **No**

2. Whether to reject Defendants' argument that the Court should ignore the well-pleaded allegations in the Complaint that Plaintiffs purchased Bearings directly from one or more of the Defendants during the class period at prices that were higher due to the conspiracy,

and find that Plaintiffs have not plausibly alleged that they were injured, and thus have no standing.

**Direct Purchaser Plaintiffs Answer:**          **Yes**

**Defendants Answer:**                                        **No**

3.          Whether Defendants' motion to dismiss Plaintiffs' claims as untimely should be denied when the Complaint alleges that Plaintiffs could not have and did not discover the antitrust conspiracy any earlier than July 2011, and where the elements of fraudulent concealment are properly pleaded.

**Direct Purchaser Plaintiffs Answer:**          **Yes**

**Defendants Answer:**                                        **No**

4.          Whether Defendants' motion to dismiss the request for an injunction should be denied because the Complaint's allegations are sufficient as to the threat of continuing or future harm.

**Direct Purchaser Plaintiffs Answer:**          **Yes**

**Defendants Answer:**                                        **No**

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012)

*In re Automotive Parts Antitrust Litig.* (*Wire Harness*), No. 2:12:-cv-101, 2013 WL 2456584 (E.D. Mich. June 6, 2013)

*In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010)

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008)

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010), *amended in part*, 2011 WL 3268649 (N.D. Cal. July 28, 2011)

## INDEX OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 6

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*,
    459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983) ........................................... 24

*Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426 (6th Cir. 2008) ...................... 6

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) .................................................. passim

*Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883 (6th Cir. 2004) ............................ 28

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) ................................. 25

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012) ........................... passim

*Conley v. Gibson*, 355 U.S. 41 (1957) ............................................................................ 7

*Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690 (1962) ............................ 16

*Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975) ............................ 26

*Dry Cleaning & Laundry Institute of Detroit, Inc. v. Flom's Corp.*,
    841 F. Supp. 212 (E.D. Mich. 1993) ........................................................................ 27

*Duncan v. Leeds*, 742 F.2d 989 (6th Cir. 1984) ........................................................... 26

*Hamilton Cnty. Bd. of Comm'rs. v. Nat'l. Football League*, 491 F.3d 310 (6th Cir. 2007) ......... 27

*Hinds County v. Wachovia Bank, N.A.*, 700 F. Supp. 2d 378 (S.D.N.Y. 2010) ........................... 14

*In re Automotive Parts Antitrust Litig.* (*Wire Harness*), No. 2:12:-cv-101,
    2013 WL 2456584 (E.D. Mich. June 6, 2013) .................................................. passim

*In re Copper Antitrust Litig.*, 436 F.3d 782 (7th Cir. 2006) ....................................... 25

*In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*, No. 12-711,
    2013 WL 812143 (D.N.J. March 5, 2013) .......................................................... 22, 23

*In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 303 (D.N.J. 2004) ............................... 27

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007) ......................................... 18

*In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291 (S.D. Fla. 2010) .............. 17

*In re Flash Memory Antitrust Litig.*, 643 F.Supp.2d 1133 (N.D. Cal 2009) ...................... 11, 14

*In re Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291 (S.D. Fla. 2010) ......... 17

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002),
     *cert. denied*, 537 U.S. 1188 (2005) ........................................................................... 11

*In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090
     (D.N.J. Oct. 20. 2011) .................................................................................................. 23

*In re OSB Antitrust Litig.*, Master File No. 07-826, 2007 WL 2253419
     (E.D. Pa. Aug. 3, 2007) ................................................................................................ 14

*In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010) ...................... passim

*In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603 (N.D. Ga. 1997) ........................... 11

*In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777 (N.D. Ohio 2011) ..................... 29

*In re Refrigerant Compressors Antitrust Litig.*, 795 F.Supp.2d 647 (E.D. Mich. 2011) ............. 22

*In re Refrigerant Compressors Antitrust Litig.*, No. 2:09–md–02042,
     2012 WL 2114997 (E.D. Mich. June 11, 2012) ........................................................... 17

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) ..................................... 25, 26, 27

*In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934 (E.D. Tenn. 2008) ...................................... 16

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
     580 F. Supp. 2d 896 (N.D. Cal. 2008) ............................................................... 7, 11, 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010),
     *amended in part*, 2011 WL 3268649 (N.D. Cal. July 28, 2011) ................................. 32, 33, 34

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009) ....................... 9, 15, 19

*In re Travel Agent Comm'n Antitrust Litig.*, No. 1:03-cv-30000,
     2007 WL 3171675 (E.D. Mich. June 11, 2012) ........................................................... 17

*In re Uranium Antitrust Litig.*, 617 F.2d 1248 (7th Cir. 1980) ................................................... 20

*In re Vitamins Antitrust Litig.*, 2000 WL 1475705 (D. D.C. May 9, 2000) ................................ 11

*Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037 (6th Cir. 1984) ................................................... 26

*Lucas Auto. Engineering v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998) ............. 32

*Michigan Division-Monument Builders of N.A. v. Michigan Cemetery Ass'n*,
     458 F. Supp. 2d 474 (E.D. Mich. 2006) ................................................................. 15, 19

*Michigan v. McDonald Dairy Co.*, 905 F.Supp. 447 (W.D. Mich. 1995) .................................... 28

*N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781,
  2013 WL 6839093 (S.D.N.Y. Dec. 27, 2013) ........................................................ 2

*NLRB v. Express Pub. Co.*, 312 U.S. 426 (1941) ...................................................... 32

*Paper Systems, Inc. v. Nippon Paper Indust. Co.,* 281 F.3d 629 (7th Cir. 2002) ........................ 20

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445 (6th Cir. 1988) ...................... 28

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .................................................................. 8

*Southaven Land Co., Inc. v. Malone & Hyde, Inc.,* 715 F.2d 1079 (6th Cir. 1983) ................... 21

*Static Control Components, Inc. v. Lexmark Int'l, Inc.,* 697 F.3d 387 (6th Cir. 2012) .............. 21

*Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*, 738 F. Supp. 2d 505 (D. Del. 2010) ............ 17

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,*
  552 F.3d 430 (6th Cir. 2008) ............................................................................ 19

*Weiner v. Klais & Co.*, 108 F.3d 86 (6th Cir. 1997) ...................................................... 6

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971) ............................. 25, 32

**Statutes**

Section 1 of the Sherman Act, 15 U.S.C. § 1 ............................................................ 8

**Rules**

Fed. R. Civ. P 8 ................................................................................................ 7

Fed. R. Civ. P. 12(b)(6) .................................................................................... 6

Fed. R. Civ. P. 8(a)(2) ..................................................................................... 6

## INTRODUCTORY STATEMENT

Direct Purchaser Plaintiffs DALC Gear & Bearing Supply Corp., McGuire Bearing Company, and Sherman Bearings Inc. ("Plaintiffs") respectfully submit this brief in opposition to the Defendants' Collective Motion to Dismiss the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (the "Motion" or "Defs' Joint MTD") (Doc. No. 106).

Defendants erroneously argue that the Complaint should be dismissed in its entirety for failing to provide the level of specificity necessary to state an antitrust claim or establish standing, as defined by the standards outlined by this Court in *Wire Harness*. More important, however, is what Defendants do ***not*** argue. They do not argue that they have insufficient notice of the nature of the claims against them, nor do they argue that the existence of a Bearings conspiracy is implausible. That is because such arguments are simply untenable in light of the well-pleaded allegations in the Complaint, as well as the existence of multiple guilty pleas and verdicts which implicate the Defendants.

Instead, Defendants claim that the conspiracy alleged in the Complaint is not narrow enough—*i.e*., it does not precisely mirror the admissions made in the two guilty pleas entered thus far in the United States investigation. Defendants then dissect the Complaint and downplay the probative value of individual allegations, claiming that each, by itself, is insufficient to nudge the Complaint across the line from conceivable to plausible. But Defendants have clearly missed the forest for the trees, as these are *not* the applicable standards of review on a motion to dismiss, and the Complaint must instead be analyzed as a whole and unconstrained by the admissions of any particular guilty plea.

If the Court believes it is experiencing déjà vu that is because these misplaced arguments are virtually identical to those it thoughtfully considered and rejected in *Wire Harness*. "[I]nsanity is doing the same thing over and over and expecting different results." *N.J.*

*Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781, 2013 WL 6839093, at*1 (S.D.N.Y. Dec. 27, 2013) (quoting Albert Einstein). Recognizing this, Defendants try in vain to distinguish the Complaint from the one in *Wire Harness*. The similarities, however, greatly outweigh any differences as the essential allegations are the same: an international bid-rigging conspiracy, rendered plausible by various factual enhancements (including the existence of globally-coordinated government investigations, multiple guilty pleas and verdicts, and a market susceptible to, and affording many opportunities for, collusion), together with Plaintiffs that purchased the price-fixed product directly from the Defendants, causing them harm. Such allegations more than sufficient to satisfy the relevant pleadings standards needed to survive a motion to dismiss.

