**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                                          MASTER FILE NO. 12-md-02311


_____

In Re: Bearings                                                    HON. MARIANNE O. BATTANI

_____

THIS DOCUMENT RELATES TO:                                    2:12-cv-00501

Direct Purchaser Actions

_____/

**OPINION AND ORDER DENYING DEFENDANTS' COLLECTIVE**
**MOTION TO DISMISS DIRECT PURCHASER PLAINTIFFS'**
**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Before the Court is Defendants' Collective Motion to Dismiss Direct Purchaser

Plaintiffs' ("DPP") Consolidated Amended Class Action Complaint (Doc. No. 106).  The

Court scheduled oral argument on June 4, 2014, which the parties waived.  The Court

has reviewed all of the relevant filings, and for the reasons that follow, Defendants'

motion is **DENIED.**

**I.  INTRODUCTION**

On February 7, 2012, the United States Judicial Panel on Multidistrict Litigation

("Judicial Panel" or "Panel")  transferred actions sharing "factual questions arising out of

an alleged conspiracy to inflate, fix, raise, maintain, or artificially stabilize prices of

automotive wire harness systems" to the Eastern District of Michigan.  (12-md-02311,

Doc. No. 2).  In its transfer order, the Judicial Panel noted that the majority of cases were pending in the Eastern District, as was the first filed action, that several defendants were located in this district, and that a related criminal investigation was underway in this district.  (Id.)  The Panel determined that centralizing litigation in this District would eliminate duplicative discovery, prevent inconsistent pretrial rulings and conserve resources.  (Id.)   After complaints were filed alleging conspiracies to fix prices of three additional component parts, the Judicial Panel determined that including all actions in MDL No. 2311 would result in the most efficient handling of the case.  The Judicial Panel noted the existence of similar conspiracies with overlapping defendants arising from the same government investigation as well as an overlap of parties and counsel.  The additional component part cases were transferred to this Court for coordinated pretrial proceedings, and In re: Automotive Wire Harness Systems Antitrust Litigation was renamed "In re: Automotive Parts Antitrust Litigation."  (Doc. No. 117 in 12-2311).  There are now twenty-nine component part cases pending, (see Doc. No. 753 in 12-2311), and the investigation by the Department of Justice is ongoing.

On August 21, 2013, Direct Purchaser Plaintiffs ("DPPs") filed their Consolidated Amended Class Action Complaint ("CACAC") (Doc. No. 100 in 12-501).  Defendants assert that the CACAC fails to meet the minimum requirements for pleading an antitrust conspiracy, that Direct Purchaser Plaintiffs lack standing to bring a claim for money damages under the Sherman Act, the statute of limitations bars federal antitrust claims accruing before July 3, 2008, and DPPs lack standing to seek injunctive relief.

## II.  FACTUAL ALLEGATIONS

Direct Purchaser Plaintiffs, DALC Gear & Bearing Supply Corp., McGuire Bearing Company, and Sherman Bearings Inc., bring this class action against Defendants for damages and injunctive relief under the antitrust laws of the United States arising out of DPPs' purchase of Bearings.  The CACAC includes allegations about the parties, the product and sales, market conditions, and the investigation into the conspiracy and the guilty pleas entered by Defendants.  The allegations are set forth in greater detail below.

### A.  The Parties

DPPs filed this class action on behalf of "all direct purchasers who, during the Class Period, purchased bearings in the United States from one or more of the Defendants." (Doc. No. 100 at ¶ 12).  The Class Period is defined as January 1, 2004, through the present.  (Doc. No. 100 at ¶¶ 9, 33).  "Defendants and their co-conspirators manufactured Bearings: (a) in the United States for installation in vehicles and industrial machinery manufactured and sold in the United States and (b) abroad for export to the United States and installation in vehicles and industrial machinery sold in the United States." (Doc. No. 100 at ¶ 48).

The eleven named Defendants fall into six groups and include JTEKT Corporation, JTEKT North America Corp., formerly d/b/a Koyo Corporation of U.S.A., Nachi-Fujikoshi Corporation, Nachi America Inc., NSK Ltd., NSK Americas, Inc., Schaeffler AG, Schaeffler Group USA Inc., AB SKF, NTN Corporation, and NTN USA Corporation.  (Id. at ¶¶ 18-28).  The Court has dismissed AB SKF and Schaeffler AG for lack of personal jurisdiction.  (See Case No.12-500, Doc. Nos. 148, 149).

3

### B.  The Product and Sales

Bearings are defined in the CACAC to include "both automotive and industrial machinery bearings," which encompassed a number of different types of bearings. (See Doc. No. 100 at ¶ 10).  Bearings reduce friction by allowing "one moving part to glide past another moving part."  (Id. at ¶ 43).  Bearings sales in the United States totaled approximately $7.1 billion in 2008 and rose to $8.5 billion in 2012.  Throughout the Class Period, Defendants' annual sales in the United States totaled several billion dollars, much of the total U.S. sales during the same period.

