**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 |
| | Hon. Marianne O. Battani |
| In re:  Bearings Cases | Case No. 12-00501 |
| This Relates To: | |
| Direct Purchaser Actions | |

**REDACTED OPINION AND ORDER REGARDING DIRECT
PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## I.    INTRODUCTION

The three named Plaintiffs — DALC Gear & Bearing Supply Corp., McGuire

Bearing Company, and Sherman Bearings Inc. — brought this suit on behalf of a class

of direct purchasers of bearings, alleging that the Defendant manufacturers and

suppliers engaged in a horizontal conspiracy to fix the prices of steel ball and roller

bearings in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Specifically, the

Direct Purchaser Plaintiffs ("DPPs") allege that Defendants conspired (i) with respect to

the amount and timing of price increases due to increased steel costs, (ii) to rig bids, fix

prices, and allocate markets for bearings in connection with customer requests for

quotations ("RFQs"), and (iii) in their responses to annual price reduction ("APR")

requests from customers.

Presently before the Court is the DPPs' motion to certify this case as a class

action under Fed. R. Civ. P. 23(b)(3) and to appoint class counsel.  The request for

certification encompasses the manufacturers and suppliers named as Defendants in this suit — including JTEKT Corporation and JTEKT North America Corporation, f/k/a Koyo Corporation of U.S.A. (together "JTEKT"); Nachi-Fujikoshi Corp. and Nachi America Inc. (together "Nachi"); NSK Ltd. and NSK Americas, Inc. (together "NSK"); NTN Corporation and NTN USA Corporation (together "NTN"); and Schaeffler Group USA Inc. ("Schaeffler") — as well as SKF USA Inc., SKF GmbH, and AB SKF (together "SKF"), which have been named as Defendants in a follow-on suit brought by the DPPs. Through their present motion, the DPPs seek to certify a class that consists of "[a]ll individuals and entities that purchased Bearings in the United States from one or more of the Defendants, SKF USA Inc., or their parents, subsidiaries, affiliates, or joint ventures, from and including April 1, 2004 through December 31, 201[4]."  (Dkt. 216, DPPs' Motion for Class Certification at 1.)[1]

On January 18, 2018, the Court heard oral argument on the DPPs' motion for class certification, as well as other motions that are addressed in a separate opinion and order.  For the reasons that follow, the Court **DENIES** the DPPs' motion.

---

[1]The DPPs' complaint defines the term "Bearings" as encompassing both automotive and industrial machinery bearings, and it cites as examples "ball bearings, tapered roller bearings, roller bearings, and mounted bearings."  (Dkt. 136, Second Consolidated Amended Class Action Complaint ("SCAC") at ¶¶ 1, 10.)  In their briefing on the present motion, the DPPs further clarify that "the bearings at issue are . . . limited to steel ball and roller bearings."  (Dkt. 282, DPPs' Reply Br. at 19 n.18.)  In addition, although the DPPs initially defined the class period as extending through December 31, 2015, (*see* DPPs' Motion for Class Certification at 1), they have since amended this end date to December 31, 2014 based on the analysis of their experts, (*see* DPPs' Reply Br. at 1 & n.1).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Beginning in 2012, a number of class action antitrust suits have been filed against the Defendant manufacturers and suppliers on behalf of a class of direct purchasers of automotive and industrial machinery bearings.  Specifically, in a second consolidated amended class action complaint filed on May 22, 2015, the Direct Purchaser Plaintiffs ("DPPs") allege that Defendants entered into a conspiracy in violation of antitrust law to suppress and eliminate competition in the market for bearings by agreeing to rig bids for and raise, fix, stabilize, or maintain the prices of these products.  This suit has been incorporated into multidistrict litigation ("MDL") in which a variety of plaintiffs, including both direct and indirect purchasers, allege that manufacturers and suppliers have conspired to fix the prices of a number of different auto parts.  Unlike the other cases in the MDL, this suit is not limited to bearings used in automobiles, but instead encompasses both automotive and industrial bearings.

### A.    The Bearings Involved in This Suit

Bearings are "friction-reducing devices that allow one moving part to glide past another moving part."  (SCAC at ¶ 41.)  They come in different types, including "ball bearings, tapered roller bearings, roller bearings, and mounted bearings."  (*Id.* at ¶ 10.) A representative of Defendant NSK has testified that ███████████████████████ ████████████████████████████████████████████████████████████ ███████████████████  As noted, the bearings at issue here (referred to in the balance of this opinion as "Bearings") are installed both in motor vehicles and in industrial machinery. (*See* SCAC at ¶ 46; *see also* DPPs' Motion, Ex. 1, Langenfeld 3/20/2017 Decl. ("Langenfeld Decl.") at ¶ 21.)

### 1.    Automotive Bearings

Defendants maintain that Bearings are sold in three different markets, each of which "has a number of distinguishing features."  (Dkt. 241, Defendants' Response Br. at 5.)  First, the Defendant manufacturers and suppliers sell automotive bearings to original equipment manufacturers ("OEMs") — automobile manufacturers such as General Motors, Toyota, or Honda — and to tier suppliers, such as Delphi and Magna Powertrain, that "purchase bearings for installation into intermediate parts, such as transmissions, and then sell those parts to the OEMs."  (*Id.*)  According to Defendants' expert, Robert D. Willig, Ph.D., sales to automotive OEMs and tier suppliers

██████████████████████████████████████████████████████

██████████████████████████████████ (Defendants' Response, Ex. 2, Willig 7/26/2017 Decl. ("Willig Decl.") at ¶ 14 n.14; *see also* Langenfeld Decl. at ¶ 41 (stating

that██████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████(footnote with citation omitted)).)

As recognized by the DPPs' expert, Dr. James Langenfeld, Defendants typically employ a "request for quotation ('RFQ') process" for selling automotive bearings to OEMs or their tier suppliers.  (Langenfeld Decl. at ¶ 130 (footnote with citation omitted); *see also* Defendants' Response Br. at 5 & n.5.)  In this process, an OEM or tier supplier generally "issues an RFQ for distinct customized bearings during the early stages of designing a new [vehicle] platform or a new generation of an existing vehicle model,"

4

and each bearing manufacturer or supplier that receives this RFQ "will typically work with its engineering department to design a new, highly customized bearing to meet the needs of the customer."  (Defendants' Response Br. at 5-6 (footnotes with citations omitted); *see also* Langenfeld Decl. at ¶ 130.)  The winning bidder in this process often is required to "enter into a contract providing for supply over a period of several years (the life of the vehicle model)."  (Defendants' Response Br. at 6 (footnote with citations omitted); *see also* Langenfeld Decl. at ¶ 134.)  This contract may provide for "rebates and other pricing adjustments," including annual price reductions ("APRs") that trigger yearly negotiations over reductions in the prices called for in the contract.  (Langenfeld Decl. at ¶ 134; *see also* Defendants' Response Br. at 6-7 (footnotes with citations omitted).)

## 2.    Industrial Bearings

Next, Defendants sell industrial bearings to a "wide range" of customers, including "major mining and construction equipment OEMs (such as Caterpillar), small electric tool OEMs (such as DeWalt or Black & Decker), pump and compressor OEMs (such as Carrier), agricultural machinery OEMs (such as John Deere), small vehicle OEMs (such as Kawasaki), suppliers in the oil and gas industry (such as Weatherford), steel mills, [and] manufacturers of huge wind and power plant turbines (such as General Electric)."  (Defendants' Response Br. at 7 (footnote with citations omitted); *see also* Langenfeld Decl. at ¶ 21 (recognizing that "bearings are used extensively in a variety of original equipment . . . applications" apart from automobiles, including "industrial machinery, aerospace equipment, agriculture, and construction and railroad equipment" (footnote with citation omitted)).)  A representative of Defendant Nachi has observed

5

that the price of an industrial bearing can vary from sixty cents for use in a skateboard to "[a] couple thousand dollars" for use in the wind turbine industry or machine tools. (Defendants' Response, Ex. 26, Campbell Dep. at 209-12.)  According to Defendants and their expert, Dr. Willig, sales of industrial bearings — excluding sales of such bearings in the aftermarket, which is addressed separately below — accounted for ███████████████████████████████████████████████████ ██████during the class period."  (Defendants' Response Br. at 9 (citation omitted).)