Furthermore, Defendants argue in the alternative that the Complaint should be limited by dismissing Plaintiffs' injunctive relief claim and all claims for damages prior to July 3, 2008. As discussed below, these arguments likewise lack merit, as Plaintiffs have adequately established the applicability of both the discovery rule and the doctrine of fraudulent concealment, as well as the threat of continuing or future harm.

For these reasons, as well as those discussed below, Defendants' Motion should be denied.

## SUMMARY OF THE COMPLAINT'S ALLEGATIONS

On August 21, 2013, Plaintiffs filed their Consolidated Amended Class Action Complaint (the "Complaint"), naming eleven Defendants organized into six distinct groups: JTEKT Corp. and Koyo Corp. of U.S.A. (collectively, "JTEKT"); Nachi-Fujikoshi Corp. and Nachi Am. Inc. (collectively, "Nachi"); NSK Ltd. and NSK Americas Inc. (collectively, "NSK"); Schaeffler AG and Schaeffler Group USA Inc. (collectively, "Schaeffler"); NTN Corp. and NTN USA Corp. (collectively, "NTN"); and AB SKF ("SKF"). (Compl. at ¶¶ 18-28).

<u>The Bearings Conspiracy</u>

Plaintiffs allege "that Defendants conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Bearings[1] sold in the United States from January 1, 2004 through the present." (*Id.* at ¶ 1). The Complaint further alleges that each of the Plaintiffs purchased Bearings directly from one or more of the Defendants during the same period (the "Class Period"), and was harmed as a result. (*Id.* at ¶¶ 15-17).

<u>Market Characteristics and Pricing</u>

The Bearings market exhibits several qualities which make it particularly conducive to the type of conspiracy alleged by Plaintiffs, including: substantial barriers to entry; high, and increasing, market concentration; inelastic demand; homogeneous or commoditized products; excess capacity; and opportunities to conspire. (*Id.* at ¶¶ 49-59). Together, Defendants control over 60% of the global Bearings market. (*Id.* at ¶¶ 51-52).

Prices for Bearings sold in the United States increased substantially more during the Class Period than before it, a fact which cannot be explained by increased costs for Bearings production. (*Id.* at ¶¶ 112-113).

<u>Government Investigations</u>

Globally-coordinated antitrust investigations are currently taking place in the United States, Japan, Europe, Australia, Canada, Singapore, and Korea regarding suspected cartel activity in the Bearings industry. (*Id.* at ¶¶ 60-99).

- **Japan**: In July 2011, the Japan Fair Trade Commission ("JFTC") launched an investigation into the Bearings industry after Defendant JTEKT sought leniency by alerting the regulatory agency to its participation in a Bearings-related conspiracy. (*Id.* at ¶ 61). Afterwards, the JFTC conducted on-site inspections of Defendants JTEKT, NSK, NTN, and Nachi-Fujikoshi in order to investigate what is believed to be violations of

---

[1] "Bearings" is defined to include both automotive and industrial machinery bearings. (Compl. at ¶ 10).

Japan's anti-monopoly law in relation to their sale of Bearings. (*Id.* at ¶ 62). Following those on-site inspections, on April 20, 2012, Japanese authorities raided Defendant NSK's facilities, (*id.* at ¶ 65), and a criminal accusation was filed against the company in Tokyo District Court on June 14, 2012. (*Id.* at ¶ 67). On March 29, 2013, the JFTC issued cease and desist orders, plus surcharge payments, to Defendants NTN, NSK, and Nachi. (*Id.* at ¶ 73).

- **United States**: Defendants NTN, Schaeffler, NSK, and SKF have acknowledged being the subject of an antitrust investigation conducted by the United States Department of Justice ("DOJ") involving the Bearings industry. (*Id.* at ¶¶ 77-82).

- **European Commission**: Sometime prior to November 8, 2011, the European Commission ("EC") executed surprise raids at several of the Defendants' offices, including at least SKF and Schaeffler. (*Id.* at ¶¶ 83-84). Defendants JTEKT, NSK, and NTN also acknowledged that they were being investigated by the EC. (*Id.* at ¶¶ 85-86, 89-90).

- **Canada**: Sometime prior to July 12, 2013, the Competition Bureau of Canada ("CBC") began investigating in an international bid-rigging cartel after being approached by Defendant JTEKT to take part in the CBC's Immunity Program. (*Id.* at ¶¶ 92, 94).

- **Australia**: On July 15, 2013, the Australian Competition and Consumer Commission ("ACCC") announced that it had instituted civil proceedings against one of Defendant JTEKT's subsidiaries. (*Id.* at ¶ 91). The ACCC alleges that the JTEKT subsidiary and at least two of its competitors entered into at least two cartel arrangements in 2008 and 2009 to increase prices for Bearings for use in automobile and industrial applications sold to aftermarket customers. (*Id.*).

- **Singapore**: On February 6, 2013, Defendant NSK's Singaporean subsidiary received an on-the-spot inspection from the Competition Commission of Singapore regarding suspected anticompetitive behavior with other Bearings manufacturers. (*Id.* at ¶¶ 95-96).

- **Korea**: Sometime in or before 2012, Defendants NTN, NSK, and SKF underwent on-site inspections of their Korean subsidiaries by the Korea Fair Trade Commission ("KFTC") regarding suspected violations of Korea's antitrust laws in connection with the sale of Bearings. (*Id.* at ¶¶ 97-99).

Guilty Pleas and Verdicts

Although the government investigations above are still ongoing, multiple Defendants have already either pleaded or have been found guilty for participating in a global Bearings conspiracy that spanned at least Japan, Canada, and the United States, and which began at least as early as 2000 (four years *before* the start of the Class Period):

- **Japan**: On December 28, 2012, the Tokyo District Court found Defendant Nachi and two of its officials guilty of participating in a price-fixing cartel with fellow Defendants NSK, NTN, and JTEKT in order to fix prices for Bearings for industrial machinery. (*Id.* at ¶¶ 68-69). On February 25, 2013, the Tokyo District Court found Defendant NSK and three of its former executives guilty of participating in a price-fixing cartel for Bearings for automotive and industrial machinery. (*Id.* at ¶ 70).

- **Canada**: On July 12, 2013, the Competition Bureau of Canada ("CBC") announced that Defendant JTEKT had pleaded guilty to taking part in an international bid-rigging cartel after taking part in the CBC's Immunity Program. (*Id.* at ¶¶ 92, 94). In its statement of admissions, Defendant JTEKT admitted to secretly conspiring with Defendant NSK to rig bids for requests for quotations to supply Toyota Motor Company between 2007 and 2013. (*Id.* at ¶¶ 92-94).

- **United States**: On September 26, 2013, Defendants JTEKT and NSK both pleaded guilty to participating in a "conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate markets, rig bids for, and to fix, stabilize, and maintain prices of bearings sold to Japanese automobile and component manufacturers in the United States and elsewhere" in violation of Section 1 of the Sherman Act. (Information ¶ 6, *U.S. v. JTEKT Corp.*, No. 1:13-cr-00104-HJW (S.D. Ohio Sept. 26, 2013) (the "JTEKT Information"); Information ¶ 6, *U.S. v. NSK Ltd.*, No. 1:13-cr-00103-HJW (S.D. Ohio Sept. 26, 2013) (the "NSK Information")).[2] This conspiracy started "***at least as early* as 2000** and continu[ed] until ***as late as* July 2011**"—*i.e.*, it began four years *before* the start of the Class Period. (*Id.*) (emphasis added).

Discovery Rule And Fraudulent Concealment

The Complaint alleges that Plaintiffs did not and could not have discovered the existence of the Defendants' Bearings conspiracy until, at the earliest, July 2011, when the antitrust investigations of Bearings manufacturers first became public. (Compl. at ¶ 122). Prior to that time, Plaintiffs did not learn of the operative facts underlying their claims despite due diligence. (*Id.*)

The Complaint further alleges that Defendants took affirmative steps to actively conceal their conspiracy, including: publicly representing that their pricing activities were unilateral; intentionally concealing their conduct, including through the use of secret meetings and

---

[2] The plea agreements and informations by Defendants JTEKT and NSK were both entered approximately one month after the Complaint was filed. Plaintiffs respectfully request that the Court take judicial notice of these pleas, which were also attached as exhibits to Defendants' Motion.

communications; and falsely attributing price increases to increased input costs. (*Id.* at 123-132). It also alleges that Defendants' conspiracy was inherently self-concealing. (*Id.* at ¶ 123).

## ARGUMENT

**I.    THE COMPLAINT SUFFICIENTLY ALLEGES A FEDERAL ANTITRUST CLAIM AND EXCEEDS THE PLEADING STANDARDS SET FORTH BY THE FEDERAL RULES, *TWOMBLY*, AND *IQBAL***

### A.  Legal Standards

Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") allows for dismissal of a complaint where it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss, courts are instructed to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). While conclusory statements merely reciting the elements of a cause of action are insufficient to state a claim, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), entitlement to relief can be established by either direct *or* inferential allegations. *In re Automotive Parts Antitrust Litig.* (*Wire Harness*), No. 2:12:-cv-101, 2013 WL 2456584, at *4 (E.D. Mich. June 6, 2013) (quoting *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997)).