Moreover, pricing data supports DPPs' antitrust claims because "increases in Japan during the Class Period have been higher on average than before the Class Period." (Doc. No. 100 at ¶ 109).  The same is true in the United States.  (Id.)  Prices for ball and roller bearings increased substantially more during the Class Period than before it.  (Doc. No. 100 at ¶¶ 111, 112).  Government data confirm that the increased prices in the United States cannot be explained by increased costs for production during the Class Period.  (Doc. No. 100 at  ¶ 113).

### C.  Market Conditions and Opportunities to Conspire

 DPPs allege that the market structure is conducive to price fixing and market allocation.  There are significant barriers to entry in the market for bearings; high and increasing market concentration; inelastic demand; homogeneous or commoditized products; excess capacity, and opportunities to conspire.  (Doc. No. 100 at ¶ 49).  A new entrant  into this market faces barriers, including significant startup costs, strong existing relationships between market players, and the large and increasing minimum

4

efficient scale.  (Doc. No. 100 at ¶ 50).

According to DPPs, the Bearings industry has become increasingly concentrated. (Doc. No. 100 at ¶ 51).  For example, in 2011, Defendants JTEKT, Koyo Corp. of U.S.A., now JTEKT North America Corp., Nachi-Fujikoshi Corp., Nachi America, NSK, NSK  Americas, Schaeffler AG, AB SKF, NTN Corporation, and NTN USA had a combined global market share exceeding 60%.  (Id.)

DPPs also allege that because a majority of ball bearings are standardized, any Defendant can produce the bearings products, thus, price is a major factor in the decision to purchase.  (Doc. No. 100 at ¶ 53).  "Defendants routinely purchase bearings from each other to meet customer demand."  (Doc. No. 100 at ¶ 54).

Because there are no close substitutes for Bearings, demand is highly inelastic, a factor that facilitates collusion.  (Doc. No. 100 at ¶ 56).  Consequently, bearings manufacturers "can raise prices to supra-competitive levels and increase profits;" (id.), thereby forcing "Class Members. . .to purchase these products at supracompetitive prices throughout the Class Period."  (Doc. No. 100 at ¶ 57).

In addition to the existence of these market conditions conducive to an antitrust conspiracy, DPPs allege Defendants and their co-conspirators had opportunities to conspire.  For example, Defendants meet privately at annual or semiannual trade association meetings, including, but not limited to, the Association of Steel and Iron Engineers, the Bearings Specialties Association, the Small Motors Manufacturers Association, and the Electric Motor Repair Group.  (Doc. No. 100 at ¶ 100).  Moreover, six of the named Defendants, NSK, NTN, Schaeffler, Nachi-Fujikoshi, Koyo, and SKF, make up the seven member World Bearing Association ("WBA").  (Id. at ¶ 101).

5

Trade meetings are not the only opportunities to conspire alleged in the CACAC. DPPs allege that distributers organized golf outings attended by Defendants' employees, who were paired at the various events.  (Doc. No. 100 at ¶ 104). Defendants and their co-conspirators had the opportunity, through these events, to "engage in private meetings, conversations  and communications to discuss pricing and customer allocation for Bearings sold in the United States."  (Doc. No. 100 at ¶ 105).

Because Defendants and their co-conspirators routinely produced and sold Bearings to each other, senior level employees "would meet or communicate to discuss and finalize these arrangements, thereby creating "additional opportunities for Defendants to collude on customer allocation and pricing structures in the U.S. Bearings market."  (Doc. No. 100 at ¶ 107).

### D.  Investigations and Guilty Pleas

This investigation into the conspiracy in the Bearings market began in Europe after several Original Equipment Manufacturers ("OEMs") complained to the European Commission ("EC").  (Doc. No. 100 at ¶ 83).   The United States, Japan, Europe, Australia, Canada, Singapore, and Korea coordinated global antitrust investigations into industrial and automotive Bearings.  (Id. at ¶ 60).

Thus far, the investigation has yielded an amnesty applicant in Japan, a criminal prosecution in Japan, and two guilty verdicts.  (Id.)  After JTEKT sought and received leniency from the Japan Fair Trade Commission ("JFTC"),  JTEKT admitted its participation in the cartel and cooperated with the JFTC investigation.  (Doc. No. 100 at ¶ 61).

In July 2011, the JFTC inspected facilities of NSK, NTN, JTEKT, and

6

Nachi-Fujikoshi for evidence of violations of the antimonopoly law. (Doc. No. 100 at ¶ 62). NTN and NSK confirmed the inspections in annual reports. (Doc. No. 100 at ¶¶ 63, 64).