Defendants state that "[i]ndustrial OEM customers purchase bearings through various procurement methods," including long term contracts, exclusive supply agreements, and "RFQ processes akin to the automotive OEM RFQ process."  (*Id.* at 8 (footnotes with citations omitted).)  According to the DPPs' expert, however, ██████ █████████████████████████████in contracts for the purchase of industrial bearings. (Langenfeld Decl. at ¶ 134 n.254.)  In addition, "[l]ess complicated [industrial] bearings might be bought on spot through list prices in catalogues."  (Defendants' Response Br. at 8-9 (footnote with citation omitted).)

### 3.    Aftermarket Bearings

Finally, the parties and their experts describe a separate market segment for the sale of "aftermarket" bearings.  (Langenfeld Decl. at ¶ 41; *see also* Defendants' Response Br. at 9 (footnote with citations omitted).)  This "aftermarket segment involves bearings used in replacement of OEM-installed products," and the customers in this market "include distributors . . . who directly purchase bearings from the manufacturers and subsequently make aftermarket sales to the ultimate end users."  (Langenfeld Decl. at ¶ 42 (footnotes with citations omitted); *see also* Defendants' Response Br. at 9

6

("Customers for aftermarket bearings are primarily distributors and some large OEMs." (footnote with citation omitted)).)  Aftermarket bearings are "sold as maintenance or repair parts in both automotive and industrial applications."  (Defendants' Response Br. at 9 (footnote with citation omitted).)  These sales ████████████████████████████ ████████████████████████████████████████████████during the time period of relevance here.  (Willig Decl. at ¶ 13 n.11.)

According to Defendants, "[t]he sales process for aftermarket bearings can differ significantly depending on the type and size of the customers involved."  (Defendants' Response Br. at 9.)  "Most aftermarket customers purchase bearings out of catalogues at set 'list prices' maintained by each manufacturer," and "[s]ales of industrial aftermarket bearings to smaller or mid-sized distributors are typically made, without negotiation, at" these list prices.  (*Id.* at 9-10 (footnotes with citations omitted).)  Sales to larger distributors, in contrast, "can involve negotiated discounts or rebates off of list prices."  (*Id.* at 10 (footnote with citations omitted).)  Defendants further assert that after custom-designed bearings are initially purchased by OEMs for incorporation into newly manufactured products, these same bearings are "typically sold at a substantially higher price" when they are later purchased "in the aftermarket for repair and replacement purposes."  (*Id.* (citations omitted).)

**B.     The Parties**

**1.     The Named Plaintiffs**

The three named DPPs that brought this suit — DALC Gear & Bearing Supply

Corp. ("DALC"), McGuire Bearing Company ("McGuire"), and Sherman Bearings Inc.

("Sherman") — are relatively small distributors that, as relevant to this litigation, are

primarily engaged in the business of purchasing and reselling aftermarket bearings.

The representatives of these named DPPs have testified that during the relevant time

period,

they███████████████████████████████████████████████████████████████

████████████████████████████████████.

(*See*█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████).  In addition, the

named

DPPs█████████████████████████████████████████████████████████.

(*See*██████████████████████████████████████████████████████████████



DALC operates out of a single location and █████████████████████████████ ████████████████████████████████. (*See* ██████████████████████████████ ████████████████████████████) In this time frame,███████████████████████ ████████████████████████████████████████████████████████████████████████████

McGuire is a family-owned business with offices in four states.  *See* "About the Company," McGuireBearing.com, http://mcguirebearing.com/about-us/about/ (last visited Dec. 11, 2018).  Finally, Sherman has a single office located in Houston, Texas, and████████████████████████████████████████████████████████████████ █████████████████████████████ The company has three employees —██ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

## 2.     The Defendant Bearings Manufacturers and Suppliers

In their second consolidated amended class action complaint, the DPPs have named five parent corporations and their U.S. subsidiaries as defendants.  Four of the parent corporations — Defendants JTEKT Corporation, Nachi-Fujikoshi Corp., NSK Ltd., and NTN Corporation — are based in Japan, and the remaining parent corporation, Schaeffler AG, is headquartered in Germany.  The DPPs also refer in their present motion to another group of related corporations — AB SKF, a Swedish corporation, along with its subsidiaries, SKF GmbH (a German corporation) and SKF USA Inc. (a U.S. corporation) — that are named as defendants in a separate suit pending before this Court, *DALC Gear & Bearing Supply Corp. v. Koyo France SA,* No. 15-12068, and that allegedly participated in the same bearings antitrust conspiracy giving rise to this suit.  Thus, the DPPs view AB SKF and its subsidiaries as

encompassed within their request for class certification, and they refer to these additional nonparty entities as "Defendants" for purposes of their present motion.

Two of the four Japanese parent corporations named as defendants in this suit have pleaded guilty to criminal charges in United States district courts relating to their participation in the market for bearings.  First, in September of 2013, Defendant JTEKT Corporation entered into a plea agreement with the United States Department of Justice ("DOJ") in which it admitted that, between 2000 and 2011, it had violated the Sherman Antitrust Act, 15 U.S.C. §1, by participating in a conspiracy with other bearings manufacturers to "suppress and eliminate competition in the automotive parts industry." (DPPs' Motion, Ex. 3, Plea Agreement filed in *United States v. JTEKT Corp.,* No. 13-cr-104 (S.D. Ohio Sept. 26, 2013), at ¶ 2.)  JTEKT further admitted that the "primary purpose" of this conspiracy "was to suppress and eliminate competition in the automotive parts industry by agreeing to allocate markets, rig bids for, and . . . fix, stabilize, and maintain the prices of bearings sold to Japanese automobile and component manufacturers in the United States and elsewhere."  (*Id.* at ¶ 4(a)(ii).) Under this plea agreement, JTEKT agreed to pay a criminal fine of $103.27 million, which encompassed both the conspiracy with other bearings manufacturers and a separate conspiracy to fix the prices of electric power steering assemblies.  (*Id.* at ¶¶ 2, 9.)

Defendant NSK Ltd. also entered into a September 2013 plea agreement with the DOJ, admitting to the same conduct over the same time frame as reflected in Defendant JTEKT's guilty plea.  (DPPs' Motion, Ex. 4, Plea Agreement filed in *United*

*States v. NSK Ltd.,* No. 13-cr-103 (S.D. Ohio Sept. 26, 2013), at ¶ 2.)  NSK Ltd. agreed

to pay a criminal fine of $68.2 million for this offense.  (*Id.* at ¶ 9.)

In addition, the DPPs point to an investigation launched by the Japan Fair Trade

Commission ("JFTC") into allegations of a conspiracy to fix the prices of bearings.  In

late 2012 and early 2013, a Japanese court found Defendants Nachi-Fujikoshi Corp.

and NSK Ltd. guilty of participating in price-fixing cartels to increase the prices of

bearings.  (*See* SCAC at ¶¶ 66-68.)  Shortly thereafter, the JFTC issued cease and

desist orders to Defendants NTN Corporation, NSK Ltd., Nachi-Fujikoshi Corp. "for their

involvement in a price-fixing conspiracy in connection with the sale of industrial

machinery bearings and automotive bearings," and the three companies were fined in

amounts totaling approximately $142 million.  (*Id.* at ¶ 71.)