### B.  DP Plaintiffs Have Sufficiently Alleged the Existence of an Antitrust Conspiracy

#### 1.  The Complaint Exceeds Rule 8's Requirements

Rule 8 of the Federal Rules of Civil Procedure ("Rule 8") requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Iqbal*, 556 U.S. at 677-7; *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 444 (6th Cir. 2012); *Ziss Bros. Constr.*, 439 Fed. Appx. at 470. Detailed factual allegations are not required. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *see also Iqbal*, 556 U.S. at 678

6

("the pleading standard Rule 8 announces does not require 'detailed factual allegations'"); *Wire Harness*, 2013 WL 2456584, at *3 ("a 'heightened fact pleading of specifics' is not needed to state an antitrust conspiracy claim") (quoting *Twombly*, 550 U.S. at 570); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 900 (N.D. Cal. 2008) ("The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which it bases its claim.").

Rule 8's requirements are merely intended to give the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *Twombly*, 550 U.S. at 545 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As this Court concluded in *Wire Harness*, "assessing the sufficiency of the CAC boils down to consideration as to whether the CAC includes allegations that inform Collective Defendants what wrongdoing they are alleged to have committed and whether the allegations in the CAC enable Collective Defendants to respond." 2013 WL 2456584, at *5 (citations omitted).

Like the complaint under scrutiny in *Wire Harness*, the Complaint here exceeds these standards. It alleges, *inter alia*, the products affected by Defendants' conduct (Compl. at ¶ 1, 10, 43-48), that Plaintiffs purchased those products directly from Defendants (*id.* at ¶ 15-17), the scope of the various globally-coordinated government investigations into Defendants' conspiracy (*id.* at ¶ 60-99), the admissions and findings contained in guilty pleas and verdicts involving Defendants' global conspiracy (*id.* at ¶ 68-70, 93), Defendant JTEKT's admission of cartel activity and cooperation with government authorities in Canada and Japan as part of its participation in those countries' respective leniency programs (*id.* at ¶ 61, 94), the methods of communication used by Defendants in furtherance of the conspiracy and specific opportunities they had to conspire (*id.* at ¶ 100-108), the particular characteristics of the Bearings market that

support the plausibility of a global conspiracy (*id.* at ¶ 49-59), how Defendants' actions resulted in artificially high Bearings prices (*id.* at ¶ 133), and that Defendants' intentionally had a direct impact on Bearings prices throughout the United States (*id.* at ¶ 135).

These allegations are precisely the kind that this Court previously deemed sufficient to state an antitrust claim in *Wire Harness*. 2013 WL 2456584, at *5-6. They provide more than enough notice of the wrongdoing alleged so that Defendants can respond and, furthermore, create a reasonable expectation that discovery will reveal further evidence of an illegal agreement. Thus, Plaintiffs have fully satisfied the pleading requirements of Rule 8 and *Twombly*.

### 2. The Conspiracy Allegations Are Plausible As Demonstrated By Market Structure, Government Investigations, And Guilty Pleas

In applying the relevant pleading standards to claims brought under Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"), the Supreme Court has held that a complaint must allege enough factual matter, taken as true, to plausibly suggest than an agreement was made—*i.e.*, it "raise[s] a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. That is not to say, however, that the Court must find that proof of an agreement is probable; in fact, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Instead, a complaint need only contain "enough 'factual enhancement' to 'nudge [the] claim across the line from conceivable to plausible.'" *Carrier Corp*. 673 F.3d at 444 (quoting *Twombly*, 550 U.S. at 570). Thus, "[i]f the Court can discern some 'factual enhancement' pointing toward, or suggesting a basis for inferring, an illegal agreement, the motion to dismiss must be denied." *In re Packaged Ice Antitrust Litig*., 723 F. Supp. 2d 987, 1004 (E.D. Mich. 2010).

Here, Plaintiffs have provided more than sufficient factual enhancement to suggest that the unlawful agreement alleged is plausible. For example, the Complaint alleges:

- The timeframe and scope of the various globally-coordinated government investigations regarding Defendants' conspiracy. (*Id.* at ¶ 60-99.)

- JTEKT's admission and cooperation with the Canadian Competition Bureau ("CCB") as part of its entry into the CCB's leniency program, as well as its Statement of Admissions in the Superior Court of Canada regarding its participation in the conspiracy. (*Id.* at ¶ 61, 93.)

- JTEKT's admission and cooperation with the Japan Fair Trade Commission ("JFTC"), as required by the terms of the JFTC's leniency program. (*Id.* at ¶ 61.)

- The Tokyo District Court's guilty verdict against Defendant Nachi-Fujikoshi and two of its former executives with respect to a price-fixing cartel involving industrial bearings. (*Id.* at ¶ 68-69.)

- The Tokyo District Court's guilty verdict against NSK and three of its former executives with respect to a price-fixing cartel involving automotive and industrial bearings. (*Id.* at ¶ 70.)

- The methods of communication used by Defendants in furtherance of the conspiracy, as well as specific opportunities Defendants had to conspire. (*Id.* at ¶ 100-108.)

- A history of collusion in the Bearings industry, including previous fines levied against multiple Defendants in the present action. (*Id.* at ¶ 114-116.)

- The particular characteristics of the Bearings market that support the plausibility of a global conspiracy, including: substantial barriers to entry; high and increasing market concentration; homogeneous or commoditized products; excess capacity; and opportunities to conspire. (*Id.* at ¶ 49-59.)

As these allegations amply demonstrate, the Complaint goes well beyond the bare assertions of parallel conduct that were deemed insufficient to state a plausible claim under *Twombly*. 550 U.S. at 545-46 (alleging parallel conduct gets a plaintiff close to stating a § 1 claim but, without further factual enhancement, it falls short of the line separating possible from plausible); *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (upholding dismissal where purely parallel conduct, without "some setting suggesting the agreement necessary to make out a § 1 claim," was alleged). Taking into account the government

9

investigations, guilty pleas and verdicts, and market factors discussed above, the Complaint plainly presents sufficient "factual enhancement" to nudge Plaintiffs' claims across the line from conceivable to plausible and, thus, defeat a motion to dismiss. *Packaged Ice*, 723 F. Supp. 2d at 1004.

Defendants—realizing that they cannot credibly argue that a Bearings conspiracy is implausible in light of the verdicts and guilty pleas of multiple Defendants—instead make three arguments which they claim warrant dismissal of the "Complaint in its entirety": 1) the guilty pleas are too narrow to support the broader conspiracy alleged in the Complaint; 2) the Complaint does not sufficiently detail each Defendant's role in the conspiracy; and 3) government investigations and opportunities to conspire, examined individually, are insufficient to establish the plausibility of a conspiracy. (*See* Defs' Joint MTD at 2-10, 24.) As set forth in the following sections, each of these arguments is without merit.

### 3. Defendants' Attempt to Limit The Conspiracy To Only The Express Terms Of The Guilty Pleas Should Be Rejected

The existence of *a* Bearings conspiracy is not genuinely in dispute. As Defendants themselves acknowledge, (Defs' Joint MTD at 5), Defendants JTEKT Corp. and NSK Ltd. have already pleaded guilty to participating in a conspiracy "[f]rom ***at least as early*** as *2000* and continuing until ***as late as*** *July 2011*" regarding "bearings sold to Japanese automobile ***and component manufacturers*** in the United States ***and elsewhere***." (JTEKT Information at ¶ 6; NSK Information at ¶ 6 (emphasis added).)[3] Instead, Defendants argue that *only* two Defendants have entered plea agreements, and that those "agreements concern unspecified types of

_____

[3] Paradoxically, despite pleading guilty to these charges, Defendants JTEKT Corp. and NSK Ltd. both joined in this joint motion to dismiss wherein it is argued that the Complaint must be dismissed in its entirety for failing to provide sufficient allegations to suggest that a conspiracy is plausible. *Compare* JTEKT Information at ¶ 6 and NSK Information at ¶ 6 *with* Defs' Joint MTD at 6 ("any inference of a broad conspiracy regarding sales to Japanese automotive manufacturers....is not plausible").

automotive bearings, sold to a single identified manufacturer and to other unnamed Japanese manufacturers, and bear no relationship to the conspiracy that has been alleged here." (*Id.* at 1.) This, they argue, necessitates that the Complaint be dismissed "in its entirety" because a complaint must be "moored" to guilty pleas. (*Id.* at 2, 24.)