In April 2012, "the Special Investigation Department of the Tokyo District Public Prosecutors Office and the JFTC raided NSK facilities regarding a potential violation of the Antimonopoly Act of Japan ("AMA")." (Doc. No. 100 at ¶ 65). The JTFC subsequently "filed a criminal accusation with the Public Prosecutor General against NSK, NTN, Nachi-Fujikoshi, and seven individuals engaged in the sale of Bearings for violating" the AMA. (Doc. No. 100 at ¶ 67). The Tokyo District Court found Nachi-Fujikoshi and two former officials of the company "guilty of participating in a price-fixing cartel" and fined Nachi-Fujikoshi 180 million yen or $2 million. (Doc No. 100 at ¶ 68). The Tokyo District Court also found NSK, NTN, JTEKT, and Nachi-Fujikoshi met in 2010 to negotiate higher prices for industrial bearings and subsequently raised prices as much as ten percent, resulting in a restraint on free competition. (Id. at ¶ 69). Two months later, the Tokyo District Court found NSK and three former executives of NSK guilty of "participating in a price-fixing cartel for automotive and industrial machinery bearings," and fined NSK "380 million yen (approximately U.S. $4 million)." (Id. at 70).

"On February 25, 2013, Nikkei Japan Business Newspaper reported that the presiding judge stated, '[t]he crime is malicious – large in scope and carried out systematically. Having the largest market share, NSK carried out the central role in this cartel.' " (Id. at ¶ 71).

The following month, "the JFTC issued cease and desist orders and surcharge

7

payment orders to NTN, NSK, and Nachi-Fujikoshi for their involvement in a price-fixing conspiracy" of industrial machinery bearings and automotive bearings.  (Doc. No. 100 at ¶ 73).  "The JFTC fined NTN approximately 7.2 billion yen, NSK 5.6 billion yen, and Nachi-Fujikoshi 509 million yen (totaling approximately $142  million USD)."  (Id.).  Although JTEKT admitted it participated in the conspiracy, JTFC did not fine JTEKT because of its status in the leniency program.  (Id.)  The trial against NTN and its two former officers is pending.  (Doc. No. 100 at ¶ 73).

The United States Department of Justice ("DOJ") likewise investigated antitrust activity in the Bearings industry.  (Doc. No. 100 at ¶ 77).  NTN, Schaeffler, NSK, and AB SKF all reported they were subject to investigation in the United States in their annual reports.  (Doc. No. 100 at ¶¶ 78-81).  The investigation is ongoing.

AB SKF and Schaeffler have admitted that their facilities were raided by European Union regulators, (Doc. No. 100 at ¶ 84), and JTEKT, NSK, and NTN have reported in their annual reports that they are subjects of investigation. (Doc. No. 100 at ¶¶ 85-89).

The investigation by the Australian Competition and Consumer Commission ("ACCC") became public in July 2013 after civil proceedings for alleged cartel conduct were instituted against a JTEKT Corporation subsidiary. (Doc. No. 100 at ¶ 84).

Around the same time, the "Competition Bureau of Canada ("CBC") announced that  JTEKT pleaded guilty to two counts of bid-rigging and was fined $5 million by the Superior Court of Quebec for its participation in an international bid-rigging cartel." (Doc. No. 100 at ¶ 92).  JTEKT admitted it "secretly conspired with NSK to submit bids or tenders in response to requests for quotations ("RFQs") to supply Toyota that were

8

predetermined by agreement." (Doc. No. 100 at ¶ 93). JTEKT sales management level personnel communicated directly with their counterparts at NSK, discussing how to coordinate their respective responses to Toyota. (Id.) They agreed that JTEKT would win certain RFQs while NSK would win others; both JTEKT and NSK submitted bids to Toyota in accordance with the agreement." (Id.) JTEKT participated in the CBC's Leniency Program and provided substantial assistance to the investigating authorities. (Doc. No. 100 at ¶ 94).

Investigations of NSK and NTN's subsidiaries have also taken place in Singapore, (Doc. No. 100 at ¶¶ 95, 96), and subsidiaries of NTN, NSK and SKF have been investigated by the Korea Fair Trade Commission and other government agencies regarding antitrust violations. (Doc. No. 100 at ¶¶ 97-99).

DPPs also include allegations demonstrating a history of collusion in the bearings market. DPPs allege that the JFTC "believes the culture of collusion is ingrained in the bearing industry." (Doc. No. 100 at ¶ 114). "In 1973, the JFTC found that NSK, Koyo Seiko Co. (currently JTEKT), Nachi-Fujikoshi, and NTN Toyo Bearing Co. (currently NTN) formed a cartel and held secret meetings at which they fixed bearings prices." (Id.) Price collusion continued through the 1980s, when Japanese Defendants conferred on pricing for customers and markets. (Doc. No. 100 at ¶ 115). SKF, Schaeffler and NSK, were fined for participation in a price-fixing cartel from 1993 through 1997 by the French Conseil de la Concurrence (Competition Council). (Doc. No. 100 at ¶ 114).

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint when it fails "to state a claim upon which relief can be granted."  When reviewing a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, " 'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.' " Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Under Iqbal, a civil complaint will only survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. . . .  Exactly how implausible is 'implausible' remains to be seen, as such a malleable standard will have to be worked out in practice." Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629-630 (6th Cir. 2009).