Finally, European antitrust authorities also investigated the alleged collusion of

the six company groups named as Defendants here — the Japanese companies JTEKT

Corporation, Nachi-Fujikoshi Corp., NSK Ltd., and NTN Corporation, and the European

companies Schaeffler AG and AB SKF — to coordinate prices in the market for

automotive bearings.  In March of 2014, the European Commission ("EC") announced

its findings that these corporations had operated an unlawful cartel, explaining that "[t]he

companies involved in this secret cartel coordinated the passing-on of steel price

increases to their automotive customers, colluded on Requests for Quotations and for

Annual Price Reductions from customers[,] and exchanged commercially sensitive

information."  (DPPs' Motion, Ex. 7, EC 3/19/2014 Press Release at 1.)  The six

corporations were ordered to pay fines totaling just over 953 million euros.  (*See id.* at

2.)

11

**C.     The DPPs' Allegations and Evidence of a Conspiracy Among Defendants to Fix the Prices of Bearings**

In support of their present motion, the DPPs identify two principal mechanisms through which Defendants carried out their alleged conspiracy to allocate the markets for and fix the prices of Bearings sold to customers in the United States.  The Court summarizes these mechanisms here, with more detail to follow as pertinent to the issues raised in the DPPs' motion.

First, the DPPs allege that "Defendants coordinated their attempts to obtain price increases from their customers in the face of rising steel costs."  (DPPs' Motion, Br. in Support at 5.)  Specifically, the DPPs assert that ███████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████ (*Id.* at 6 (footnote with citations omitted).)  The DPPs further contend that ████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████' (*Id.* (footnote with citation omitted).)  According to the DPPs, these Defendants entered into five agreements — one each in the years 2004, 2005, 2007, 2008, and 2010 — through which they██████████████████████ ███████████████████████████████████████████████ ██████████████████████████ (*Id.* at 6-7 (footnote with citations omitted).)  The DPPs also assert that ████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.

Next, the DPPs allege that Defendants "colluded with respect to RFQ pricing and responses to customer APR requests."  (*Id.* at 9.)  In support of this assertion, the DPPs point to evidence that, in their view, demonstrates (i) "that Defendants████████████ ████████████████████████████████(ii) that in responding to RFQs from customers, Defendants████████████████████████████████ ████████████████████████████████████████████ ████████and (iii) that Defendants likewise██████████████████████ ████████████████████████████████.  (*Id.* at 9-10 (citation and footnote with citations omitted).)

According to the DPPs, Defendants' use of these mechanisms to fix the prices of Bearings, and to thereby bring about injury to the members of the DPP class, can be demonstrated through evidence common to the proposed class of direct purchasers. First, the DPPs point to Defendants' guilty pleas, admissions in discovery responses, documents, and testimony as common, class-wide evidence that "Defendants colluded with respect to steel price increases to customers and with respect to RFQs and APRs." (*Id.* at 3.)  Next, the DPPs contend that the economic analysis put forward by their expert, Dr. Langenfeld, will "show[] that the characteristics of the bearings industry and Defendants' pricing behavior were such that Defendants' anticompetitive conduct could have caused class-wide injury."  (*Id.*)  Finally, the DPPs cite the econometric analysis of a second expert, Dr. James T. McClave, as demonstrating on a class-wide basis that

13

"class members paid higher prices for bearings than they would have paid in a competitive market." (*Id.*)[2]

## III.   STANDARD OF REVIEW

Through the present motion, the DPPs seek certification under Fed. R. Civ. P. 23 of a class of individuals and entities that purchased Bearings in the United States from one or more of the Defendant manufacturers and suppliers in the period from April 1, 2004 through December 31, 2014.  In order to secure the desired class certification, the DPPs "must affirmatively demonstrate [their] compliance with Rule 23."  *Comcast Corp. v. Behrend,* 569 U.S. 27, 33, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks and citation omitted).  This entails, as a threshold matter, a showing that:

> (1)  the class is so numerous that joinder of all members is impracticable;
>
> (2)  there are questions of law or fact common to the class;
>
> (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These "four requirements — numerosity, commonality, typicality, and adequate representation — effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Wal-Mart Stores, Inc. v. Dukes,* 564

---

[2]In separate motions, Defendants sought to exclude the expert report and proposed testimony of Dr. McClave, as well as portions of the expert report and proposed testimony of Dr. Langenfeld, but the Court denied these motions in an earlier opinion and order.

U.S. 338, 349, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks and citations omitted).

Once the DPPs have satisfied each of the four prerequisites of Rule 23(a), they must then show that their proposed class "satisf[ies] at least one of the three requirements listed in Rule 23(b)."  *Wal-Mart,* 564 U.S. at 345, 131 S. Ct. at 2548.  In this case, the DPPs rely solely on subsection (b)(3) of the Rule, which entails a finding by the Court "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Randleman v. Fidelity National Title Insurance Co.,* 646 F.3d 347, 352-53 (6th Cir. 2011).  Yet, the "mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible."  *Powers v. Hamilton County Public Defender Commission,* 501 F.3d 592, 619 (6th Cir. 2007) (internal quotation marks and citation omitted).

The Supreme Court has emphasized that "Rule 23 does not set forth a mere pleading standard," and that a party seeking class certification must instead "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart,* 564 U.S. at 351, 131 S. Ct. at 2551.  The trial court must conduct a "rigorous analysis" to confirm that the requirements of Rule 23 have been

15

met, and this inquiry may entail "prob[ing] behind the pleadings" and considering "the merits of the plaintiff's underlying claim." *Wal-Mart,* 564 U.S. at 350-51, 131 S. Ct. at 2551 (internal quotation marks and citations omitted).  Moreover, the court's "obligation to consider all relevant evidence and arguments" bearing upon class certification "extends to expert testimony," and such "opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement."  *In re Hydrogen Peroxide Antitrust Litigation,* 552 F.3d 305, 307, 323 (3d Cir. 2008).

Yet, the requisite rigorous analysis of the record and inquiry into the merits must be focused on and limited to "only those matters relevant to deciding if the prerequisites of Rule 23 are satisfied." *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation,* 722 F.3d 838, 851 (6th Cir. 2013).  "In other words, district courts may not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *In re Whirlpool,* 722 F.3d at 851-52 (internal quotation marks and citation omitted).  As the Supreme Court has emphasized, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds,* 568 U.S. 455, 459, 133 S. Ct. 1184, 1191 (2013).

## IV.   ANALYSIS

### A.   The DPPs Have Not Established the Typicality and Adequacy Elements of Rule 23(a).

In addressing the DPPs' motion for class certification, the Court begins its analysis with the four requirements of Rule 23(a):  numerosity, commonality, typicality, and adequacy of representation.  Defendants' opposition to the DPPs' motion is focused

on the last two of these required elements, so the Court may move rather quickly through the prerequisites of numerosity and commonality.

### 1.    Numerosity

Turning first to Rule 23(a)'s requirement of numerosity, the Sixth Circuit has stated that the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *Bacon v. Honda of America Manufacturing, Inc.,* 370 F.3d 565, 570 (6th Cir. 2004).  In this case, the DPPs and their expert, Dr. McClave, have determined from Defendants' transaction records that ██████████ customers made direct purchases of bearings during the class period.  (*See* DPPs' Motion, Ex. 2, McClave 3/20/2017 Decl. ("McClave Decl.") at § 4.0.) Under this record, the Court is satisfied that Rule 23(a)'s numerosity requirement has been met, and Defendants do not contend otherwise.