It is well established, however, that a civil suit is not "circumscribed or defined by the boundaries of the criminal investigations or plea agreements." *Packaged Ice*, 723 F. Supp. 2d at 1011; s*ee also Wire Harness*, 2013 WL 2456584, at *7 (stating "it is not necessary to confine the admissions regarding products or time frames to those Defendants that have pleaded guilty") (citing *In re Flash Memory Antitrust Litig.*, 643 F.Supp.2d 1133, 1149 (N.D. Cal 2009); *SRAM*, 580 F.Supp.2d 896). For a variety of reasons other than innocence, the government often allows criminal defendants to plead guilty to more limited charges. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-65 (7th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2005) (discussing reasons that DOJ's decision to limit criminal charges and not prosecute ADM for fixing prices of high fructose corn syrup, when it had prosecuted ADM for participating in two other price-fixing cartels, had no evidentiary value in the civil case); *In re Vitamins Antitrust Litig.*, 2000 WL 1475705, at *11 (D. D.C. May 9, 2000) ("[T]he Court rejects the notion that the guilty pleas and cooperation agreements and the class settlements foreclose a broader conspiracy. Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention."); *id.* at *11 n.13 ("the government may undertake plea bargains in order to achieve certain strategic objectives and these goals may be different from those of private litigants"); *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 619-20 (N.D. Ga. 1997) (stating that "the Court is aware of no authority that requires a civil antitrust plaintiff to plead only the facts

11

of a prior criminal indictment. To the contrary, several cases flatly reject this theory.") (collecting cases).

This Court addressed (and rejected) the same argument in *Wire Harness*. 2013 WL 2456584, at *7. There, the defendants argued that the factual allegations in the guilty pleas did not support the existence of a broader global conspiracy because only four defendants pleaded guilty, the guilty pleas covered different time frames, concerned different products, involved only certain automobile manufacturers, and did not specify the identity of coconspirators. *Id.* The Court disagreed, holding:

> In the case before this Court, it is not necessary to confine the admissions regarding products or time frames to those Defendants that have pleaded guilty. Here, the CAC describes the guilty pleas of multiple Defendants and their executives. The executives admitted they met and agreed to allocate supply, rig bids, and fix prices for wire harnesses and related products. The structure of the industry makes it susceptible to collusion. At this stage of the litigation, these allegations are sufficient. DPPs identified the parties to the conspiracy, the products involved, the geographic market affected, and the time frame of the conspiracy. DPPs also alleged methods used to implement the conspiracy. The absence of any admission by a Defendant pleading guilty that the conduct involved an overarching conspiracy does not doom the CAC.

*Id.* (citations omitted). This case is no different.

The Complaint here alleges, *inter alia*: the existence of guilty pleas and verdicts directly implicating four of the six Defendant groups, *i.e.*, Nachi, NSK, NTN, and JTEKT (Compl. at ¶¶ 60, 68-70, 92-94); that multiple executives admitted or were found guilty of conspiring to fix Bearings' prices (*id.* at ¶¶ 66, 68, 70, 93); and that the structure of the Bearings industry makes it susceptible to collusion (*id.* at ¶¶ 49-59). At this stage of the litigation, especially considering the additional "factual enhancements" discussed above, such allegations are more than sufficient to create the "expectation that discovery might lead to evidence of [the more expansive conspiracy pled in the complaint] among the same actors." *Packaged Ice*, 723 F. Supp. 2d at 1011.

12

Defendants' attempt to limit and redefine the plausible conspiracy pleaded in the Complaint to the exact contours of the guilty pleas reached thus far is improper and should be rejected.

Besides, Defendants are simply wrong when they argue that "there is not a specific fact alleged in the DPPs' Complaint—or the two recent bearings plea agreements—that plausibly supports a conspiracy extending either to non-automotive industrial bearings or to non-Japanese automotive customers." (Defs' Joint MTD at 4.) For example, the Complaint describes how: the Tokyo District Court found Defendants NSK, NTN, JTEKT, and Nachi-Fujikoshi conspired to fix prices for *non-automotive industrial* bearings (Compl. at ¶ 69); the Australian Competition and Consumer Commission was investigating a JTEKT subsidiary for participating in a cartel involving Bearings for automotive *and* industrial applications (*id.* at ¶ 91); JTEKT pleaded guilty to participating in "an *international* bid-rigging cartel" in the Superior Court of Quebec (*id.* at ¶ 92) (emphasis added).

These allegations, taken together, further support the plausibility of a conspiracy which is broader than the two U.S. plea agreements entered by Defendants at this time. Simply put: it is not necessary for each Defendant to plead guilty before an industry-wide conspiracy can be properly alleged. *See, e.g., Wire Harness*, 2013 WL 2456584, at *7 (finding industry-wide conspiracy plausible based on similar allegations regarding market structure, ongoing investigations, and where some, but not all, defendants had pleaded guilty).

### 4. The Complaint Sufficiently Details Each Defendant's Involvement in the Conspiracy

Defendants next argue that the Complaint must be dismissed because it lacks the required specificity as to "the origins and workings of the alleged conspiracy, the individuals involved, or the roles of the various Defendants." (Defs' Joint MTD at 4.) According to Defendants, Plaintiffs are required to provide facts sufficient "to identify the relevant 'who, what, when, how or why.'"

(Defs' Joint MTD IPP Compl. at 3 (incorporated by reference in Defs' Joint MTD at 3) (citation omitted).)

As an initial matter, the Complaint clearly alleges that Defendants (who) were engaged in a global conspiracy (what) from at least January 1, 2004 to the present (when) to fix prices for Bearings (why). (Compl. at ¶1.) Detailed allegations regarding each Defendant's particular involvement in the conspiracy is not required. *See, e.g., Wire Harness*, 2013 WL 2456584, at *7 (rejecting defendants' "who, what, when and where challenge" and stating that plaintiffs "are not required to allege the exact nature of the agreements and the extent to which each Defendant furthered the conspiracy's objectives prior to discovery"); *Hinds County v. Wachovia Bank, N.A.*, 700 F. Supp. 2d 378, 395 (S.D.N.Y. 2010) (plaintiffs are not required to plead details about each individual defendant's conduct in furtherance of the conspiracy); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. at 1142 n.7 (denying several defendants' motions despite argument that no specific allegations were directed at their particular company); *SRAM*, 580 F. Supp. 2d at 903-907 (allegations need not be detailed on a "defendant by defendant" basis); *In re OSB Antitrust Litig.*, Master File No. 07-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("[a]ntitrust conspiracy allegations need not be detailed defendant by defendant").

Furthermore, Plaintiffs are not "tar[ring] all Defendants with the same conspiratorial brush." (Defs' Joint MTD at 4.) The Complaint alleges specific facts about each Defendant group from which participation in the global Bearings conspiracy can be reasonably inferred, including:

- JTEKT sought leniency and pleaded guilty in Canada, is being investigated in Australia, and was found by a Japanese district court to have participated in a Bearings conspiracy with two other Defendant groups (*id.* at ¶¶ 60, 62, 66, 69, 91-94);

- Nachi admitted to its role in a Bearings conspiracy and was found guilty by a Japanese district court (*id.* at ¶¶ 66, 68);

- NSK admitted to its role in a Bearings conspiracy and was found guilty by a Japanese district court, and acknowledged it was being investigated by the DOJ, EC, KFTC, and Singaporean authorities (*id.* at ¶¶ 62, 66, 68, 70, 80, 86, 95-98);

- Schaeffler acknowledged it was being investigated by the DOJ, and that it was raided by the EC (*id.* at ¶¶ 78, 84, 88);

- SKF acknowledged it was being investigated by the DOJ and KFTC, and that it was raided by the EC (*id.* at ¶¶ 81, 84, 87, 99); and

- NTN acknowledged it was being investigated by the DOJ and KFTC, it was raided by the EC, and, during the trial of one of the other Defendants, was found by a Japanese district court to have participated in a Bearings price fixing conspiracy (*id.* at ¶¶ 62, 66, 68, 77, 89-90, 97).

Defendants' erroneous reliance on *Travel Agent Comm'n*. 583 F.3d at 905 and *Michigan Division-Monument Builders of N.A. v. Michigan Cemetery Ass'n*, 458 F. Supp. 2d 474, 485 (E.D. Mich. 2006) notwithstanding, nothing more is required of Plaintiffs at this time.

The facts of *Travel Agent Comm'n* are readily distinguishable. There, plaintiffs attempted to state an antitrust claim by purely relying on allegations of parallel conduct without any "setting suggesting the agreement necessary to make out a § 1 claim." 583 F.3d at 905. Similarly, in *Michigan Monument Builders*, the plaintiffs there attempted to bring antitrust claims against twenty individual cemeteries without alleging a single factual allegation specific to any particular one, save for their ownership, location, or state of incorporation. 458 F. Supp. 2d at 485. By contrast, here Plaintiffs plead numerous facts describing a series of globally-coordinated government investigations, multiple guilty pleas and verdicts, and specific market factors regarding the Bearings industry which support the plausibility of a conspiracy. (*See* Compl. at ¶ 15-17, 49-59, 60-108). The cases cited by Defendants are grossly inapposite.