## IV.  ANALYSIS

### A.  Plausibility of the CACAC Antitrust Claim

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.  In Twombly, the Supreme Court considered the pleading requirements needed to

10

withstand a motion to dismiss a Section 1 Sherman Act claim. It held that a complaint

must contain "enough factual matter (taken as true) to suggest" the existence of an

agreement. 550 U.S. at 556.

> Asking for plausible grounds to infer an agreement does not
> impose a probability requirement at the pleading stage; it
> simply calls for enough facts to raise a reasonable
> expectation that discovery will reveal evidence of illegal
> agreement. And, of course, a well-pleaded complaint may
> proceed even if it strikes a savvy judge that actual proof of
> those facts is improbable, and that a recovery is very remote
> and unlikely.

Id.

The Court begins its analysis of the sufficiency of this complaint, as it has in other

component part cases, by reviewing the facts of Twombly. The plaintiffs brought a

consumer antitrust class action against local telephone and telecommunications carriers

alleging the defendants conspired to restrain trade. According to the plaintiffs, the

defendants engaged in parallel conduct to "inhibit the growth" of companies new to the

market and agreed not to compete with each other. 550 U.S. at 550-551. The

defendants moved to dismiss the complaint on the ground that it failed to include factual

allegations from which an express or tacit agreement could be inferred. Id. at 552.

Because the Supreme Court dismissed the antitrust claim in Twombly, the

decision does not stand as an example of the type of allegations that would satisfy the

plausibility standard. Nevertheless, the Supreme Court provided general guidance. It

indicated that a "heightened fact pleading of specifics" is not needed to state an antitrust

conspiracy claim, 550 U.S. at 570, although parallel behavior is not enough. The

Supreme Court summarized its decision in Twombly as follows:

11

>Our decision in <u>Twombly</u> illustrates the two-pronged approach. There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U.S.C. § 1. Recognizing that § 1 enjoins only anticompetitive conduct 'effected by a contract, combination, or conspiracy," <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the plaintiffs in <u>Twombly</u> flatly pleaded that the defendants 'ha[d] entered into a contract, combination or conspiracy to prevent competitive entry. . .and ha[d] agreed not to compete with one another.'  550 U.S. at 551, 127 S.Ct. 1955 (internal quotation marks omitted).

<u>Iqbal</u>, 556 U.S. at 679-80. The complaint also alleged that the defendants' 'parallel course of conduct. . .to prevent competition' and inflate prices was indicative of the unlawful agreement alleged.  <u>Id.</u> (internal quotation marks omitted).

>The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a 'legal conclusion' and, as such, was not entitled to the assumption of truth.  <u>Id.</u>, at 555, 127 S.Ct. 1955. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the 'nub' of the plaintiffs' complaint "the well-pleaded, nonconclusory factual allegation of parallel behavior' to determine whether it gave rise to a 'plausible suggestion of conspiracy.'  <u>Id.</u>, at 565-566, 127 S.Ct. 1955. Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. <u>Id.</u>, at 567, 127 S.Ct. 1955.  Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed.  <u>Id.</u>, at 570, 127 S.Ct. 1955.

<u>Iqbal</u>, 556 U.S. at 679-80.

Defendants contend that Twombly requires dismissal of this case for two reasons.  First, the CACAC stretches narrow guilty pleas to a unbounded conspiracy.  Second, the CACAC lacks factual allegations supporting Defendants' opportunities to conspire.  Each ground is discussed below.

### 1.  Overreaching

Defendants argue that the complaint stretches the minimal factual allegations too far.  According to Defendants, the various allegations about investigations into the Bearings industry do not support the broad conspiracy alleged here.  Notably, in contrast to the wire harness component part case, involving eleven plea agreements covering virtually the entire wire harness industry, here two Defendants entered very limited pleas.  JTEKT Corporation and NSK Ltd's pleas are limited to certain automotive bearings, sold only to Japanese automotive manufacturers.  Those admissions fail to support the conspiracy advanced by DPPs, involving automotive and industrial Bearings sold to all automotive manufacturers.  Moreover, in contrast to the allegations in the wire harness case, here there have been no search warrants, no allegations of simultaneous raids, and the investigations outside the United States are not linked to the guilty pleas in the United States.  Even if the foreign investigations could be relevant, Defendants assert that here the claims investigated are distinguishable.  For example, the Japanese investigation involved only four of the eleven Defendants and concerned industrial bearings in Japan.  The conspiracy investigated began in May 2010.  Even the subsequent administrative findings by the JFTC against three Defendants involved automotive Bearings, and referenced no connection to the United States.  The DOJ has

13

only taken action against two Defendants.