### 2.    Commonality

A class action must include "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To demonstrate the requisite commonality, the DPPs "must show that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that the common answer relates to the actual theory of liability in the case."  *Rikos v. Procter & Gamble Co.,* 799 F.3d 497, 505 (6th Cir. 2015).  Yet, "there need be only one common question to certify the class."  *In re Whirlpool,* 722 F.3d at 853.  "What we are looking for is a common issue the resolution of which will advance the litigation."  *Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir. 1998).

17

In arguing that this element of Rule 23(a) is satisfied, the DPPs identify a number of common questions of fact or law that bear upon the resolution of their federal antitrust claims.  These include:

> (a) whether Defendants engaged in a conspiracy to fix, raise, maintain, or stabilize prices of bearings; (b) the identity of the participants in the conspiracy; (c) the duration of the conspiracy and the acts carried out by Defendants in furtherance of the conspiracy; (d) whether the conspiracy violated Section 1 of the Sherman Act; (e) whether the conspiracy caused bearings prices in the U.S. to be higher than they would otherwise have been; (f) whether Defendants caused injury to the business or property of Plaintiffs and the class; (g) whether Plaintiffs and [the] class are entitled to injunctive relief and, if so, its nature and extent; and (h) the appropriate class-wide measure of damages.

(DPPs' Motion, Br. in Support at 21-22.)

The Court agrees that the issues identified by the DPPs are common questions of fact or law that, when resolved, will advance the disposition of the DPPs' claim of a price-fixing conspiracy.  Most notably, this claim rests upon the question whether Defendants "agreed upon a common course of action," and this has been recognized as establishing commonality under Rule 23(a) in a case where, as here, the plaintiffs asserted a claim of antitrust conspiracy under Section 1 of the Sherman Act.  *In re Northwest Airlines Corp.,* 208 F.R.D. 174, 217 (E.D. Mich. 2002).  Consequently, the DPPs have established the prerequisite of commonality, and Defendants again do not argue otherwise.

### 3.    Typicality and Adequacy of Representation

To satisfy the remaining two prongs of Rule 23(a), the three named DPPs must demonstrate that their claims or defenses "are typical of the claims or defenses of the class," and that they "will fairly and adequately protect the interests of the class."  Fed.

18

R. Civ. P. 23(a)(3),(4).  In determining whether the requisite typicality exists, a court must inquire whether the interests of the named plaintiff are "aligned with those of the represented group," such that "in pursuing his own claims, the named plaintiff will also advance the interests of the class members."  *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1082 (6th Cir. 1996).  Thus, the requirement of typicality may be viewed as posing the flip-side of the commonality inquiry:  namely, "a court must ask whether, despite the presence of common questions, each class member's claim involves so many *distinct* factual or legal questions as to make class certification inappropriate." *Fuller v. Fruehauf Trailer Corp.,* 168 F.R.D. 588, 598 (E.D. Mich. 1996).  "The premise of the typicality requirement is simply stated:  as goes the claim of the named plaintiff, so go the claims of the class."  *Sprague,* 133 F.3d at 399.

Next, the Rule 23(a) prerequisite of adequacy of representation is intended to ensure that the proposed class representatives have "interests in common with, and not antagonistic to, the interests of the unnamed members of the class, and that the representatives will vigorously prosecute these interests through qualified counsel."  *In re Northwest Airlines,* 208 F.R.D. at 225; *see also American Medical Systems,* 75 F.3d at 1083.  In this case, Defendants do not challenge the qualifications of the DPPs' counsel, so the Court's inquiry focuses solely on whether the named DPPs and absent class members have common or antagonistic interests.  As the Sixth Circuit has observed, "[t]he adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members."  *American Medical Systems,* 75 F.3d at 1083; *see also General Telephone Co. v. Falcon,* 457 U.S. 147,

19

157 n.13, 102 S. Ct. 2364, 2370 n.13 (1982) (recognizing that the Rule 23(a) prerequisite of typicality "tend[s] to merge with the adequacy-of-representation requirement").  Accordingly, the Court will analyze the remaining two elements of Rule 23(a) together.

In Defendants' view, the three named DPPs cannot show that the proofs offered in support of their claims will necessarily prove the claims of absent class members. They maintain that because the "named DPPs are all small distributors of bearings sold for aftermarket use, mainly for industrial applications," these named plaintiffs cannot be "adequate representatives of automotive OEM class members like Toyota, Honda, Ford, GM and Nissan; large industrial OEM customers like Caterpillar, Navistar, General Electric, and CNH; *and* tier suppliers like Delphi."  (Defendants' Response Br. at 22 (emphasis in original).)  In support of this contention, Defendants point to evidence that the named DPPs (i) ███████████████████████████during the relevant period, and███████████████████████████████████████,

(*see*███████████████████████████████████████████████████████████████████████████); (ii) ██████████████████████████████,

(*see*██████████████████████████████████████████████████████████);

(iii)██████████████████████████████████,

(*see*████████████████████████████████████████████); and (iv)

████████████████████████████████████████████████████████████████████████████

,

(*see*████████████████████████████████████████████████████████████████████████

20

████████████████████████). More generally, Defendants cite the findings of their

expert, Dr. Willig,

that███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████. (*See* Willig Decl at ¶ 15(a).) Under this record,

Defendants argue that there is a "significant disparity" between the Bearings purchases

and attendant circumstances of the named DPPs and those of absent class members,

such that the claims of the former cannot be characterized as typical of the claims of the

latter. (Defendants' Response Br. at 21.)

According to Defendants, a number of courts have cited similar disparities

between named plaintiffs and absent class members as a basis for denying class

certification. In *In re Optical Disk Drive Antitrust Litigation,* 303 F.R.D. 311, 313-14

(N.D. Cal. 2014), for instance, the defendant optical disk drive ("ODD") manufacturers

allegedly conspired to fix the prices of these products, and this conspiracy featured

"multiple instances of alleged 'bid-rigging' involving procurements of ODDs by Dell, HP,

and Microsoft." The named plaintiffs were "three small companies and four individuals,"

each of whom "purchased non-customized ODDs (or computers containing ODDs) from

a defendant at nonnegotiable[] list prices through a defendant's distribution subsidiary or

retail website." *Optical Disk Drive,* 303 F.R.D. at 317. The court observed that "[i]n

contrast, the putative class encompasses a myriad of other ODD purchasers whose

volumes and means of ODD purchases do not compare," including two OEMs, Dell and

HP, that "together accounted for almost half of [the] defendants' dollar value sales

during the class period." 303 F.R.D. at 317. The court further noted that "Dell and HP

21

ran bidding processes" to purchase ODDs, and that other OEMs and major distributors in the putative class "typically negotiated [the] prices" they paid for ODDs.  303 F.R.D. at 317.

Against this backdrop, the defendants challenged the typicality of the named plaintiffs' claims and the adequacy of their representation of the putative class, and the court agreed that the plaintiffs had not established these prerequisites to class certification.  In so ruling, the court cited such factors as (i) the disparity in negotiating power between the named plaintiffs and the absent class members, such as Dell and HP, that purchased ODDs in much higher volume, and (ii) the difference between the named plaintiffs' purchases of ODDs at list prices and the purchases by larger entities through bidding processes at negotiated prices.  303 F.R.D. at 317.  The court also observed that although "the named plaintiffs have strong evidence of bid-rigging involving some of the largest purchasers, they are struggling to find a way to prove that list prices paid by ordinary purchasers such as themselves were fixed."  303 F.R.D. at 318.  In light of these "acute" disparities between the named plaintiffs and others in the putative class, the court concluded that the named plaintiffs could not establish that their claims were typical of those of the absent class members, nor that they had sufficient incentive to litigate claims involving bidding processes in which they did not participate. 303 F.R.D. at 318.