15

**5. Defendants' Attempt To Discount The Relevance Of Particular Allegations, As Opposed To Evaluating The Complaint As A Whole, Should Be Rejected**

Lastly, Defendants argue that the alleged conspiracy is implausible by breaking apart the Complaint and downplaying the persuasiveness of individual allegations. (Defs' Joint MTD at 5-10.) Such a dismemberment approach, however, is merely a distraction, as it has been explicitly rejected by the Supreme Court. *See Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 699 (1962) (holding that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole").

It is improper under Rule 12(b)(6) for a defendant to dissect an antitrust complaint and then complain that individual allegations, viewed in isolation, do not meet *Twombly's* pleading standard. *See e.g., In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008) ("Moreover, defendants['] attempt to parse and dismember the complaints [is] contrary to the Supreme Court's admonition that "[t]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts."); *Packaged Ice*, 723 F. Supp. 2d at 1006-07 (discussing *Southeastern Milk*, rejecting the dismemberment approach, and holding that there was "sufficient factual content alleged to put the Plaintiffs' allegations in a context suggestive of a plausible conspiracy"). Nonetheless, that is exactly what Defendants have done here.

But as previously demonstrated above, Plaintiffs have pleaded sufficient information to a) put Defendants on ample notice of Plaintiffs' claims and b) nudge those claims across the line from conceivable to plausible. (*See* Section I(B)(2), *supra.*) The persuasiveness of individual investigations or opportunities to conspire, examined in a vacuum, is not the yardstick against which the Complaint is to be measured.

16

Moreover, the cases relied upon by Defendants to subtract from the probative value of the government investigations do not support their argument and are readily distinguishable. For example, Defendants cite four cases for the proposition that, "absent a showing of probable cause by government investigators, as in *Wire Harness III*, a government investigation is not itself probative of wrongdoing." (Defs' Joint MTD at 7.) Yet not a single one of those cases even mentions "probable cause." *See In re Refrigerant Compressors Antitrust Litig.*, No. 2:09–md–02042, 2012 WL 2114997 (E.D. Mich. June 11, 2012); *Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*, 738 F. Supp. 2d 505, 517 (D. Del. 2010); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1316 (S.D. Fla. 2010); *In re Travel Agent Comm'n Antitrust Litig.*, No. 1:03-cv-30000, 2007 WL 3171675 (E.D. Mich. June 11, 2012).

In *Refrigerant Compressors*, the court did not "credit" defendants' argument that government investigations carry no weight in an antitrust case; rather, it held that plaintiffs had not adequately stated a claim where it relied merely on vague allegations "without specific factual allegations as to the numerous individual defendants named in this case." 2012 WL 2114997, at *7-8;[4] *see also Superior Offshore Int'l*, 738 F. Supp. 2d at 517 (finding, in the absence of any facts about the DOJ's investigation, that the existence of an investigation, alone, was insufficient to render plaintiff's claim plausible); *In re Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1316 (S.D. Fla. 2010) (refusing to take judicial notice of an investigation by the Florida Attorney General's office where that fact did not make the allegations in the complaint more plausible, but ultimately finding that a plausible conspiracy was alleged, albeit more limited in scope than the one pleaded). By contrast, Plaintiffs here have

---

[4] Notably, plaintiffs there asked the court to consider the allegations contained in *another party's complaint* in determining whether they satisfied the relevant pleading standard. *Id*. at *8. That request was refused, although the court did take judicial notice of two plea agreements entered into by certain defendants after the filing of the operative complaint. *Id*.

made specific allegations regarding each Defendant group and the relevance of the investigations and guilty pleas/verdicts which implicate them. (*See* Section I(B)(4), *supra*.)

Similarly, Defendants argue that foreign investigations are "[e]ven more irrelevant" to Plaintiffs' claims than domestic investigations. (Defs' Joint MTD at 7.) While perhaps not sufficient to state a claim by itself, the existence of a foreign investigation is routinely deemed probative of a conspiracy. *See, e.g., Wire Harness*, 2013 WL 2456584, at *6 (finding "the scope of the investigations by government entities as well as global coordination of the investigation" as one factor supporting the plausibility of an antitrust claim). *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007) does not advance Defendants' argument. While Defendants correctly quote the court's concern that "[a]llegations of anticompetitive wrongdoing in Europe—absent any evidence of linkage between such foreign conduct and conduct here—is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here,'" *id.*, they glaringly omit that this particular concern is clearly inapplicable where, as here, multiple Defendants have already *admitted* that it *also* happened in the United States. (*See* JTEKT Information at ¶ 6); NSK Information at ¶ 6.) Additionally, Defendants ignore those allegations in the Complaint which plausibly link the foreign investigations to conduct in the United States, including, *inter alia*: the existence not only of a foreign investigation, but a globally-coordinated investigation involving the DOJ (Compl. at ¶¶ 60-99); the admission by Defendant JTEKT of participating in "an ***international*** bid-rigging cartel" involving Bearings (*id.* at ¶¶ 92-93); and the market conditions that support the plausibility of a global conspiracy (*id.* at ¶¶ 49-59).

Defendants further argue that opportunities to conspire only become relevant to a court's plausibility analysis when some threshold between two and eleven plea agreements is reached *and* where the defendants collectively control somewhere between 60% and 90% of the relevant

18

market. (Defs' Joint MTD at 9-10.) Not surprisingly, Defendants fail to cite a single case in support of either of these pre-requisites. Relatedly, Defendants also argue that opportunities to conspire can only be considered when they include particularized allegations regarding "who, what, where, when, how or why." (Defs' Joint MTD End Payors at 8-9 (incorporated by reference in Defs' Joint MTD).) But again, not a single one of the three cases Defendants cited actually support this proposition. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 436-37 (6th Cir. 2008) (holding that plaintiffs allegations, in their entirety, offered only bare allegations without any reference to the "who, what, when, how or why," but not even discussing any allegations regarding opportunities to conspire); *Travel Agent Comm'n*, 583 F.3d at 905 (finding that alleging a mere opportunity to conspire at trade association meeting does not, by itself, "weigh *heavily* in favor of suspecting collusion") (emphasis added); *Monument Builders*, 458 F. Supp. 2d at 485 (not even addressing opportunities to conspire in holding that a complaint devoid of a single factual allegation specific to any of the twenty individual cemetery defendants—besides ownership, location, and state of incorporation—does not meet Rule 8's pleading standards).

In sum, Plaintiffs are not asking the Court to find the plausibility of an unlawful agreement based solely on the existence of a government investigation or an opportunity to conspire. As discussed above, Plaintiffs have instead painted a detailed, non-conclusory picture for Defendants of conspiracy that enables Defendants to respond to the Complaint and supports the inference that discovery will reveal further evidence of an illegal agreement. Defendants' attempt to impose additional burdens on Plaintiffs at this stage of the litigation should be rejected.

## II.     THE COMPLAINT SUFFICIENTLY PLEADS PLAINTIFFS' STANDING

Defendants insist that the Complaint lacks sufficient detail concerning how the Plaintiffs might have been injured by the alleged conspiracy. (Defs' Joint MTD at 10-14.) As with their other attempts to inject a heightened standard into antitrust pleading, this argument, too, should fail. Plaintiffs have alleged that they purchased Bearings from one or more of the Defendants during the alleged period of the conspiracy, that they were injured by the alleged antitrust violation, and how they were injured. (Compl. at ¶¶ 3, 15-17; 133-135, 141.) Plaintiffs have also alleged that Defendants and their co-conspirators engaged in a single price-fixing conspiracy involving Bearings sold in the United States, and allocated markets and customers for Bearings sold in the United States during the Class Period. (*Id.* at ¶¶ 137-139.) The Complaint plainly alleges that Plaintiffs and "the other members of the Class have been injured in their businesses and property in that they have paid more for Bearings than they otherwise would have paid in a competitive market." (*Id.* at ¶ 141.)

Plaintiffs have alleged sufficient injury to state an antitrust claim against each of the Defendants, who are jointly and severally liable for all of the overcharges of the conspiracy. *See, e.g., Paper Systems, Inc. v. Nippon Paper Indust. Co.,* 281 F.3d 629, 634 (7th Cir. 2002) ("Given joint and several liability, each of the five conspirators is liable. . . ."); *In re Uranium Antitrust Litig.,* 617 F.2d 1248, 1257 (7th Cir. 1980) ("Antitrust liability under Section 1 of the Sherman Act is joint and several.") Plaintiffs have thus alleged each of the elements of an antitrust claim in sufficient detail, and as such the Complaint satisfies all the requirements of Rule 8, as clarified in *Twombly* and this Court's prior ruling in *Wire Harness.*

In this Circuit, courts weigh the following factors in determining whether a particular plaintiff has pleaded antitrust standing:

> (1) the causal connection between the antitrust violation and harm to the
> plaintiff and whether the harm was intended to be caused; (2) the nature of
> the plaintiff's alleged injury including the status of the plaintiff as
> consumer or competitor in the relevant market; (3) the directness or
> indirectness of the injury, and the related inquiry of whether the damages
> are speculative; (4) the potential for duplicative recovery or complex
> apportionment of damages; and (5) the existence of more direct victims of
> the alleged antitrust violation.