The Court assesses the viability of the CACAC upon review of all of the allegations.  See e.g. In re Southeastern Milk Antitrust Litig., 555 F. Supp. 2d 934, 944 (E.D. Tenn. 2008) (examining allegations of conspiracy to set prices and observing that a Sherman Act conspiracy should not be "dismember[ed]" upon review) (citing Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 699 (1962)). Accord In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1005-06 (E.D. Mich. 2010) (rejecting the dismemberment approach and observing that the plaintiffs identified the corporate players and executives, the general nature of the agreements, locations and time frames so as to enable the defendants to respond).   When the CACAC is viewed in its entirety, it contains sufficient allegations to satisfy DPP's pleading burden.

Certainly the antitrust claims brought by DPPs involve a more expansive time frame than admitted in the foreign guilty pleas and a greater array of bearings that admitted in the guilty pleas.  Nevertheless, case law requires the Court to reject an assessment of the CACAC by reading the guilty pleas in isolation.  The fact that no Defendant has pleaded guilty to the full range of conduct alleged in the CACAC does not circumscribe this law suit because relatively few defendants plead guilty to all of the charges against them and guilty pleas also factor in such considerations as government resources.  Here, the allegations in the CACAC, as well as the press release from the European Commission, suggest a broad industry-wide conspiracy that began before the time admitted in the guilty pleas.

According to the European Commission, two European companies, Defendants

14

AB-SKF and Schaeffler AG, four Japanese companies, JTEKT Corporation, NSK Ltd., Nachi-Fujikoshi Corporation, and NTN Corporation, as well as NTN's French subsidiary, operated a cartel in the market for automotive bearings for more than seven years–from April 2004 until July 2011. These companies "colluded to secretly coordinate their pricing strategy vis-à-vis automotive customers. . . ." (See 12-500, Doc. No. 136, Ex. A). DPPs allege that "Defendants NTN, NSK, Nachi-Fujikoshi, and JTEKT on average export approximately 55% of their Bearings to the United States and Europe." (Doc. No. 100 at ¶ 117 ). Further, except for NSK and SKF, Defendants derive the majority of their revenue from sales within the United States." Id. Finally, the United States imports 40% of its Bearings from Asia. (Id.) These allegations provide a link between the investigations in Europe and Japan and the investigation in the United States, which is ongoing.

These connections provide a sufficient basis for an inference that the antitrust conduct alleged in foreign jurisdictions makes antitrust conduct in the United States plausible. See In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1010 (E.D. Mich. 2010) (noting that where the plaintiffs were not "reaching across the ocean to unproven allegations," but were referencing an "admitted conspiracy," and therefore, the 'if there, then here' argument" should be taken into account). See also In re Flat Glass Antitrust Litig. (II), 2009 WL 331361 at *3 (W.D. Pa. 2009) (same). Just as in Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 445 (6th Cir. 2012) (reviewing the district court's dismissal of an antitrust lawsuit for failure to state a claim), the CACAC contains sufficient allegations sufficient to meet DPPs' burden to survive a Rule 12(b)(6) motion.

15

Because defendants typically do not plead guilty to all of the charges against them, and government resources often play a role in the plea agreement reached, civil litigation is not limited by a defendant's admissions.  In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 664, 665 (7th Cir. 2002).

In sum, the factual allegations in the CACAC create "a reasonable expectation that discovery will reveal evidence of illegal agreement" beyond those parties that have pleaded guilty and beyond the conduct and time frames admitted in the plea agreements.  Twombly, 550 U.S. at 556. Accord In re Polyurethane Foam Antitrust Litig., 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011) (relying on "specific admissions" made during a governmental investigation that supported the "existence of a conspiratorial agreement").

### 2.  Opportunities to Conspire

Next, Defendants contend that the conclusory allegations regarding opportunities to conspire renders the CACAC defective.  Further, Defendants assert that the market allegations are insufficient because there is no explanation as to how the market share is divided.  In contrast to the wire harness complaint, which specified each of the defendant's market share, here, DPPs merely allege that Defendants' combined market share exceeded 60% in 2011.  (Doc. No. 100 at ¶ 52).  Defendants conclude that these omissions require dismissal of the CACAC.  The Court disagrees.

Here DPPs  allege facts showing that the structure of the industry makes it susceptible to collusion.  Although only two Defendants have pleaded guilty in the case before this Court, other Defendants have pleaded guilty in Europe and Japan.  The

16

guilty pleas demonstrate an express agreement existed to fix prices and allocate customers in a market with conditions ripe for conspiratorial conduct.  At this stage of the litigation, these allegations, viewed in the light most favorable to DPPs show an "illicit accord" not, "lawful unchoreographed free-market behavior." See Twombly, 550 U.S. at 567.

In sum, the CACAC includes sufficient allegations to inform Defendants what wrongdoing they are alleged to have committed.  Moreover, the CACAC details factual allegations creating an inference of a world-wide conspiracy based upon the globally coordinated investigations, the guilty pleas by two Defendants; the structure of the Bearings industry; and the allegations demonstrating Defendants' opportunity to meet and collude.  Based upon the context of this case, the Court's judicial experience, and plain common sense, the Court finds DPP has advanced a plausible antitrust claim.