Faced with similar facts, the court in *In re Graphics Processing Units Antitrust Litigation,* 253 F.R.D. 478, 489-90 (N.D. Cal. 2008), likewise held that the named plaintiffs in that case could not satisfy the Rule 23(a) requirement of typicality.  The defendant manufacturers in that case allegedly conspired to fix the prices of graphics

22

processing units ("GPUs"), and the named plaintiffs, three individual consumers, sought

to certify a class of "all individuals and entities who purchased any GPU chip, board, or

card from [the] defendants."  *Graphics Processing Units,* 253 F.R.D. at 480-81.  In

finding that the claims of these named plaintiffs were not typical of those of the putative

class, the court pointed to the "overwhelming disparities" in the circumstances

surrounding the named plaintiffs' purchases versus the defendants' sales to absent

class members.  253 F.R.D. at 490.  In particular, the court observed that the named

plaintiffs "each purchased a single graphics card through [a defendant's] website at

retail prices ranging from $149 to $239" and with "non-negotiable" terms.  253 F.R.D. at

489.  In contrast, "over 99.5% of [the] defendants' business" consisted of sales to

wholesale customers that "purchased a vast array of products on individually negotiated

terms," and some of these "wholesale conglomerates, such as Dell, Microsoft, Hewlett-

Packard, Apple, Motorola, and Best Buy, likely had more bargaining power than [the]

defendants themselves."  253 F.R.D. at 489.  The court reasoned that "[t]he wholesale

purchasers therefore came to the negotiating table in a fundamentally different position

than the representative plaintiffs."  253 F.R.D. at 490.

Under this record, the court found that the named plaintiffs had not met the

typicality prerequisite of Rule 23(a).  The court explained:

> . . . .  The representative plaintiffs simply do not have the
> appropriate incentive to establish antitrust violations with respect to all of
> the absent class members.  To prove their claims, the named plaintiffs will
> have to show that the *list prices* that they paid for their graphics cards
> were artificially inflated by [the] defendants.  Proof that [the] defendants
> conspired to fix those prices would hardly prove that [the] defendants also
> conspired to fix the *non-list prices* for the transactions entered into with
> absent wholesale purchasers . . . .  The atypicality and detachment of the
> named plaintiffs' claims from those of the remaining class obstruct their

23

ability to adequately pursue and prove the claims of the absent class members.

It does not suffice that *counsel* have an incentive to prove the wholesalers' claims. While counsel in this case are excellent, the test is whether the clients themselves, who ultimately control and drive the litigation, have the requisite typicality under Rule 23.

253 F.R.D. at 490 (citation omitted); *see also Deiter v. Microsoft Corp.,* 436 F.3d 461, 467-68 (4th Cir. 2006) (holding that the claims of the named plaintiffs, who purchased individual copies of Microsoft Windows through the defendant's website or by telephone at fixed prices, were not typical of the claims of other class members that had purchased Windows licenses in large quantities at negotiated prices). In light of the named plaintiffs' failure to satisfy this and other Rule 23 requirements, the court elected to certify a "more limited class" consisting of "all individuals and entities who purchased graphics cards directly from [the] defendants online." *Graphics Processing Units,* 253 F.R.D. at 497.

In response, the DPPs maintain that the case law cited by Defendants is distinguishable under a proper reading of the record here. First, they accuse Defendants of "substantially overstat[ing]" the differences between the purchases made by the named DPPs and those of absent class members. (Dkt. 282, DPPs' Reply Br. at 6.) They assert, as a threshold matter, that "[i]ndustrial distributors, including the named Plaintiffs, ██████████████████████████████████ ████████," and that distributors more generally ██████████████████████████ ███████████████████████████████████████ (*Id.* at 6 & n.6 (citations omitted).) As for the named Plaintiffs themselves, the DPPs state that they ██████████████████████████████████████████████████████

24

██████████████ (*Id.* at 6 (citation omitted).)  This evidence, in the DPPs' view, serves to distinguish the cases relied upon by Defendants, in which "the named plaintiffs were retail customers whereas the alleged conduct concerned OEMs and distributors."  (*Id.* at 6 n.5.)[3]

More generally, the DPPs point to case law demonstrating that class members need not be "wholly homogeneous to satisfy typicality."  (*Id.* at 5.)  A court in this District has emphasized, for instance, that "there is nothing in Rule 23(a)(3) which requires named plaintiffs to be clones of each other or clones of other class members."  *In re Cardizem CD Antitrust Litigation,* 200 F.R.D. 297, 304 (E.D. Mich. 2001) (internal quotation marks and citations omitted).  Rather, the Sixth Circuit has recognized that "a [named] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  *American Medical Systems,* 75 F.3d at 1082 (internal quotation marks and citation omitted).  Along the same lines, another court has reasoned that "if the named class members' claims are based on the same legal theory or arise from the same course of conduct, factual differences in date, size, manner, or conditions of purchase, the type of purchaser, or other such concerns do not make [the] named plaintiffs atypical."  *In re Foundry Resins Antitrust Litigation,* 242 F.R.D. 393, 406

---

[3]Notably, it is not accurate to say that the named plaintiffs in the cases identified by Defendants were all "retail customers."  Rather, as discussed earlier, the named plaintiffs in *Optical Disk Drive* were "three small companies and four individuals" that "purchased non-customized ODDs (or computers containing ODDs) from a defendant at nonnegotiable[] list prices through a defendant's distribution subsidiary or retail website."  303 F.R.D. at 317.  Consequently, the record here is not so readily distinguishable as the DPPs suggest.

(S.D. Ohio 2007); *see also In re Urethane Antitrust Litigation,* 768 F.3d 1245, 1250, 1255 (10th Cir. 2014) (upholding the certification of a class in a price-fixing case "based on the plaintiffs' evidence of an artificially inflated baseline" that affected the price negotiations of all buyers in the plaintiff class, even though the underlying market "comprise[d] a myriad of products, pricing structures, individualized negotiations, and contracts" (internal quotation marks and citation omitted)); *In re Optical Disk Drive Antitrust Litigation,* No. 10-md-2143, 2016 WL 467444, at *12 (N.D. Cal. Feb. 8, 2016) ("In cases involving an alleged price-fixing conspiracy, the representative plaintiff's claim is often considered typical even where the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class.").  The DPPs contend that the principles recognized in this case law are fully applicable here, where the claims of the named DPPs "arise from the same illegal practices underlying the class members' claims, and they intend to prove those claims using proof common to the class demonstrating that the conspiracy artificially inflated bearings prices."  (DPPs' Reply Br. at 5.)