*Static Control Components, Inc. v. Lexmark Int'l, Inc.,* 697 F.3d 387, 402 (6th Cir. 2012)

(quoting *Southaven Land Co., Inc. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1085 (6th Cir.

1983)). Plaintiffs satisfy each of the *Static Control* factors:

> (1) ***The causal connection between the antitrust violation and harm to the plaintiff and
> whether the harm was intended to be caused*** - Plaintiffs have pleaded that "[a]s a direct
> and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members
> of the Class have been injured in their businesses and property in that they have paid
> more for Bearings than they would have paid in a competitive market." (Compl. at ¶
> 141.) Plaintiffs have also pleaded that "Defendants knew and intended that their pricing
> actions regarding their sales of Bearings would have a direct impact on prices for
> Bearings for all direct purchasers of Bearings throughout the United States." (*Id.* at ¶
> 135.)

> (2) ***The nature of the plaintiff's alleged injury including the status of the plaintiff as
> consumer or competitor in the relevant market*** - Plaintiffs allege that they were injured
> in their capacity as consumers of the alleged price-fixed product in the relevant market.
> (*Id.* at ¶¶ 15-17 ("Plaintiff[s] purchased Bearings directly from one or more Defendants
> during the Class Period and suffered injury as a result of Defendants' unlawful
> conduct.").)

> (3) ***The directness or indirectness of the injury, and the related inquiry of whether the
> damages are speculative*** - Plaintiffs allege that their injuries were direct ("Plaintiff[s]
> purchased Bearings directly," (*id.* at ¶¶ 15-17), and that their injuries are not speculative,
> in that they allege that they paid higher prices for Bearings than they would have paid in
> the absence of the Defendants' unlawful conduct, which was the direct and intended
> result of the conspiracy. (*Id.* at ¶¶ 135, 141.)

> (4) ***The potential for duplicative recovery or complex apportionment of damages*** –
> Plaintiffs are direct purchasers from the alleged violators, and thus they are the very
> plaintiffs intended to vindicate such wrongdoing. *Illinois Brick Co. v. Illinois,* 431 U.S.
> 720, 734-35 (1977) ("we understand *Hanover Shoe* as resting on the judgment that the
> antitrust laws will be more effectively enforced by concentrating the full recovery for the
> overcharge in the direct purchasers.")

21

(5) *The existence of more direct victims of the alleged antitrust violation* - As mentioned, Plaintiffs are direct purchasers from the Defendants. There are no more direct victims of the alleged antitrust violation under Federal law. *Id.*

Defendants rely on *In re Refrigerant Compressors Antitrust Litig.,* 795 F.Supp.2d 647, 660 (E.D. Mich. 2011), for the proposition that Plaintiffs should be required to specifically identify from which Defendants they purchased Bearings, what products they purchased, and where and when such purchases took place. Such detailed averments are not required. The problem identified by the Court in *Refrigerant Compressors* was that the complaint there was drafted so as to make it "impossible to determine which, *if any,* of the named [direct purchaser] Plaintiffs allege that they purchased compressors directly from a Defendant . . . as opposed to products containing compressors." *Id.* at 659 (emphasis in original). That problem does not exist here where each of the Plaintiffs alleges specifically that it bought Bearings, not products containing Bearings. (Compl. at ¶¶ 15-17.)

Defendants' reliance on *In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.,* No. 12-711, 2013 WL 812143, at *9 (D.N.J. March 5, 2013) is similarly misplaced. Unlike here, *Ductile Iron Pipe* involved three distinct classes of Direct Purchaser Plaintiffs: (1) the Price Fixing Class consisting of purchasers of imported and domestic ductile iron pipe fittings ("DIPF"); (2) the Monopolization Class consisting of direct purchasers of domestic DIPF from defendant McWane during a certain period; and (3) the McWane/Sigma Conspiracy Class consisting of direct purchasers of domestic DIPF from defendants McWane or Sigma during a narrower period than the Monopolization Class. *Id.* at *5. Because there were three separate classes of Direct Purchasers—each defined by variations regarding which Defendant a class member purchased from, when the purchases were made, and whether imported or domestic DIPF was purchased—the plaintiffs pleaded those facts to distinguish between the various subclasses. The *Ductile Iron Pipe* court did not require that the class representatives plead the

kind of detailed allegations suggested by Defendants here; instead, the court explicitly rejected the argument that detailed factual allegations were required under Rule 8 and held that "Plaintiffs' allegations that they were injured by having paid more...than they otherwise would have paid absent the [D]efendants' unlawful conduct...is sufficient to establish antitrust standing." *Id.* at *9 (quoting *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at *6 (D.N.J. Oct. 20. 2011)).

Defendants state that Plaintiffs do not identify which type of Bearings were the subject of the conspiracy, nor which Bearings were purchased. (Defs' Joint MTD at 12, n.3.) The Complaint, however, alleges that automotive and industrial bearings were the products involved in the conspiracy. (Compl. at ¶ 1.) Unlike *Ductile Iron Pipe*, there is only one class of direct purchasers involved here. Plaintiffs need only plead that a class member purchased automotive or industrial Bearings from one of the Defendants during the Class Period to establish the requisite standing, and they have done so.

Despite Defendants' strained and faulty reasoning to the contrary, this Court's decision in *Wire Harness* does not heighten the pleading standard to require Plaintiffs to plead "facts regarding the process by which the prices they paid for bearing or whether or how the process was impacted by any alleged conspiracy…." (Defs' Joint MTD at 13.) As this Court is well aware, in *Wire Harness*, the "DPPs purchased the offending Wire Harness Products at a price agreed to by the OEMS." *Wire Harness*, 2013 WL 2456584, at *10. The defendants there argued that the plaintiffs were "not truly 'direct purchasers' in any economic sense because the DPPs only paid allegedly inflated prices because the OEMS agreed to those prices in separate transactions with Defendants." *Id.* at *9. There is no such purchasing process alleged here.

23

More importantly, the Court did not *require* that the plaintiffs in *Wire Harness* affirmatively plead the purchasing process described above. Rather, the Court held that the plaintiffs' status as suppliers subject to that purchasing process did not "render[] them something other than direct purchasers," nor did the fact that the conspiracy was directed primarily at automobile manufacturers and not plaintiffs. *Id.*

Defendants here are alleged to have engaged in a price-fixing and bid-rigging conspiracy whose sole purpose was to artificially inflate the prices Plaintiffs paid and Defendants received for Bearings. Plaintiffs paid those inflated prices and were injured, thus establishing their standing to bring a claim under the antitrust laws.[5]

## III.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.

Defendants further argue, incorrectly, that Plaintiffs claims are barred by the statute of limitations because they have not adequately alleged fraudulent concealment. This argument ignores the discovery rule, and rehashes the arguments concerning fraudulent concealment that this Court rejected in *Wire Harness.* 2013 WL 2456584, at *10-14. Based on the same analysis set forth in *Wire Harness*, Plaintiffs claims here are not barred by the statute of limitations.

---

[5] Defendants present a short section on constitutional standing that requires little discussion. As the Supreme Court has made clear, antitrust standing has two prongs, constitutional standing plus directness of injury. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535, n. 31, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983) "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."). Plaintiffs adequately allege that they were harmed, satisfying the constitutional standing requirement.

## A.  Plaintiffs' Claims Were Tolled By The Discovery Rule

Absent tolling, "[a] Sherman Act claim must be brought 'within four years after the cause of action accrued.'" *Carrier*, 673 F.3d at 446, quoting 15 U.S.C. § 15(b);[6] *accord In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 536 (6th Cir. 2008) ("A cause of action, however, does not necessarily 'accrue' when the defendant commits the act causing the plaintiff's injury, but may be tolled until the plaintiff discovers or should have discovered the injury"); *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) (the statute of limitations applicable to a federal antitrust violation is "qualified by the discovery rule, which 'postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured'") (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990)).

The first direct purchaser Bearings complaint was filed on July 3, 2012. Ignoring the discovery rule, Defendants argue that Plaintiffs' claim for damages beyond the four-year limitations period is barred. Plaintiffs have, however, sufficiently pleaded that the conspiracy began January 1, 2004, and that the statute was tolled until at least July 2011—*i.e.*, the date the antitrust investigations of the Bearings manufacturers became public—because that is the first date on which the Plaintiffs could have arguably discovered their injury. (Compl. at ¶ 122.) The statute of limitations was thus tolled by the discovery rule until, at the earliest, July 2011. Plaintiffs timely sued in July 2012. *See Scrap Metal*, 527 F.3d at 536; *In re Packaged Ice*

---

[6] When a continuing antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of a defendant. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). In price-fixing cases, accrual occurs each time the plaintiff purchases a product whose price has been affected by the antitrust conspiracy. *Id.* Therefore, each sale at an inflated price starts the running of the limitations period anew. *Id.; see also In re Southeastern Milk Antitrust Litig.*

*Antitrust Litig.*, 779 F. Supp. at 670 (refusing to dismiss state law antitrust claims because of the discovery rule).