## B.  STANDING/VIABILITY OF CLAIM FOR DAMAGES

The parties dispute whether DPPs have alleged facts sufficient to demonstrate Article III standing or standing under antitrust law.   DPPS must demonstrate they have antitrust standing.  See Static Control Components, Inc. v. Lexmark Int'l, Inc., 697 F.3d 387, 402 (6th Cir. 2012) aff'd on other grounds, 134 S. Ct. 1377 (2014).  "[S]tanding in an antitrust case is more onerous than the conventional Article III inquiry."  NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc).

In Static Control Components, 697 F.3d at 402, the Sixth Circuit addressed the factors assessed and balanced when deciding whether a claimant has satisfied his burden to adequately plead antitrust standing.  First, the plaintiff must allege "the causal

17

connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused." Id.   Second, the court considers "the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market." Id. Third, the court looks at "the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative." Id.  Fourth, the court must assess "the potential for duplicative recovery or complex apportionment of damages." Id.  Finally, the court must consider "the existence of more direct victims of the alleged antitrust violation." Id. (citations omitted).

After reviewing the allegations set forth in the complaint, the Court is satisfied that DPPs have adequately pleaded antitrust standing.  First, the complaint includes allegations that DPPs purchased Bearings directly from one or more of the Defendants and/or co-conspirators during the Class Period (Doc. No. 100 at ¶¶ 3,15-17, 133-135, 141), and that Defendants knew and intended that the conspiracy impact the prices DPPs paid for Bearings. (Doc. No. 100 at ¶ 141).  DPPs allege that Defendants and their co-conspirators engaged in a price-fixing conspiracy involving Bearings sold in the United States and allocated markets and customers for Bearings sold in the United States during the Class Period.  (Doc. No. 100 at ¶¶ 137-139).  The allegations of price increases satisfies DPPs' burden.  See In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig., CIV. 12-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) (finding it unnecessary for the direct purchasers to "state the actual price that they paid" because they alleged the purchases were made directly from the defendants during the time frame of the conspiracy to fix prices).  Moreover, because DPPs purchased Bearings

18

directly from Defendants, there is no need for complex apportionment of damages.  As direct purchasers, they are direct victims of the alleged conspiracy.

The balancing test is satisfied despite the lack of detailed allegations regarding the connection between Bearings sold to a particular OEM and the conspiracy alleged in the CACAC.  To link the purchases of Bearings to the alleged conspiracy, DPPs link their purchases to the conspiracy with an allegation that they purchased Bearings in the United States from one or more of Defendants or their co-conspirators, and that the anticompetitive conduct impacted the independent bid process, resulting in supracompetitive prices.  (Doc. No. 100 at ¶ 135-141).  Further, DPPs allege that the conspiracy was intended to and did affect the sales prices of Bearings to buyers in the United States. (Id.).

In addition, DPPs contend that these facts create joint and several liability.  In support of their position, DPPs rely on Paper Sys., Inc. v. Nippon Paper Indus., 281 F.3d 629 (7th Cir. 2002) (reversing dismissal of manufacturer that had not sold directly to a plaintiff), a case addressing the effect of joint and several liability on the analysis of damages in an antitrust lawsuit.  The plaintiffs alleged that five manufacturers conspired "to reduce output and raise prices in the thermal facsimile paper business."  Id. at 631.  Because the defendants used different distribution systems to sell paper, a particular plaintiff might be a direct purchaser of one defendant, but not the others.  Id. at 632.  The court concluded that only direct customers could recover damages for overcharges from a particular defendant, but because the defendant's status as a member of a cartel remained undetermined, it remained in the case as "jointly and severally liable for the

19

entire overcharge" caused by the conspiracy.  Id. at 634.

The allegations, when viewed in the light most favorable to DPPs, satisfy its burden.  In sum, DPPs have "causally linked" its antitrust  injury to "an illegal presence in the market."  Brunswick v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  They allege that they paid a higher price for Bearings purchased from Defendants than they would have paid absent the alleged conspiracy.  In re Titanium Dioxide Antitrust Litig., No. 10-0318, 2012 WL 3711890, at * 10 (D. Md. Aug. 28, 2012) (citing Hanover Shoe v. United Shoe Mach. Corp., 392 U.S. 481, 489 (1968) (observing that a prima facie case of injury and damage is met when a plaintiff shows that he paid an illegally high price and shows that the amount of the overcharge)).

Further, DPPs have established standing under Article III of the Constitution. They have alleged personal injuries "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  Allen v. Wright, 468 U.S. 737, 751 (1984).  Here DPPs have articulated the impact of the alleged conspiracy–they were harmed by paying higher prices because of the conspiracy.  They have satisfied their pleading burden.