The Court is not persuaded that the record establishes the requisite uniformity of illegal practices through which the named DPPs and absent class members sustained their alleged injuries.  The DPPs in this case claim that Defendants carried out an alleged price-fixing conspiracy through three means:  (i) coordinated price increases in response to price increases imposed by steel suppliers, (ii) bid-rigging in connection with RFQs issued by automotive OEMs and automotive component manufacturers, and (iii) collusion in their responses to APR requests made by automotive OEMs.  (*See*

26

DPPs' Motion, Br. in Support at 2-3, 5-14.)  Yet, as Defendants correctly observe, the named DPPs███████████████████████████████████████████████████

█████████████and they therefore "do not have the incentive (or personal knowledge needed) to develop evidence at trial of bid rigging or APR collusion for customized bearings purchased by the dominant members of the putative class."  (Defendants' Response Br. at 24.)  Rather, any damages suffered by the named DPPs presumably are traceable solely to the first of the three above mechanisms through which Defendants implemented their alleged price-fixing conspiracy.  Therefore, just as in *Optical Disk Drive,* 303 F.R.D. at 318, the evidence of Defendants' alleged bid-rigging and collusion in response to APR requests will be of no assistance in the named DPPs' effort "to prove that list prices paid by ordinary purchasers such as themselves were fixed."  To the contrary, Defendants aptly note that "the named DPPs only have the incentive to focus their trial efforts on the [steel price increase] issues that allegedly did affect them, and to pursue expert damages methodologies that result in a significant portion of any purported overcharges being attributed to the [steel price increase] agreements, as opposed to either bid rigging or APR collusion with respect to particular OEMs and tier suppliers."  (Defendants' Response Br. at 24 n.84.)

In an effort to avoid this conclusion, the DPPs first take issue with Defendants' assertion that the named Plaintiffs████████████████████████████████████████

████████████████████, and they instead insist that these three entities██████████████ (DPPs' Reply Br. at 6.)  Yet, the evidence cited in support of this claim suffers from a number of flaws.  First, each of the three witnesses identified by the DPPs is affiliated with the same named Plaintiff, McGuire, so it cannot be said from this record that the

other two named DPPs███████████.  Next, one of these three witnesses,██████
████████████████████████████████████████████████████████████████████████
███████████████████████████████████.  (*See*████████████████████████████
████████████████████████.)  As for the remaining two McGuire witnesses cited by
the DPPs, although these individuals testified that████████████████████████████
████████████████████████████████████,
(*see*█████████████████████████████████████████████████████████████), it is
clear that█████████████████████████████████████████████████████████████,
███████████████████/████████████████████████).
Given███████████████████████████████████████████████████████████████
██████████████████████████████,
and██████████████████████████████████████████████████████████████████
███████████████████, (██████████████████████████), it is clear that McGuire's claims
of injury do not arise from█████████████████████████████████████
███████████████████████████████████████████████████████████████████████.
(*See* Langenfeld Decl. at ¶
130██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████████████.)  Nor have the DPPs pointed to any
evidence that Defendants engaged in bid-rigging, market allocation, or other forms of
collusion in their responses
to███████████████████████████████████████████████████████████████████
███████████.

Next, the DPPs suggest that the three means through which Defendants carried out their alleged price-fixing conspiracy are sufficiently interconnected to support the inference that the named DPPs have sustained injuries as a result of Defendants' alleged bid-rigging and APR collusion.  If so, this would provide an incentive for the named DPPs to offer proof of these two forms of unlawful activity, even if they were not the direct targets of these efforts.  As evidence of this posited relationship, the DPPs first point to the testimony of Defendants' own expert, Kevin McCloskey, that "[a] customized bearing that was initially designed for a specific purpose may later become a bearing listed in a manufacturer's bearing catalogue."  (Defendants' Response, Ex. 1, McCloskey 7/25/2017 Decl. at ¶ 31.)  Along the same lines, the DPPs' expert, Dr. Langenfeld, has identified ██████████████████████████████████████████████ ████████████████████.  (DPPs' Reply, Ex. E, Langenfeld 11/16/2017 Reply Decl. ("Langenfeld Reply") at ¶ 85.)  Dr. Langenfeld further opines that the bearings prices paid by the named DPPs and other class members are ████████████████████████ ██████████████████████"  (*Id.* at ¶ 142.)

The problem with this line of argument, however, is that evidence of correlation does not establish causation, *see, e.g., Citizens For Tax Reform v. Deters,* 518 F.3d 375, 387 (6th Cir. 2008), and it is the DPPs' burden to show that the latter may be proven through evidence common to the class.  Stated differently, even assuming there is a statistically significant relationship between the allegedly inflated bearings prices paid by the named DPPs and by other members of the putative class, the named DPPs still lack the incentive to develop and introduce evidence that Defendants engaged in bid-rigging and APR collusion, absent any expert testimony or other evidentiary basis

for forging a causal link between such unlawful activity and damages suffered by the named DPPs.  Yet, the DPPs' experts only purport to identify statistical correlations between the bearings prices paid by various types of customers and in various market segments, and they make no attempt to identify possible causes for these correlations. Under this record, it is a matter of sheer speculation whether the named DPPs' alleged injuries might be traceable in part to Defendants' alleged bid-rigging and APR collusion, and there would be no basis for allowing a trier of fact to hear evidence of these activities in the hope that they might make this speculative leap.  Consequently, given the disparities in the circumstances under which the named DPPs and other members of the putative class purchased Bearings from Defendants, and given the divergent means through which Defendants allegedly conspired to fix the prices charged to these various types of purchasers, the Court finds that the claims asserted by the named DPPs are not typical of the claims asserted by absent class members.

It follows on similar grounds that the DPPs cannot satisfy the Rule 23(a) requirement that they must "fairly and adequately protect the interests of the class."  As stated earlier, the adequacy-of-representation prong of Rule 23(a) demands a showing that the named plaintiffs have "interests in common with, and not antagonistic to, the interests of the unnamed members of the class, and that the representatives will vigorously prosecute these interests through qualified counsel."  *In re Northwest Airlines,* 208 F.R.D. at 225.  Although Defendants do not challenge the qualifications of the DPPs' counsel, they question the named DPPs' incentive to pursue the claims of other class members, *see American Medical Systems,* 75 F.3d at 1083, where the named DPPs have not ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

███████████████████████, and thus have no stake in the outcome of antitrust claims arising from collusion in these activities.

For the reasons already explained, the Court agrees that the named DPPs lack the incentive to pursue claims based on Defendants' alleged bid-rigging or APR collusion. Accordingly, they cannot show that they will adequately represent the interests of class members that complain of injury as a result of these allegedly unlawful activities. To the contrary, Defendants correctly observe that the named DPPs have an incentive to see that the damages proven at trial are attributed as much as possible to unlawful activities that impacted bearings purchasers like them — namely, those who generally████████████████████████████████████████████████ ████████████████████. Given this likelihood that the interests of the named DPPs might diverge from the interests of other class members, the named DPPs cannot be deemed adequate representatives of the putative class.

**B.      The DPPs Have Not Shown That Common Issues Predominate over Issues Affecting Only Individual Class Members.**

Because the Court has determined that the DPPs cannot satisfy two of Rule 23(a)'s four prerequisites for certification of a class, it need not proceed any further in analyzing the DPPs' present motion. Nonetheless, for the sake of completeness, the Court will consider whether the DPPs have met the relevant criteria set forth in Rule 23(b) for maintaining a class action: namely, whether they have shown that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

For largely the same reasons cited in the Court's Rule 23(a) analysis, the Court finds that the class proposed in the DPPs' motion is not eligible for certification under the standards of Rule 23(b)(3).

In a recent decision, the Supreme Court outlined the principles that govern a court's determination whether common issues predominate over questions affecting only individual members of a putative class:

> The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof. The predominance inquiry asks whether the common, aggregation-enabling[] issues in the case are more prevalent or important than the non-common, aggregation-defeating[] individual issues. When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper [for certification] under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

*Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1045 (2016) (internal quotation marks and citations omitted). As the Court has emphasized, "Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof," but rather demands that "common questions *predominate* over questions affecting only individual class members." *Amgen,* 568 U.S. at 469, 133 S. Ct. at 1196 (internal quotation marks, alterations, and citations omitted) (emphasis in original).