### B.  Plaintiffs' Claims Were Tolled By Defendants' Fraudulent Concealment

In addition, the statute of limitations was tolled by the doctrine of fraudulent concealment. *See, e.g., Scrap Metal*, 527 F.3d at 536 ("[A]cts of fraudulent concealment by the defendant toll the limitations period for as long as the concealment continues"); *Carrier,* 673 F.3d at 446 (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)) ("Three elements must be pleaded in order to establish fraudulent concealment: (1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts."); *Wire Harness*, 2013 WL 2456584, at *11.

Recycling arguments that were previously rejected by this Court in *Wire Harness*, Defendants contend that the Complaint fails to plead affirmative acts of concealment with specificity, pursuant to Rule 9(b), and that Plaintiffs fail to allege that they relied on the facts of fraudulent concealment. Defendants are wrong. The Complaint alleges affirmative acts of concealment that satisfy *Carrier* and are virtually identical to the allegations this Court found sufficient in *Wire Harness*.

It is important to recognize that while a "plaintiff must plead the factual allegations underlying a claim of fraudulent concealment with particularity," the Sixth Circuit is reluctant to dismiss fraudulent concealment allegations without the benefit of discovery. *Carrier*, 673 F.3d at 446, 448 (citing *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1043 (6th Cir. 1984)); *Duncan v. Leeds*, 742 F.2d 989, 993 (6th Cir. 1984) (addressing the need to construe allegations of fraudulent concealment liberally and in the plaintiff's favor at such an early stage in the litigation); *Wire Harness*, 2013 WL 2456584, at * 13. Also, "[f]raudulent concealment … may

be established through the acts of co-conspirators." *Carrier*, 673 F.3d at 447 n.8 (quoting *Scrap Metal*, 527 F.3d at 538). And "where there is a dispute as to the issue of fraudulent concealment, the question is one for the jury." *Packaged Ice*, 723 F. Supp. 2d at 1018 (quoting *Dry Cleaning & Laundry Institute of Detroit, Inc. v. Flom's Corp.*, 841 F. Supp. 212, 216 (E.D. Mich. 1993)).

Plaintiffs allege the three elements needed to invoke the fraudulent concealment doctrine. The first element concerns allegations that Defendants wrongfully concealed their conduct. A plaintiff need only point to "affirmative acts of concealment" to meet this requirement. *Carrier*, 673 F.3d at 446 (quoting *Hamilton Cnty. Bd. of Comm'rs. v. Nat'l. Football League*, 491 F.3d 310, 319 (6th Cir. 2007)). While "mere silence or unwillingness to divulge wrongful activities is not sufficient," a plaintiff need only allege "some trick or contrivance intended to exclude suspicion and prevent inquiry." *Id.* at 446-47 (quotation omitted). The Complaint easily satisfies this standard.

In *Carrier*, 673 F.3d at 447, the Sixth Circuit held that the plaintiff adequately pleaded affirmative acts of concealment and, as noted by this Court in *Wire Harness*, 2013 WL 2456584, at *12, "[t]he allegations found to be sufficient in *Carrier Corp.* were neither detailed nor extensive."[7] "In the Sixth Circuit, the affirmative acts of concealment may be committed at any

---

[7] The *Carrier* plaintiff had alleged the following: (i) "quotes [from] the EC's findings that the conspirators 'established security rules to prevent a paper trail … and used a coding-system to hide the identity of the producers in their documents and spreadsheets,'" and (ii) "because of the co-conspirators' misstatements and attempts at suppressing evidence of illegal conduct, [the plaintiff] had no knowledge of the Defendants' conspiracy until the release of the EC decision .…" 673 F.3d at 447-48. The Sixth Circuit concluded that "[t]aken as true, these actions would have both concealed from [the plaintiff] the very 'means of discovering [its] cause of action,' and prevented [the plaintiff] from discovering the basis for its antitrust claim within the limitations period." *Id.* at 448 (internal citation omitted); *see also id.* at 447 (citing *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 303, 316 (D.N.J. 2004)) (concluding that a plaintiff "injected precision" into its fraudulent-concealment claim "by pleading the findings of the United States Department of Justice and the European Commission")); *id.* at 448 (citing

time, including during the course and in furtherance of the underlying conspiracy." *Michigan v. McDonald Dairy Co.*, 905 F.Supp. 447, 451 (W.D. Mich. 1995) (citing *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1474-76 (6th Cir. 1988)). The "self-concealment of a conspiracy sufficient to toll the statute of limitations refers to activities in furtherance of the conspiracy which by their nature defy detection." *Pinney Dock*, 838 F.2d at 1471-72; *see also Wire Harness*, 2013 WL 2456584, at *12. There is no requirement that a plaintiff plead a defendant's affirmative conduct apart from conduct that was part of the conspiracy itself that concealed the means for discovering plaintiff's claims. *See id.*; *McDonald Dairy Co.*, 905 F. Supp. at 451-52 (bid-rigging constituted affirmative acts under *Pinney Dock*).

In *Wire Harness*, this Court found that allegations regarding defendants' measures to maintain secrecy, their use of code names, meetings at private residences or remote locations, and their monitoring activity all supported a finding of wrongful concealment. *Wire Harness*, 2013 WL 2456584, at *12; *see also Carrier*, 673 F.3d at 447 (affirmative acts of concealment sufficiently alleged where plaintiff alleged a "coding-system to hide the identity of the producers in their documents and spreadsheets"). The Complaint alleges similar conduct by Defendants here: Defendants met and communicated in secret (Compl. at ¶ 126-128); and disseminated fraudulent pricing information (*id.* at ¶ 130). These allegations are further supported by the government investigations and charges, (*id.* at ¶¶ 60-99), which this Court has held assist in satisfying the wrongful concealment elements. *Wire Harness*, 2013 WL 2456584, at *12. Additionally, the Informations to which defendants JTEKT Corporation and NSK Ltd. pleaded guilty charged that they and their co-conspirators "employ[ed] measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations," and

---

*Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004) ("hiding evidence" can constitute affirmative concealment).

engaged in communications to monitor and enforce adherence to the conspiracy." (JTEKT Information at ¶¶ 8(h)-(i); NSK Information at ¶¶ 8(h)-(i).) This Court in *Wire Harness* found the use of code names, meeting at private residences or remote locations, and monitoring conduct to constitute affirmative acts of fraudulent concealment, therefore satisfying the first element of the doctrine, *i.e.*, the existence of wrongful concealment. *Wire Harness*, 2013 WL 2456584, at *12.

As in *Wire Harness*, the Complaint alleges the second element of the fraudulent concealment doctrine as well: inability to discover the operative facts of Defendants' wrongdoing. *Id.* at *13. Plaintiffs allege that Defendants and their co-conspirators represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral and, therefore, competitive. (Compl. at ¶ 124.) Further, as discussed above, that multiple Defendants have pleaded guilty to anticompetitive behavior in the sale of Bearings bolsters Plaintiffs' allegations that they could not have discovered Defendants' antitrust conspiracy prior to July 2011, when the antitrust investigations of Bearings manufacturers became public.[8] This Court has previously found that such allegations satisfy the second fraudulent concealment element. *Wire Harness*, 2013 WL 2456584, at *13.

As to the third element, the exercise of due diligence, Plaintiffs allege that despite their due diligence, they had no knowledge of Defendants' and their co-conspirators' unlawful

---

[8] In *Packaged Ice*, 723 F. Supp. 2d at 1018, the plaintiffs alleged that they "did not and could not have discovered Defendants' unlawful contract, combination or conspiracy at any earlier date" and that defendants "undertook affirmative acts of concealment of their contract, combination or conspiracy, including their attendance at secret meetings, and engaging in secret conversations concerning the allocation of markets and customers for Packaged Ice." Further, where the defendants, like Defendants here, had pled guilty to a conspiracy that clearly embraced the entire proposed class period, the court found that these allegations plausibly alleged affirmative acts of concealment. *Id.; see also In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 804 (N.D. Ohio 2011) (finding the complaint "establish[ed] that no facts existed that did or should have excited Plaintiffs' suspicions about alleged price-fixing and customer allocation conspiracy until the 2010 government raids," and therefore, "Plaintiffs plausibly allege they could not have discovered the alleged conspiracy at an earlier time.").

contract, combination, or conspiracy. (Compl. at ¶ 129.) Throughout their dealings with Defendants, Plaintiffs received various pricing information, but had no way of knowing that prices they were presented by Defendants were higher than they should have been if Defendants had not engaged in the anticompetitive conduct alleged. (*Id.* at ¶130.) Plaintiffs could not have discovered the wrongful conduct at any earlier point in time because of the secret meetings, misrepresentations as to the reasons for the prices charged, and the fact Defendants had secret communications concerning the price-fixing of Bearings. (*Id.* at ¶131.) These are precisely the types of allegations this Court has found sufficient to plead the due diligence element of fraudulent concealment. *Wire Harness*, 2013 WL 2456584, at *13. As this Court previously recognized, the Sixth Circuit is reluctant to hold that a plaintiff's "efforts were insufficient to satisfy the third element 'at such an early stage of litigation and without the benefit of discovery.'" *Id.* (quoting *Carrier*, 673 F.3d at 448-49). Accordingly, the third element of the fraudulent concealment doctrine is also met.