## C.  Sufficiency of the Fraudulent Concealment Allegations

The parties disagree as to whether the fraudulent concealment doctrine tolled the statute of limitations through at least July 2011, when the antitrust investigations of Bearings manufacturers became public.  DPPs allege that "Defendants and their co-conspirators affirmatively and wrongfully concealed their anticompetitive conduct" from at least January 1, 2004, through at  least July 2011.  (Doc. No. 100 at ¶ 122).

20

According to DPPs, despite their due diligence, they "did not learn or discover the operative facts giving rise to their claims." (Id. at ¶ 129)

According to the CACAC, DPPs received pricing information from one or more of Defendants or their co-conspirators, and DPPs had no way to know that these prices were higher than they should have been because of the conspiracy. DPPs allege that "price increases were often attributed to increases in cost of inputs," for example, steel. (Doc. No. 100 at ¶ 132).

Defendants allegedly accomplished this concealment through attendance at secret meetings, secret conversations, and communications. (Doc. No. 100 at ¶ 127). Defendants represented to customers and others that Bearing pricing was unilateral. (Doc. No. 100 at ¶ 124).

The first complaint filed by a direct purchaser, on July 3, 2012, alleges a conspiracy from at least as early as January 1, 2004. According to DPPs, the statute was tolled until at least July 2011, the date the investigations into Bearings became public. DPPs assert that is the first day they would have discovered their injuries. (Doc. No. 100 at ¶ 122). They conclude that the statute of limitations was tolled by the discovery rule through July 2011. Because the law suit was filed in July 2012, the suit is timely.

In the alternative, the claims are tolled by the doctrine of fraudulent concealment. Defendants maintain that any claims for damages suffered from the conspiracy before July 2008 are barred because the statute requires claims be brought "within four years

after the cause of action accrued." 15 U.S.C. § 15b; Klehr v. A.O. Smith Corp., 521 U.S. 179, 189-90 (1997).

Whether claims prior to July 2008 are barred turns on whether the statute was tolled by the fraudulent concealment doctrine.   A plaintiff must plead three elements to establish fraudulent concealment:

> (1) wrongful concealment of their actions by the defendants;
> (2) failure of the plaintiff to discover the operative facts that
> are the basis of his cause of action within the limitations
> period; and (3) plaintiff's due diligence until discovery of the
> facts.

Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975).  A plaintiff must plead the factual allegations underlying a claim of fraudulent concealment with particularity.  Friedman v. Estate of Presser, 929 F.2d 1151, 1160 (6th Cir. 1991). DPPs allege that they failed to discover the operative facts during the limitations period. Accordingly, the Court considers the remaining factors.

### 1. Wrongful Concealment

To show "wrongful concealment," a plaintiff must show something more than silence or an unwillingness to reveal wrongful conduct.   Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League, 491 F.3d 310, 319 (6th Cir. 2007); Browning v. Levy, 283 F.3d 761, 770 (6th Cir. 2002).  A plaintiff must allege the existence of a "trick or contrivance intended to exclude suspicion and prevent inquiry."  Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1467 (6th Cir. 1988) (quotation omitted).  The Sixth Circuit has held that "[f]raudulent concealment. . .may be established through the acts of co-conspirators."  Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 448 n.8 (6th Cir.

2012) (citing In re Scrap Metal Antitrust Litig., 527 F.3d 517, 538 (6th Cir.2008), cert. denied, 556 U.S. 1152 (2009)).  Finally, courts should be reluctant to dismiss fraudulent concealment allegations at an early point in the litigation.  Id.

Notably, the allegations found to be sufficient for wrongful concealment in Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 446-47 (6th Cir. 2012), were not extensive.  In that case, the  plaintiffs relied on findings from the European Commission that conspirators "established security rules to prevent a paper trail. . .and used a coding-system to hide the identity of the producers in their documents and spreadsheets."  Id. at 447.  These allegations satisfied the Sixth Circuit, inasmuch as they demonstrated "active steps to hide evidence, as opposed to simply meeting in secret."  Id. at 447 (citing Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883, 891 (6th Cir. 2004) (explaining that "hiding evidence" can constitute affirmative concealment)).

Here, DPPs argue that the earliest notice was July 2011, the date the antitrust investigation became public. (Doc. No. 100 at ¶ 122).  There was no information in the public domain about the rigged bids for Bearings; Defendants met and communicated in secret, and agreed to keep the facts from discovery.  (Doc. No. 100 at ¶¶ 125-127, 131).  Defendants represented to customers and others that the pricing and bidding activities were unilateral, thereby misleading DPPs as to the true, collusive, and coordinated nature of Defendants' activities relating to customer allocation, and price-fixing (Doc. No. 100 at ¶ 124), Defendants disseminated fraudulent pricing information (Doc. No. 100 at ¶ 130), and Defendants affirmatively concealed their conduct when the antitrust investigation became public.  Further, several Defendants admitted to colluding

secretly, and although JTEKT Corporation and NSK Ltd. pleaded guilty after DPPs filed their CACAC, the Court is aware that in their pleas they admitted to using code names and meeting at remote locations as well as monitoring compliance with the conspiracy.