The DPPs must establish "through evidentiary proof" that they satisfy the prerequisites for class certification under Rule 23(b)(3), and the Court must perform a "rigorous analysis" to ensure that these requirements are met. *Comcast Corp.,* 569 U.S. at 33, 133 S. Ct. at 1432 (internal quotation marks and citations omitted). This analysis "will frequently entail overlap with the merits of the plaintiff's underlying claim," *Comcast Corp.,* 569 U.S. at 33-34, 133 S. Ct. at 1432 (internal quotation marks and citation omitted), but "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," *Amgen,* 568 U.S. at 466, 133 S. Ct. at 1194-95. "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen,* 568 U.S. at 460, 133 S. Ct. at 1191 (internal quotation marks and alteration omitted).

Turning to the present motion, although the parties advance a whole host of arguments about why, in their view, common questions do or do not predominate over individualized inquiries, the Court chooses to focus on an issue addressed earlier in its Rule 23(a) analysis of typicality and adequacy of representation: namely, the nature of the price-fixing conspiracy alleged by the DPPs. As previously discussed, the DPPs characterize their antitrust claim in this case as resting upon allegations of "a single conspiracy to raise bearings prices in the U.S. higher than they otherwise would have been," and they assert that this alleged conspiracy "was accomplished through several mechanisms, including rigging bids, fixing prices, and allocating markets for bearings." (DPPs' Reply Br. at 28.) In Defendants' view, however, the DPPs have "allege[d] three separate types of antitrust liability and impact in this case: (i) bid rigging of specific

33

RFQs for specific OEMs and tier suppliers; (ii) collusion with respect to APR requests for certain automotive OEMs and tier suppliers; and (iii) five separate [steel price increase] agreements." (Defendants' Response Br. at 48.) Defendants contend that these three separate theories of liability give rise to the very same problem that defeated class certification in *Comcast Corp.*: a disjunction between a party's theory of liability and antitrust impact and its theory of damages.

In order to resolve the parties' dispute on this point, the Court first must examine more closely the Supreme Court's decision in *Comcast Corp.* In that case, the plaintiff cable television subscribers asserted that defendant Comcast had engaged in a series of "clustering" transactions with other cable television providers that left Comcast in a dominant position in Philadelphia and its surrounding communities, and they alleged that this "clustering scheme . . . harmed subscribers in the Philadelphia cluster by eliminating competition and holding prices for cable services above competitive levels." *Comcast Corp.,* 569 U.S. at 29-30, 133 S. Ct. at 1430. In support of this antitrust claim, the plaintiffs "proposed four theories of antitrust impact," each of which allegedly "increased cable subscription rates throughout the Philadelphia" market area. 569 U.S. at 31, 133 S. Ct. at 1430-31. The plaintiffs moved for class certification, and the district court accepted one of their theories of antitrust impact — the so-called "overbuilder" theory — as capable of being proved on a classwide basis, but it "rejected the rest." 569 U.S. at 31, 133 S. Ct. at 1431. The district court "further found that the damages resulting from [the overbuilder theory of] impact could be calculated on a classwide basis," but it failed to take note that the model of damages put forward by the plaintiffs'

34

expert calculated damages in the aggregate, and "did not isolate damages resulting

from any one theory of antitrust impact." 569 U.S. at 31-32, 133 S. Ct. at 1431.[4]

The Supreme Court held that the district court had improperly certified the case

as a class action under Rule 23(b)(3). 569 U.S. at 34, 133 S. Ct. at 1432. In so ruling,

the Court "start[ed] with an unremarkable premise":

> If [the plaintiffs] prevail on their claims, they would be entitled only to
> damages resulting from reduced overbuilder competition, since that is the
> only theory of antitrust impact accepted for class-action treatment by the
> District Court. It follows that a model purporting to serve as evidence of
> damages in this class action must measure only those damages
> attributable to that theory. If the model does not even attempt to do that, it
> cannot possibly establish that damages are susceptible of measurement
> across the entire class for purposes of Rule 23(b)(3). Calculations need
> not be exact, but at the class-certification stage (as at trial), any model
> supporting a plaintiff's damages case must be consistent with its liability
> case, particularly with respect to the alleged anticompetitive effect of the
> violation.

569 U.S. at 35, 133 S. Ct. at 1433 (internal quotation marks and citations omitted). The

Court then explained that the lack of fit between the plaintiffs' theory of antitrust impact

and their expert's model of damages precluded certification of a class:

> There is no question that the model failed to measure damages
> resulting from the particular antitrust injury on which [Comcast's] liability in
> this action is premised. The scheme devised by [the plaintiffs'] expert, Dr.
> McClave, sought to establish a "but for" baseline — a figure that would
> show what the competitive prices would have been if there had been no
> antitrust violations. Damages would then be determined by comparing to
> that baseline what the actual prices were during the charged period. The
> "but for" figure was calculated, however, by assuming a market that
> contained none of the four distortions that [the plaintiffs] attributed to
> [Comcast's] actions. In other words, the model assumed the validity of all
> four theories of antitrust impact initially advanced by [the plaintiffs] . . . . At
> the evidentiary hearing, Dr. McClave expressly admitted that the model

---

[4]The plaintiffs' expert in that case, Dr. James McClave, is likewise serving as an
expert for the DPPs in this case.

35

calculated damages resulting from the alleged anticompetitive conduct as a whole and did not attribute damages to any one particular theory of anticompetitive impact.

* * * *

In light of the model's inability to bridge the difference between supra-competitive prices in general and supra-competitive prices attributable to [the overbuilder theory of impact], Rule 23(b)(3) cannot authorize treating subscribers within the Philadelphia cluster as members of a single class. Prices whose level above what an expert deems "competitive" has been caused by factors unrelated to an accepted theory of antitrust harm are not "anticompetitive" in any sense relevant here. The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event.* The District Court . . . ignored that first step entirely.

569 U.S. at 36-38, 133 S. Ct. at 1433-35 (internal quotation marks, citations, and footnotes omitted).

This case presents essentially the same problem addressed by the Supreme Court in *Comcast Corp.* If this suit goes forward as the class action proposed by the DPPs, the trier of fact will hear evidence of three different mechanisms through which Defendants allegedly conspired to fix the prices of bearings. So far as the Court can tell, nothing would prevent the trier of fact from concluding that Defendants engaged in one or two of these price-fixing mechanisms — say, bid-rigging in the RFQ process and collusion in their responses to APR requests — but not the others. Under this scenario, the only class members that could claim antitrust impact and resulting damages would be those that purchased bearings through the means that were subject to conspiratorial activity — in this example, through RFQs or contracts with APR provisions. It appears, in other words, that each of the three price-fixing mechanisms identified by the DPPs is independent from the others, in terms of both Defendants' capacity to invoke it and its effect upon the relevant subset of Defendants' customers.

36

As already discussed, however, the named DPPs and other similarly-situated members of the Plaintiff class — *i.e.,* small distributors of primarily industrial bearings — generally did not ███████████████████████████████. Likewise, even assuming that some of their bearing purchases were governed by contracts, there is no evidence that ███████████████████████████████. Yet, the DPPs' proposed showing of classwide antitrust impact and damages through common evidence rests almost entirely upon expert regression analysis and testimony about the overall nature and characteristics of the market for bearings.  Nowhere in this body of evidence do the DPPs or their experts purport to isolate the effects of a given conspiratorial effort — *e.g.,* collusion in Defendants' responses to RFQs — upon all or a significant portion of the proposed class.  (*See, e.g.,* Dkt. 299, Ex. 3, McClave 12/9/2017 Dep. at 17-20 (acknowledging that ██████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████).)  Rather, as discussed earlier, the DPPs and their experts claim only that there is a correlation in the prices paid for bearings across various segments of the putative class, such as OEM and aftermarket customers.