Finally, Defendants argue that Plaintiffs failed to allege that they relied on Defendants' acts of fraudulent concealment. However, *Carrier Corp.* simply requires that the complaint "provide specific details regarding the nature of the alleged cover-up" and allegations that "because of the co-conspirators' misstatement and attempts at suppressing evidence of illegal conduct, [the plaintiff] had no knowledge of the defendants conspiracy until the release of the EC decision . . . ." *Carrier Corp.*, 673 F.3d at 447-48. In *Wire Harness*, this Court noted that the complaint need only allege, like the Complaint alleges here, that the Defendants represented to customers and others that their pricing and bidding activities were unilateral, thereby misleading

the plaintiffs as to the true, collusive, and coordinated nature of Defendants' activities related to bid-rigging, customer allocation, and price-fixing. *Wire Harness,* 2013 WL 2456584, at *12.[9]

Under *Carrier* and *Wire Harness*, Plaintiffs have adequately alleged fraudulent concealment of Defendants' collusion that, when eventually exposed, resulted in guilty pleas. Any further issues concerning fraudulent concealment (and the appropriate damages period) should properly be left to the jury.

## IV.   THE COMPLAINT PROPERLY PLEADS PLAINTIFFS' ENTITLEMENT TO INJUNCTIVE RELIEF

Defendants' claim that plaintiffs lack standing to seek injunctive relief because they have "failed to plead facts to support a claim of continuing conspiracy" is incorrect. (*See* Defs' Joint MTD at 22.) Not only have Plaintiffs sufficiently pleaded a continuing conspiracy, but Defendants acknowledge the continued ongoing effects of that conspiracy. Plaintiffs also have sufficiently alleged the threat of future harm from the continuation or resumption of Defendants' conspiracy.

Section 16 of the Clayton Act, 15 U.S.C. § 26, provides in part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18 and 19 of this title, when and under the same

---

[9] Defendants also argue that Plaintiffs were on notice of the alleged price-fixing conspiracy because the structure of the Bearings market makes it conducive to price-fixing and market allocation, and the increase in Bearings prices in the United States during the Class Period is not explained by an increase in costs for the production of Bearings. Defendants claim these facts were known to Plaintiffs and should have alerted plaintiffs to the existence of a price-fixing conspiracy. (Defs' Joint MTD at 20-21.) However, to show notice of a conspiracy, what Plaintiffs must be aware of is not the structure of the Bearings market, but some facts or at least some indications that there was anticompetitive conduct occurring. The portions of the Complaint cited by Defendants do not indicate whether the cited acts were known to Plaintiffs when they occurred, or could not have become known until after plaintiffs became aware of the alleged conspiracy in July 2011. Moreover, Defendants' argument is not supported by the law of the Sixth Circuit.

> conditions and principles as injunctive relief against threatened conduct that will
> cause loss or damage is granted by courts of equity . . . .

The Supreme Court has interpreted Section 16 to allow courts to enjoin antitrust violations when

they have been proven:

> We see no reason that the federal courts, in exercising the traditional equitable
> powers extended to them by § 16, should not respond to the "salutary principle
> that when one has been found to have committed acts in violation of a law he may
> be restrained from committing other related unlawful acts."

*Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 133 (1969) (quoting *NLRB v. Express*

*Pub. Co.*, 312 U.S. 426, 436 (1941)). "The necessary determination [in granting injunctive relief]

is that there exists *some* cognizable danger of recurrent violation." *Id.* (emphasis added). "[A]n

antitrust plaintiff seeking injunctive relief need only show a threatened injury, not an actual one."

*Lucas Auto. Engineering v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998).

There is no need to show an imminent threat of irreparable injury. *See e.g. In re TFT-LCD (Flat*

*Panel) Antitrust Litig.*, 267 F.R.D. 583, 596 (N.D. Cal. 2010), *amended in part*, 2011 WL

3268649 (N.D. Cal. July 28, 2011).

Plaintiffs have adequately pleaded such a threatened injury. Plaintiffs allege that

Defendants have engaged in a conspiracy that has lasted at least 10 years. (Compl. at ¶ 1.)

Notwithstanding Defendants' unsupported assertions to the contrary, Plaintiffs have not alleged

that the conspiracy has concluded. While Defendants claim that any notion that the conspiracy

has continued in light of the government investigations and guilty pleas should be dismissed as

implausible, this Court rejected the exact same argument in denying the Defendants' motion to

dismiss the injunctive claim in *Wire Harness.* 2013 WL 2456584, at *13-14.

Moreover, Defendants acknowledge that the "typical bearings product cycle"—*i.e.*, the

period between the quotation and sourcing of the bearings and the time of sale—is between four

and six years. (Defs' Joint MTD at 23 n.8.) Therefore, their claim that the pricing cycle is somehow immaterial here is baffling: By their own admission, any prices set as a result of a collusive bidding process beginning before Defendants claim their conspiratorial conduct would have ceased in 2011 could be in effect as late as 2017. This factor strongly weighs in favor of allowing a Plaintiff's injunctive relief claim to stand.

Finally, Defendants' unsupported argument that the conspiracy has concluded, even if accepted as true, "does not obviate the threat that the conspiracy will persist or resume in the future." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. at 597. Plaintiffs have alleged that Defendants and their co-conspirators operate in a market with high barriers to entry (Compl. at ¶ 50), among companies that engaged in frequent secret meetings (*id. at* ¶¶ 127, 131), that commenced at least as early as 2004 and continued to at least 2011 (*id.* at ¶ 122). The same market conditions and opportunities to conspire that facilitated Defendants' long-running conspiracy continue today. These factors were also relied upon in *Wire Harness* to deny the motion to dismiss the claim for injunctive relief. *Wire Harness, supra.* Other courts have found similar allegations sufficient to sustain a nationwide injunctive relief claim. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. at 595-97 (finding plaintiffs' allegation of a multi-company conspiracy, operated in a market with high barriers to entry, with frequent secret meetings in an industry with continuing opportunities to conspire, sufficient to seek injunctive relief); *SRAM*, 264 F.R.D. at 610-11 (same); *In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718, at *8 (N.D. Cal. Apr. 19, 2012) (motion to dismiss claim for injunctive relief denied because plaintiff need only show a threatened injury, not an actual one).

The existence of guilty pleas does not render injunctive relief inappropriate. *Wire Harness*, 2013 WL 2456584, at *14; *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267

F.R.D. at 597 (fact that various defendants have pleaded guilty to Sherman Act violations did not make injunctive relief inappropriate). In pleading guilty, two of the Defendants acknowledged that they have already chosen to ignore the antitrust laws. Neither is this the first time these Defendants have colluded: The Complaint alleges a rich, 30-year history of collusion among Defendants, to the point where the Japan Fair Trade Commission said it "believes the culture of collusion is ingrained in the bearings industry." (Compl. at ¶¶ 114-115.) One cannot assume, as Defendants suggest, that the fact that they were caught yet again will somehow prevent them this time from backsliding into further unlawful conduct. In sum, the threat of Defendants' persisting in their violations of the antitrust laws demonstrates that injunctive relief is particularly appropriate here.

## **CONCLUSION**

Plaintiffs have sufficiently pleaded a plausible conspiracy, their standing to challenge that conspiracy, and the need for injunctive relief. Accordingly, the Court should deny Defendants' Collective Motion to Dismiss the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint in all respects.

Dated: February 3, 2014                                Respectfully Submitted,

By: /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
100 West Long Lake Road: Ste. 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

*Interim Liaison Counsel for the Direct Purchaser Plaintiffs*

34

SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

KOHN SWIFT & GRAF, P.C.

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

FREED KANNER LONDON & MILLEN
LLC

Steven A. Kanner
William H. London
Michael E. Moskovitz
Michael L. Silverman
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com
msilverman@fklmlaw.com

**Interim Lead Counsel for Direct Purchaser Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2014, I electronically filed the foregoing paper with the Clerk of the court using the ECF system which will send notification of such filing to all counsel of record registered for electronic filing.

FINK + ASSOCIATES LAW

By: /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Interim Liaison Counsel for DP Plaintiffs
100 West Long Lake Road, Suite111
Bloomfield Hills, MI 48304
(248) 971-2500
dfink@finkandassociateslaw.com