The Court found similar allegations sufficient to demonstrate wrongful concealment in other component part cases, see In re Auto. Parts Antitrust Litig., 12-MD-02311, 2013 WL 2456584 (E.D. Mich. June 6, 2013), and Defendants have not provided grounds for distinguishing the situation here from the decision in those cases. The Court rejects Defendants' contention that because pubic data confirm substantial increases in Bearings prices during the Class Period and a market that was susceptible to collusion, DPPs should have discovered the conspiracy.

The Court finds DPPs have met their burden to show wrongful concealment.

## 2.  Due Diligence

In deciding whether DPPS satisfied their burden as to this element, the Court again relies on the decision in Carrier Corp., 673 F.3d at 448-49  (declining to hold that the plaintiffs' efforts were insufficient to satisfy the third element "at such an early stage of litigation and without the benefit of discovery" to guide its analysis) (citing Jones v. TransOhio Sav. Ass'n, 747 F.2d 1037, 1043 (6th Cir.1984) (noting the panel's reluctance to dismiss fraudulent concealment allegations prior to discovery)).  See also Duncan v. Leeds, 742 F.2d 989, 993 (6th Cir. 1984) (addressing the need to construe allegations of fraudulent concealment liberally and in the plaintiff's favor at such an early stage in the litigation). The Sixth Circuit deemed dismissal appropriate if, and only if, "it is obvious from the complaint that the plaintiff conducted absolutely no investigation."

24

Id. (citation omitted).   Actions that would deceive a reasonably diligent plaintiff toll the statute.

In Carrier Corp., the Sixth Circuit was satisfied that due diligence had been pleaded because the plaintiff detailed the steps it had taken once it became aware of the EC investigation.  See 673 F.3d at 448.  In the CACAC, DPPs allege that they had no knowledge and could not have discovered the conduct earlier through the exercise of reasonable diligence.  (Doc. No. 100 at ¶ 129).  DPPs allege that they received pricing information, but had no way of knowing that the prices imposed were higher because Defendants were conspiring.  (Doc. No. 100 at ¶ 130).  Here, the allegations are sufficient to create an inference that DPPs lacked a reason to initiate an investigation. Moreover, the allegations demonstrate no basis for inferring that DPPs ignored available information that would have aroused suspicion and prompted an investigation. In sum, DPPs have included allegations as to each element that must be proven to toll the statute of limitations.

## D.  Sufficiency of the Injunctive Relief Request

DPPs ask the Court for an injunction preventing Defendants from "continuing and maintaining" the price-fixing conspiracy.  (Doc. No. 100, Prayer for Relief at ¶ D).  The request is authorized under the Clayton Act, which provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.

In challenging the request, Defendants argue that the CACAC lacks the factual

25

support necessary to establish a real or immediate threat that DPPs will be harmed

again.  Specifically, Defendants contend that DPPs were not the target of antitrust

activity and any real threat of future harm has been eliminated by the government

investigations.  The plea agreements entered by JTEKT Corporation and NSK Ltd.

show that the conspiracy ended no later than July 2011.

Defendants' argument is unpersuasive in light of DPPs' allegation that

investigations in six jurisdictions, including the United States are ongoing.  (Doc. No.

100 at ¶ 60).  The typical bearings product cycle is approximately four to six years, so

the impact of the collusive bidding process could remain in effect beyond the filing of the

CACAC.  Therefore, the Court finds that the facts as alleged in the CACAC create an

inference of the existence of a "cognizable danger of recurrent violation."  See  United

States v. W. T. Grant Co., 345 U.S. 629, 633 (1953).  Specifically, DPPs allege a

decade-long global conspiracy in a market with high barriers to entry.  The same market

conditions exist today.  See In re Static Random Access Memory (SRAM) Antitrust

Litig., 264 F.R.D. 603, 611 (N.D. Cal. 2009) (certifying a nationwide class for injunctive

relief based upon similar allegations).  The fact that some Defendants have pleaded

guilty does "not obviate the threat that a conspiracy will persist or resume in the future."

In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 597 (N.D. Cal. 2010)

amended in part, M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011) (certifying

a nationwide injunctive class under Rule 23(b)(2)).  Finally, the complaint alleges a

thirty-year history of collusion among Defendants such that the Japan Fair Trade

Commission stated it belief that "the culture of collusion is ingrained in the bearings

industry." (Doc. No. 100 at ¶¶ 114-115).  Collusion occurred in Europe.  The Court's analysis of the viability of the claim for injunctive relief must be based upon the allegations in the complaint.  Here, the Court is satisfied that DPPs has stated a claim for which relief may be granted.

## V.  CONCLUSION

For the reasons discussed above, the Court **DENIES** the motion.

**IT IS SO ORDERED**.

Date:   August 29, 2014                               s/Marianne O. Battani_____
                                                      MARIANNE O. BATTANI
                                                      United States District Judge


<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 29, 2014.

                                                      s/ Kay Doaks_____
                                                      Case Manager