As explained by the Supreme Court, this leads to the prospect that the DPPs' proposed methodology for establishing antitrust impact and damages through classwide evidence will "identif[y] damages that are not the result of the wrong."  *Comcast Corp.,* 569 U.S. at 37, 133 S. Ct. at 1434.  Even assuming that the trier of fact determines that Defendants engaged in one or more (but less than all) of the forms of concerted action identified by the DPPs as the means by which they carried out their antitrust conspiracy,

and further assuming that the trier of fact credits the testimony of the DPPs' experts that there was a positive correlation among all members of the putative class in the prices paid for bearings, this still leave the trier of fact without guidance in ascertaining the *cause* of this correlation, much less ensuring that this cause is traceable to Defendants' violation of antitrust law.  Just as in *Comcast Corp.,* then, there is a lack of fit between the antitrust conspiracy posited by the DPPs and the methodology through which they seek to establish classwide antitrust impact and damages.  The DPPs' model cannot "bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to" a given theory of antitrust impact.  *Comcast Corp.,* 569 U.S. at 38, 133 S. Ct. at 1435.

Consequently, in accordance with the Supreme Court's ruling under analogous circumstances, the Court finds that the DPPs cannot satisfy the requirement under Rule 23(b)(3) that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Although it is perhaps possible that the DPPs could propose a smaller class or subclasses that would overcome this deficiency, the Court declines to do so on the DPPs' behalf, where the record before the Court on the DPPs' present motion does not permit such a determination, and where the DPPs have not put suggested any such alternative in the briefs accompanying their motion.

This leaves only the question whether the DPPs have established the second prong of the showing demanded under Rule 23(b)(3) — *i.e.,* whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  In Defendants' view, the DPPs' showing on this point is defeated by "the significant interests and unquestioned abilities of the large OEMs that dominate the

38

proposed class to control and prosecute their own claims." (Defendants' Response Br. at 25.) Given the language in Rule 23 itself requiring the Court to consider "the class members' interests in individually controlling the prosecution or defense of separate actions," Fed. R. Civ. P. 23(b)(3)(A), and given that the automotive OEMs are represented by "venerable law firms" and have "enormous resources" to devote to this litigation if they so choose, (Defendants' Response Br. at 26), Defendants argue that these larger members of the putative class have both the means and the incentive to vindicate their own claims.

In response, the DPPs first note that although the automotive OEMs unquestionably have the wherewithal to pursue separate actions, Defendants have identified only one example of them doing so in the MDL — *i.e.,* a suit brought by Ford Motor Company in the wire harness case — and none whatsoever in this Bearings litigation. This, of course, calls into question the interests and incentives of the automotive OEMs to "individually control[] the prosecution" of the claims asserted on their behalf in this case. Indeed, even Defendants express their "expect[ation] that most OEM and tier supplier claims will resolve out of court." (Defendants' Response Br. at 26.) Assuming this is so, the presence of these large entities in the putative class seemingly does not jeopardize the manageability of this suit as a class action.

The DPPs also point to cases that have rejected the argument advanced by Defendants under circumstances similar to those presented here. In *Cardizem CD,* 200 F.R.D. at 325, for instance, the defendants challenged the superiority of a class action on the ground that the proposed class included "some very large corporations with sizable individual claims, who are fully capable of bringing their own individual actions."

39

The court nonetheless found that the Rule 23(b)(3) requirement of superiority was satisfied, observing that "not all of the . . . class members are large businesses with large claims," and that there instead was "diversity both in the size of their businesses and in the size of their claims." *Cardizem CD,* 200 F.R.D. at 325. In light of this diversity, the court reasoned that it was "not obvious that all members of the class could economically bring suits on their own," nor that "all members of the class would be willing to independently sue their suppliers." 200 F.R.D. at 325 (internal quotation marks and citation omitted). More generally, the court explained that "the presence of large claimants in a proposed antitrust class and the possibility that some of them might proceed on their own does not militate against class certification." 200 F.R.D. at 325 (internal quotation marks and citations omitted); *see also In re Domestic Drywall Antitrust Litigation,* 322 F.R.D. 188, 201 (E.D. Pa. 2017) (noting that the class in that case included both "large entities" and "several small and medium sized plaintiffs who would otherwise lack the resources or incentives to pursue individual actions," and holding that "the presence of large retailers as class members does not defeat superiority").

Finally, the Court agrees with the DPPs that the cases cited by Defendants are distinguishable. In *Optical Disk Drive,* 303 F.R.D. at 317, there was a stark difference between the larger and smaller members of the putative class, with two large OEMs "together account[ing] for almost half of defendants' dollar value sales during the class period" and "[o]ther OEMs and major distributors account[ing] for another 37.8%" of these sales. Against this backdrop, the defendants argued that "the real parties in interest are a 'handful' of OEMs who can bring their own actions," and the court noted

40

that one of these OEMs had already done so.  *Optical Disk Drive,* 303 F.R.D. at 322.

Here, in contrast, while there are significant disparities among the members of the

putative class in the volume and dollar value of their bearings purchases, it cannot be

said that this litigation is dominated by a mere "handful" of OEMs, and none of these

larger entities has actually brought a separate suit arising from its purchase of bearings.

Next, in *Plotnick v. Computer Sciences Corp. Deferred Compensation Plan for

Key Executives,* 182 F. Supp.3d 573, 591 (E.D. Va. 2016), *aff'd,* 875 F.3d 160 (4th Cir.

2017), the court noted that "the members of the proposed class are all highly-

compensated and presumably financially sophisticated former executives for a major

multinational corporation."  In light of this sophistication and the "potentially six-figure (or

greater) claims of many of the class members," the court found that "certifying a class in

this instance would not further the central goal of the Rule 23(b)(3) mechanism, as the

proposed class members have sufficient incentives to enforce their own rights on their

own terms."  *Plotnick,* 182 F. Supp.3d at 591.  Similarly, in another case cited by

Defendants, the members of the putative class were "high net-worth investors with large

claims, capable of litigating individually," and in fact "approximately 25 class members

ha[d] already brought individual lawsuits."  *Kottler v. Deutsche Bank AG,* No. 05-7773,

2010 WL 1221809, at *5 (S.D.N.Y. March 29, 2010); *see also Becnel v. KPMG LLP,*

229 F.R.D. 592, 598 (W.D. Ark. 2005) (observing that "the putative class members

involved in this case are wealthy investors who are financially able to pursue and

manage their own litigation," and that this was "apparent by the lawsuits already filed on

an individual basis by potential members of the class").  This case, by contrast, features

no such uniformity among the class members in their capacity to vindicate their rights through individual suits — and, as noted, no such suits have actually been filed.

Accordingly, the Court is satisfied that a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Nonetheless, because the DPPs have not satisfied the other requirement of Rule 23(b)(3) — namely, that "questions of law or fact common to class members predominate over any questions affecting only individual members" — the Court finds that the DPPs have not demonstrated a basis under Rule 23(b) for pursuing the class action proposed in their motion.

## V.     CONCLUSION

For these reasons, the Court **DENIES** the Direct Purchaser Plaintiffs' March 20, 2017 motion for class certification (Dkt. 216).

**IT IS SO ORDERED.**

Date:   January 7, 2019                          s/Marianne O. Battani
                                                 MARIANNE O. BATTANI
                                                 United States District Judge

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on January 7, 2019.

                                                 s/ Kay Doaks
                                                 Case Manager